**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re,<br><br>Joseph Walker & Company, Inc.,<br><br>                                          Debtor. | C/A No. 10-01948-JW<br><br>Adv. Pro. No. 11-80023-JW<br><br>Chapter 7 |
| Arabi Gin Co.,<br>BCT Gin Co., Inc.,<br>Coley Gin & Fertilizer Co.,<br>Jones County Cotton Gin, Inc., and<br>Henry County Gin, LLC,<br><br>                                          Plaintiff(s),<br><br>v.<br><br>Plexus Cotton, Ltd.,<br>Plexus Cotton USA, Inc.<br>Nicholas Peter Francis Earlam<br>Laurence Kirby, and<br>Joseph Walker & Co., Inc.,<br><br>                                          Defendant(s). | **ORDER ON<br>PARTIES' CROSS MOTIONS FOR<br>SUMMARY JUDGMENT** |

This matter is before the Court on cross motions for summary judgment filed by Plaintiffs Arabi Gin Company, BCT Gin Company, Inc., Coley Gin & Fertilizer Company, Jones County Cotton Gin, Inc., and Henry County Gin, LLC ("Plaintiffs"); and Defendants Plexus Cotton, Ltd., Plexus Cotton USA, Inc., Nicholas Peter Francis Earlam, Forester Adams, Edward Clarke, Laurence Kirby, and Mark English.   After a hearing and consideration of the record, applicable law, and arguments of counsel, the Court denies Plaintiffs' motion and grants Defendants' motion in part and denies it in part for the reasons set forth below.

1

## JURISDICTION

This Court has jurisdiction over the proceeding pursuant to 28 U.S.C. §§ 1334, 157 (2012). This matter is a non-core proceeding under 28 U.S.C. § 157(b)(2), as it is "otherwise related to" the Chapter 7 bankruptcy case of Joseph Walker & Company, Inc. ("Debtor"). *See* 28 U.S.C. § 157(c)(1) (2012). The parties have expressly consented to this Court's entry of final orders or judgments and, therefore, the Court is permitted "to hear and determine and to enter appropriate orders and judgments."[1]   28 U.S.C. § 157(c)(2) (2012). If it is determined that this Court does not have authority to enter its Order herein as a final order, the Court submits this determination as proposed findings of fact and conclusions of law to the United States District Court for review.[2]

## FINDINGS OF FACT

### Procedural Background

1.       On March 23, 2011, Plaintiffs commenced this adversary proceeding by filing a complaint ("Original Complaint") asserting personal, state-law based claims against Defendants for piercing Debtor's corporate veil, alter ego, breach of fiduciary duty to creditors, breach of contract, fraud, negligent misrepresentation, civil conspiracy, tortious interference, promissory estoppel, and constructive trust.[3]   Plaintiffs seek compensatory damages of $10,687,356.72 and punitive damages of $100,000,000.00. The claims relate to separate contracts entered into by

---

[1] Plaintiffs state in their Original and Amended Complaints their position that this adversary proceeding "is a core proceeding . . . and may be finally determined" by this Court. Defendants consented to this Court's entry of final orders or judgments in their Answer to Plaintiffs' Amended Complaint filed November 23, 2011. The Court recognizes that the effect of consent to final judgment remains an outstanding issue following the Supreme Court's decisions in *Stern v. Marshall* and *Exec. Benefits Ins. Agency v. Arkison;* however, it believes it has final judgment authority based on the express consent of these sophisticated parties. *See Stern v. Marshall,* 131 S. Ct. 2594 (2011); *Executive Benefits Ins. Agency v. Arkison,* 134 S. Ct. 2165 (2014).

[2] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any conclusions of law constitute findings of fact, they are so adopted.

[3] At the hearing on these motions, Plaintiffs formally withdrew their claims for civil conspiracy and constructive trust.

Debtor in the fall of 2007 and spring of 2008 to purchase cotton to be harvested in the fall of 2008 from seven cotton gins, including the five Plaintiffs ("Ginner Contracts").

2.       On August 1, 2011, Defendants filed their Answer to the Original Complaint.

3.       Following the filing of the Original Complaint and after the Court inquired about the Chapter 7 Trustee for Debtor's case, Michelle L. Vieira's ("Trustee"), view of this litigation, counsel for Plaintiffs entered into negotiations with the Trustee about acquiring any interest in the Original Complaint's claims possessed by Debtor's bankruptcy estate.  On September 29, 2011, the Trustee filed a Notice and Application for Sale of Property, which sought approval to sell to Plaintiffs the "Estate's interest in the causes of action enumerated in the [Original Complaint]."  On November 21, 2011, this Court entered, with the parties' consent, an Order Authorizing Sale of Asset ("Order of Sale"), which held that the Trustee was authorized to sell "the Estate's interest in the nine causes of action asserted in the Adversary Proceeding No. 11-80023-jw [pending at the time]."[4]

4.       On November 10, 2011, Plaintiffs filed an Amended Complaint, which removed Dave McCarthy, J. Walker Clarke, Jr., Lawrence Fritz, and Joseph Pearson as Defendants and added Laurence Kirby and Mark English to reflect the composition of Debtor's board of directors at the times relevant to Plaintiffs' claims.  Neither Plaintiffs' Original nor Amended Complaint contained an allegation of a derivative claim for breach of the fiduciary duties owed by directors and officers to the corporation and/or shareholders they serve.

5.       On November 23, 2011, Defendants filed their Answer to the Amended Complaint.

6.       After considerable discovery, a number of amended scheduling orders, and discovery disputes relating to the deposition of Nicholas Peter Francis Earlam and Plexus Cotton,

---

[4] Defendants maintain that neither the Estate nor Trustee possessed any interest in Plaintiffs' claims as pled.

Ltd., Plaintiffs filed a Motion to Intervene on October 8, 2012 to allow Debtor to intervene as a plaintiff and allow Plaintiffs to file a Proposed Intervenor Complaint asserting several new causes of action against Defendants Plexus Cotton Ltd., Nicholas Peter Francis Earlam, and Laurence Kirby.[5]

7.    By order entered November 21, 2012, the Court denied the Motion to Intervene, holding that the causes of action set forth in the Proposed Intervenor Complaint did not fall within the scope of the Order of Sale because the claims alleged were not part of the original pleading and therefore Plaintiffs, as opposed to the Trustee, were not the proper parties in interest and lacked standing to assert the proposed claims against Defendants on Debtor's behalf. Plaintiffs did not pursue additional sales or assignments by the Trustee and the Trustee, on behalf of Debtor, has not asserted the new claims as a party to this lawsuit.

8.    After additional discovery and a further amended scheduling order, Defendants' Motion for Summary Judgment on all causes of action in the Amended Complaint was filed on August 30, 2013.[6]

9.    Plaintiffs filed their Motion for Partial Summary Judgment on their claims of breach of fiduciary duty to creditors and tortious interference on September 27, 2013.

10.    After the hearing on the summary judgment motions, the parties entered into a Stipulation of Dismissal of Certain Defendants, filed February 3, 2014, which dismissed with

---

[5] The causes of action set forth in Plaintiffs' Proposed Intervenor Complaint included breach of contract, breach of fiduciary duty, civil conspiracy, fraudulent concealment, promissory fraud, and tortious interference. Plaintiffs also requested, on behalf of Debtor, a declaratory judgment voiding contracts 8001A and 8001B and enforcing Contract 8001 as well as the Plexus Limited Agreement; these contracts and this Agreement are discussed in further detail below. The causes of action enumerated in the Proposed Intervenor Complaint were not included in the Original or Amended Complaints and, to date, none of Plaintiffs' pleadings have been further amended.

[6] Although Defendants' Motion is captioned alternatively as a Motion for Summary Judgment and Judgment on the Pleadings, the Court will treat the motion as one solely for summary judgment due to Defendants' reliance on matters outside of the pleadings in making their arguments. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

prejudice the following former directors of Debtor: Forester Adams, Edward Clarke, J. Walker Clarke, Sr., and Mark English.  The remaining Defendants include only Nicholas Peter Francis Earlam, Laurence Kirby, Plexus Cotton, Ltd., and Plexus Cotton USA, Inc.

### The Parties and Other Relevant Entities

11.    Plaintiffs are five cotton gins located in Alabama, Georgia, and North Carolina:

    a.   Plaintiff Henry County Gin, LLC ("Henry County"), is a domestic limited liability company organized under Alabama law with its principal place of business located in Alabama.

    b.   Plaintiffs Arabi Gin Company ("Arabi"), BCT Gin Company, Inc. ("BCT"), and Coley Gin & Fertlizer Company ("Coley") are corporations organized under Georgia law with their principal places of business located in Georgia.

    c.   Plaintiff Jones County Cotton Gin, Inc. ("Jones County") is a corporation organized under North Carolina law with its principal place of business located in North Carolina.

12.    Roanoke Tar Cotton ("RTC") and Tri-County Gin, Inc. ("Tri-County") are the remaining two of the seven gins involved in the Ginner Contracts.  RTC and Tri-County (collectively, "Assignor-Gins") are corporations, both organized under North Carolina law with their principal places of business located in North Carolina.  Plaintiffs acquired by assignment the Assignor-Gins' interests in the claims set forth in the Amended Complaint.[7]

13.    Debtor was added by Plaintiffs as a nominal defendant in this adversary proceeding.  Debtor, as a corporation organized under South Carolina law with its principal place

---

[7] The parties agree the Assignor-Gins' interests in any claims of fraud and negligent misrepresentation were not assignable.  Therefore, Plaintiffs carry only the Assignor-Gins' interests in the actions for piercing of Debtor's corporate veil, alter ego, breach of contract, breach of fiduciary duty to creditors, tortious interference, and promissory estoppel.

of business located in Columbia, South Carolina, filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on March 18, 2010.  As of the date of this Order, Debtor's bankruptcy case is still pending.

14.    Nicholas Peter Francis Earlam ("Earlam") and Laurence Kirby ("Kirby") are the two remaining individual Defendants and both are residents of Liverpool, United Kingdom. During the time period relevant to this proceeding, Earlam served Plexus Cotton, Ltd. as the chairman of its board of directors and as a high-level executive manager. Earlam also served on Debtor's board of directors, becoming its chairman on or around October 6, 2008.[8]  During the same time period, Kirby served as the chief financial officer, corporate secretary, and a member of the board of directors for Plexus Cotton Ltd. and also served on Debtor's board of directors.

15.    Defendant Plexus Cotton, Ltd. ("Plexus Limited") is a foreign corporation organized under the laws of the United Kingdom with its principal place of business located in the United Kingdom, and is engaged in the international cotton trade.  Plexus Limited was the majority shareholder of Debtor prior to its bankruptcy filing and Debtor functioned as its overseas subsidiary.   Additionally, three representatives of Plexus Limited—Mark English, Earlam, and Kirby—served on Debtor's five-person board of directors.

16.    Defendant Plexus Cotton USA, Inc. ("Plexus USA") is a corporation organized under South Carolina law with its principal place of business located in Columbia, South Carolina.  Prior to Debtor's bankruptcy filing, it was a wholly-owned subsidiary of Debtor.

17.    Debtor, Plexus Limited, and Plexus USA were members of a cooperative of businesses referred to by the parties as the Plexus Group.  The entities also participated in a joint marketing effort which has been referred to as the Cotton Alliance.

---

[8] October 6, 2008 is an important date in this litigation. As discussed more fully below, Debtor's board of directors voted on October 6, 2008 to modify Contract 8001.

18.     Albrecht Mueller-Pearse ("Albrecht") was a German corporation which shared an established business relationship with the Plexus Group from prior dealings.  Albrecht went into German insolvency proceedings and receivership in February of 2009 and its assets have since been liquidated.   Two of Albrecht's subsidiaries, Friedrich W. Kaemena & Company ("Kaemena") and Hong Kong Cotton Company ("HKC"), remained viable enterprises after the liquidation.

19.     At all relevant times, the following parties held an ownership interest in the following entities: (1) Plexus Limited held a 57% share of Debtor, positioning it as Debtor's controlling majority shareholder; (2) Earlam held a 36.5% share of Plexus Limited; (3) Mrs. Earlam held a 23.8% share of Plexus Limited which, combined with her husband's interest, provided the couple with a 60.3% controlling majority share of the entity; (4) Albrecht held a 31.4% share in Plexus Limited; (5) Earlam held a 7% share of Albrecht; (6) Kaemena and HKC (collectively, "Subsidiaries") were 100% wholly-owned subsidiaries of Albrecht; and (7) Plexus USA was a 100% wholly-owned subsidiary of Debtor.

**Factual Background**

20.     Between July 10, 2007 and March 5, 2008,[9] Debtor entered into the Ginner Contracts through which it agreed to purchase from the Ginners a total of 51,825 bales of 2008/2009 new crop cotton.[10]   The Ginners were to deliver the contracted cotton to Debtor

---

[9] Specifically, the Ginners executed their respective agreements with Debtor on the following dates: (1) Arabi – January 14, 2008, January 15, 2008, and January 24, 2008; (2) BCT – January 11, 2008, January 14, 2008, January 15, 2008, and February 21, 2008; (3) Coley – January 18, 2008; (4) Jones County – July 10, 2007 and January 14, 2008; (5) RTC – September 20, 2007 and February 26, 2008; (6) Tri-County – January 15, 2008; and (7) Henry County – September 7, 2007, January 22, 2008, and March 5, 2008.
[10] The Court's understanding of the term "2008/2009 new crop cotton," as used in the Ginner Contracts, is that it refers to cotton harvested by farmers and thereafter obtained by the Ginners (all of which were located in the southeastern region of the United States) in the months of September through December of 2008.

within thirty days of classing,[11] but no later than January 15, 2009.  Cotton delivered under the

Contracts after January 15, 2009 could be accepted only at Debtor's option.

21.    According to the Ginner Contracts, the price of the cotton was to be set at a later

point in time.

22.    The following provision was included in each of the Ginner Contracts:

> Seller [Ginner] agrees and understands that Buyer [Debtor] in
> reliance on this contract and the fixations above will enter into
> offsetting contractual commitments to sell such cotton, and should
> Seller [Ginner] fail to deliver all eligible production from the
> specific acreage, Seller agrees to pay the Buyer [Debtor] on
> demand the amount of actual damages suffered by Buyer by reason
> of Seller's [Ginner's] failure to so deliver, such damages to include
> but not be limited to consequential damages, expenses related to
> commodities exchange margin calls, costs of cover, legal fees, and
> expenses and any other damages or losses.

The form of offsetting contractual commitment to which these provisions refer is known as a

hedge.[12]

22.    Since hedging is a common practice in the cotton trading industry, it appears that,

due in part to representations made to the Ginners by Debtor, the Ginners expected Debtor to

have a hedge in place to offset its purchases from the Ginners.[13]

---

[11] "Classing" refers to the process which occurs after raw cotton is delivered by farmers to a cotton gin to be baled.
Samples are taken from each bale and are classed according to fiber strength, length, uniformity, color, and other
factors; classing establishes the quality of each bale of ginned cotton and plays a role in the ultimate pricing of the
cotton.  The Ginner Contracts set general parameters for the quality of cotton Debtor contracted to purchase from the
Ginners, but the official determination of each bale's quality level was incapable of determination until the raw
cotton was harvested, ginned, baled, and sent to a classing service or agency.

[12] "'A hedge . . . is a form of insurance against unfavorable fluctuations in the price of a commodity in which a
position has already become fixed or, as in the case of a producer such as a cotton grower, will become fixed in
normal course and the sale, liquidation, or use of the commodity is to occur at some time in the future.'" *Carpenter
v. C.I.R.*, 25 T.C.M. (CCH) 965 (1966) (quoting *Muldrow v. C.I.R.*, 38 T.C. 907, 913 (1962)).

[13]    Deposition testimony of the Ginners' representatives provides the consistent position that the Ginners were
"surprised when [they] found out this cotton was not hedged."  *See* Depo. of Van Muphy, P. 103, L. 10–13; *see also*
Depo. of Linda Exum.  Based on prior representations made to the Ginners by Debtor, the Ginners believed Debtor
had "some hedges [sic] positions and that [Debtor] had the cotton sold to a farm merchant."  *See* Depo. of Thomas
Waller, P. 46, L. 8–11; *see also* Depo. of Craig Huckaby, P. 190, L. 10–20.
    In addition to hedging in the futures market, several Ginner representatives testified about the practice of
creating an offsetting commitment by way of a physical sale—Defendants have repeatedly used the term "physical

23.     In the spring of 2008, Debtor incurred multiple margin calls[14] on its futures contract positions.[15]  On or around March 18, 2008, Plexus Limited loaned Debtor $500,000.00 to assist Debtor in satisfying a margin call in the amount of $833,003.00. According to Debtor's chief financial officer, Dave McCarthy, Debtor borrowed an additional $118,000.00 from Plexus Limited to meet another margin call in the spring of 2008.  Presumably as a result of the financial burden that came with meeting numerous margin calls,[16] Debtor chose to shift away from hedging in the futures market and sought a physical hedge to offset the Ginner Contracts.

24.     The occurrence of margin calls was not unique to Debtor; the extreme volatility of the cotton markets in 2008 affected various merchants across the globe.  In March 2008, cotton futures prices rose to practically unprecedented levels which, in turn, resulted in a disconnect between physical cotton prices and futures prices.  As prices fluctuated from their March high, brokerage firms were prompted to make margin calls on their customers.

---

hedge" in reference to such a sale whereas Linda Exum of BCT referred to it as a "physical sale" or "a back-to-back sale, where you buy it from me and sell it to somebody else, [and] that you were locked in."  *See* Dep. of Linda Exum, P. 50, L. 1–8; P. 121, L. 23 – P. 122, L. 22.  Hereinafter, the Court will use the term "physical hedge" when referring to such a transaction. The Ginners' representatives' deposition testimony indicates that Debtor at some point informed the Ginners that it had physical hedges via contracts with foreign buyers to purchase from Debtor the cotton that would be sold to it by the Ginners. *See, e.g.*, Depo. of Thomas Waller, P. 91, 93, 117–18; Depo. of Van Murphy, P. 46, L. 3–17.  These "foreign buyers" and the details of their contractual relationship with Debtor are discussed further herein.

[14] The United States Commodity Futures Trading Commission's Glossary ("CFTC Glossary") defines this type of "margin call" as a "request from a brokerage firm to a customer to bring margin deposits up to initial levels." CFTC defines  "margin" as "[t]he amount of money or collateral deposited by a customer with his broker, by a broker with a clearing member, or by a clearing member with a clearing organization," and notes that "[t]he margin is not partial payment on a purchase"—when a futures position is opened, the amount of margin required by a broker at that stage is referred to as the "initial margin." *See* CFTC Glossary, at http://www.cftc.gov/consumerprotection/educationcenter/cftcglossary/index.htm.  "'A margin call usually occurs when the market prices of the securities are falling.'"  *Huffington v. T.C. Grp., L.L.C.*, 685 F. Supp. 2d 239, 241 n.5 (D. Mass. 2010), *aff'd*, 637 F.3d 18 (1st Cir. 2011) (quoting Black's Law Dictionary 217 (8th ed. 2004)).

[15] The CFTC Glossary defines a "futures contract" as "[a]n agreement to purchase or sell a commodity for delivery in the future: (1) at a price that is determined at initiation of the contract; (2) that obligates each party to the contract to fulfill the contract at the specified price; (3) that is used to assume or shift price risk; and (4) that may be satisfied by delivery or offset." Unlike forward contracts, which are private agreements between two parties, futures contracts are exchange-traded.  Futures contracts have clearing houses that guarantee the transactions, which lowers the probability of default. *See* www.investopedia.com/terms/f/futurescontract.asp.

[16] The record provides inconsistent evidence regarding the motivation for Debtor's decision to seek out a physical hedge against the Ginner Contracts.  Based on a review of the relevant deposition testimony and the report of Defendants' solvency expert, Loretta Cross, the Court believes the aforementioned statement accurately reflects the available evidence.

25.    On March 23, 2008, around the same time Debtor received the margin calls discussed above, Earlam received an email from a member of Debtor's board, Forester Adams ("Adams"), about impending financial troubles and the state of Debtor's business.    Earlam responded the next day, raising the idea that Debtor consider moving the Ginner Contracts to "another company within the [Plexus] group."    Shortly thereafter, Adams began discussing with Albrecht the possibility of arranging a sale of cotton from Debtor to Albrecht which would function as a physical hedge to offset Debtor's obligations under the Ginner Contracts.

26.    Adams emailed Earlam on April 1, 2008 to confirm the execution of a forward contract[17] between Debtor and Albrecht ("Contract 8001").    Contract 8001 provided that Albrecht would purchase 61,000 bales of "2008/2009 crop" cotton from Debtor, which encompassed the 51,825 bales of "2008/2009 new crop cotton" Debtor was to purchase from the Ginners.    Per the Contract's terms, the price for 45,090 bales of the cotton to be sold under Contract 8001 was fixed based on the market price for cotton on the earlier date of March 4, 2008.    Additional backdated price fixations occurred on March 5th and 11th, which were two of the year's highest price days for cotton at the time of Contract 8001's execution.    The parties agree that Contract 8001 was relied upon by Debtor as a physical hedge against the Ginner Contracts.

27.    Contract 8001 provided for "prompt delivery" of the cotton, which required Debtor to deliver the contracted cotton to Albrecht within two to three weeks after Debtor

---

[17] The CFTC Glossary describes a "forward contract" as follows:

> A cash transaction common in many industries, including commodity merchandising, in which a commercial buyer and seller agree upon delivery of a specified quality and quantity of goods at a specified future date. Terms may be more "personalized" than is the case with standardized futures contracts (i.e., delivery time and amount are as determined between seller and buyer). A price may be agreed upon in advance, or there may be agreement that the price will be determined at the time of delivery.

The Ginner Contracts as well as Contract 8001 were, by definition, forward contracts.

obtained warehouse receipts from the Ginners for the cotton purchased under the Ginner Contracts.

28.    Around the same time Contract 8001 was executed, a cooperative of businesses including Albrecht—referred to by the parties as the Albrecht Group—engaged in merger discussions with the Plexus Group.  A formal meeting to discuss a potential merger between the Albrecht and Plexus Groups took place in late April 2008.

29.    On April 9, 2008, after Debtor entered into Contract 8001, Earlam sent an email to Fritz Grobien ("Grobien"), a managing partner at Albrecht.  Earlam's email stated in pertinent part that "Plexus will write a letter to [Albrecht] saying that they take over all obligations of this contract . . . ."  The promise was formally memorialized on April 15, 2008 in a writing ("Plexus Limited Agreement"), signed by Earlam, which read as follows:

> Dear Fritz
>
> Ref: Joseph Walker Company's Sale no. 8001
>
> This letter serves to confirm that the performance of this contract is one hundred percent at the responsibility of Plexus Cotton Limited.
>
> I appreciate your signing it and sending it back to Joseph Walker Co.
>
> With kindest regards and thanks for your help.
>
>
> Yours sincerely,
>
>
> NPF Earlam

Earlam's fellow dual-director, Kirby, was the only other member of Debtor's board who was aware of the Plexus Limited Agreement.  The parties agree that the language of the Plexus

Limited Agreement, at a minimum, constituted a promise that Plexus Limited would cover any financial disadvantages suffered by Albrecht as a result of its performance under Contract 8001.[18]

30.     At some point after the Plexus Limited Agreement was memorialized but before the end of 2008, Earlam learned from Kirby that the Plexus Limited Agreement would need to be reflected as a contingent liability on Plexus Limited's books unless it was replaced with a new agreement under which liability for losses would be placed on an individual or entity other than Plexus Limited.  According to Earlam, this was accomplished by a verbal agreement between himself and Grobien of Albrecht as early as September 2008 and prior to October 6, 2008 ("Earlam Agreement"), under which Earlam agreed to be personally responsible for any losses incurred by Albrecht as the result of having entered into Contract 8001.[19]

31.     The evidence indicates that as early as September 27, 2008 Debtor was aware of Albrecht's desire to renegotiate Contract 8001. On October 6, 2008, Albrecht formally communicated to Debtor via email that its performance under Contract 8001 was no longer possible.  Albrecht sought to modify Contract 8001 to transfer and split its purchase obligations between two of Albrecht's Subsidiaries, Kaemena and HKC, and include an extended delivery timeframe.  At the time of these communications and proposals, evidence shows that Albrecht may have had adequate financing to make the purchases under Contract 8001, but doing so would have placed it into extreme economic hardship by straining its credit lines.

---

[18] Plaintiffs have argued that the Plexus Limited Agreement has a much broader scope which instead would cover any losses whatsoever that Albrecht suffered in relation to Contract 8001, including any losses caused by Debtor's nonperformance.  Plaintiffs' position, presumably taken from a literal reading of Earlam's April 15th email, aligns with their arguments discussed herein in relation to their fraud claims, which in part allege that Earlam—individually, on behalf of Plexus Limited, or both—verbally pledged to "stand behind" the Ginner Contracts.

[19] Although the exact wording of this verbal agreement is unknown to the Court, it is reasonable to infer that the terms of Earlam's verbal commitment given in September were the same as those later memorialized on December 23, 2008.  The December 23rd writings are discussed in greater detail below.

32.    Debtor convened a special meeting of its board on October 6, 2008 to consider Albrecht's proposed modifications to Contract 8001.

33.    At the meeting, Earlam, Kirby, Adams, and Edward Clarke ("E. Clarke") unanimously voted to modify Contract 8001 under the terms proposed by Albrecht.[20]    On October 7th, Debtor executed contracts with Albrecht Subsidiaries Kaemena and HKC.    As requested by Albrecht, Contract 8001's purchase obligations were split between the Subsidiaries and Contracts 8001A and 8001B were thereby executed ("Subsidiary Contracts").[21] Collectively, the Subsidiary Contracts provided for the sale of 55,000 bales of cotton at ninety cents ($0.90) per pound[22] for shipment from March through October 2009 at Kaemena and HKC's option.

34.    It appears that the actions of Debtor's board, as evidenced through the October 6th vote, were intended to release Albrecht from Contract 8001.    The Subsidiary Contracts dealt with substantially the same collateral that was the subject of Contract 8001.    Further, the Subsidiary Contracts' execution was initiated by Debtor's board at Albrecht's request with the implicit aim of substituting Albrecht's previously existing contractual obligations with those agreed to by the Subsidiaries.[23]

---

[20] The fifth member of Debtor's board and the third of the dual-directors serving Debtor and Plexus Limited, Mark English, was not present for this meeting and did not participate in the vote.    Kirby attended by telephone whereas Earlam was physically present at the meeting.

[21] Contract 8001 and the Subsidiary Contracts were memorialized on practically identical forms, save one detail: Contract 8001 does not bear a date of execution whereas the Subsidiary Contracts are marked with "October 7, 2008" on the first page.

[22] The Subsidiary Contracts' price fixations of ninety cents per pound was slightly higher than the price at which the bulk of the contracted cotton under Contract 8001 was fixed ($0.8939 per pound for 45,090 bales).    Defendants have argued this higher price made substitution of the Subsidiary Contracts for Contract 8001 an objectively sound option for Debtor's board.    However, Contract 8001's backdated per pound price fixations for 6,775 bales on March 5, 2008 and 650 bales on March 11, 2008 were set at much higher prices than those included in the Subsidiary Contracts—$0.9641 and $0.9386, respectively.    Furthermore, the Subsidiary Contracts covered the sale of 6,000 bales less than Debtor originally agreed to sell to Albrecht under Contract 8001.

[23] In his deposition, Earlam testified that he believed "[t]he contract with [Albrecht] was novated . . . to Kaemana [sic] and Hong Kong Cotton Company." Depo. of Earlam, P. 81, L. 9–11.

35.    At the time of the October 6th board meeting, only two members of Debtor's board—Earlam and Kirby—knew of the Plexus Limited and Earlam Agreements provided to Albrecht (collectively, "Agreements").  The deposition testimony of Adams and E. Clarke, the participating board members unaware of the Agreements at the time of the vote, indicates that both would have appreciated learning of the Agreements prior to the vote.  However, Adams and E. Clarke have also provided affidavits stating that their decisions would have been the same even if the Agreements had been disclosed.

36.    During the fall of 2008, Earlam and other members of Debtor's board communicated with representatives of the Ginners in an attempt to restructure the terms of the Ginner Contracts.  Specifically, around the same time as the October 6th board meeting, Earlam and other board members[24] asked the Ginners to delay delivery under the Ginner Contracts because Debtor's foreign buyer had pushed back the date on which it intended to take delivery from Debtor.  Earlam also spoke to the Ginners about existing market volatility, Debtor's desire to perform under the Ginner Contracts, and, on several occasions, suggested that the Ginners place their cotton into a government-subsidized loan program to protect their cotton growers from losses in the event performance was delayed or market prices further declined.  According to representatives of the Ginners, Earlam also stated that Plexus Limited "stood behind" the Ginner Contracts.  Earlam denies these statements.  There is no evidence that Kirby was a participant in any of these meetings with the Ginners.

37.    Near the time of Earlam's meetings with representatives of the Ginners, Debtor circulated a proposed addendum to the Ginner Contracts that, if accepted, would delay performance and shift the Ginners' delivery timeframe forward to January through July 31, 2009.

---

[24] The composition of the delegation from Debtor's board that visited the Ginners varied from location to location. Earlam was present for all of the visits to the Ginners discussed herein, but on certain occasions he also traveled with E. Clarke, Adams, and/or his wife.

38.    On or around October 26, 2008, the Ginners attended a meeting at Debtor's Columbia, South Carolina headquarters.  At or around this time, the Ginners were informed that Debtor would be withdrawing its proposed addendum.   No party adopted the addendum prior to it being withdrawn.

39.    The record reflects that at least one Plaintiff, BCT, may have attempted to deliver a portion of the cotton it contracted to sell to Debtor prior to the Ginner Contracts' January 15, 2009 deadline for delivery and was turned away.  After Debtor accepted and paid for 100 bales from BCT, Debtor subsequently rejected a second shipment of another 100 bales.[25]   The evidence indicates that further delivery by BCT and initial delivery by the other Ginners was not attempted, at least in part, because of representations made by members of Debtor's board, including Earlam, that delayed delivery would assist Debtor in its ultimate performance of the Ginner Contracts.[26]

40.    On December 17, 2008, Debtor's primary lender, BB&T, asserting default, forced Debtor to begin liquidating some of its assets and wind-down its business.  According to Dave McCarthy, Debtor's default under the terms of its credit line with BB&T came about as a result of Debtor's failure to maintain its physical cotton inventory with no more than 10,000 unhedged bales. [27]   Debtor's default with BB&T was unrelated to the board's decision to modify Contract 8001.

---

[25] In her deposition, Linda Exum of BCT provided further detail in relation to BCT's attempts to deliver the contracted cotton to Debtor.  *See* Depo. of Linda Exum, P. 16, L. 4–15.

[26] For example, when Mike DeShazo of Henry County was asked in his deposition why Henry County agreed to delay delivery of the contracted cotton, he responded: "Because they asked us. . . . [Henry County was] as interested in the survivability of [Debtor] as they were. I mean, we didn't want nothing to happen to them."  Depo. of Mike DeShazo, P. 155, L. 22 – P. 156, L. 9.  Craig Huckaby of Arabi testified that Arabi was prepared to delay delivery, as Debtor had requested, but then Debtor "backed out on the deal" presented in the proposed addendum.  Depo. of Craig Huckaby, P. 148, L. 1–12.

[27] "Inventory" in this context includes only the cotton for which Debtor had already paid and put into its storage facilities. The terms of Debtor's covenant with BB&T did not include similar limitations on unhedged new crop cotton, such as that to be purchased in the future under the Ginner Contracts.

41.    On December 23, 2008, the Earlam Agreements were memorialized in two separate writings.  Earlam provided promises to Albrecht, the Subsidiaries, and the Subsidiaries' directors consisting of language of similar effect to that of the Plexus Limited Agreement.  The Earlam Agreements were secured by shares of Plexus Limited stock owned by Earlam and his wife, who together stood as its majority shareholders.

42.    The Earlam Agreement with Albrecht stated, in pertinent part:

> [T]he Guarantor [Earlam] unconditionally and irrevocably undertakes . . . to pay [Albrecht] an amount equal to any loss incurred by [Albrecht] as a result of [Albrecht] having entered into the Contract [8001] or as a result of the Subsidiaries having entered into contracts 8001A and/or 8001B dated 7 October 2008 with [Debtor] in place of the [C]ontract [8001] . . . .

Similarly, the Earlam Agreement with the Subsidiaries and their directors stated, in pertinent part:

> [T]he Guarantor [Earlam] unconditionally and irrevocably undertakes . . . to pay the Companies an amount equal to any loss incurred by the Companies as a result of the Companies having entered into the [Subsidiary] Contracts . . . .

The Earlam Agreements also provide that no third party would be entitled to enforce any rights or remedies under their terms.[28]

43.    On January 12, 2009—three days before the Ginner Contracts' deadline for delivery—the Ginners received notice from Debtor that it would not be able to perform.[29]

44.    Sometime between January 12, 2009 and February 25, 2009, it appears that certain Ginners sold some of the cotton that was the subject of the Ginner Contracts to other

---

[28] The Plexus Limited Agreement did not provide a similar prohibition.
[29] The Ginner Contracts provided that any delivery attempted by the Ginners after January 15, 2009 could be accepted only at Debtor's option; Debtor's notice of nonperformance indicated that Debtor would not exercise its right to accept delivery under such an option.

parties.   Other Ginners delayed their efforts to sell the contracted cotton to others until the summer of 2009 following further efforts to seek performance by Debtor or the Subsidiaries.

45.    On or around February 25, 2009, the Ginners filed an arbitration complaint with the American Cotton Shippers Association ("ACSA") against Debtor and Plexus Limited claiming a loss of $11,973,472.67 arising from Debtor's non-performance of the Ginner Contracts.  ACSA determined it did not have jurisdiction over Plexus Limited, but continued in the proceedings against Debtor.  Debtor filed a response to the Ginners' complaint, admitting liability but disputing the amount of damages sought.

46.    On or around March 6, 2009, Arabi, BCT, Coley, and Jones County filed individual complaints against Debtor in South Carolina state court for collection, constructive trust, and injunctive relief.  Henry County filed a complaint alleging the same claims on June 15, 2009.   The complaints filed by Plaintiffs in March and June (collectively, "State Court Complaints") sought to preserve and enforce the Subsidiary Contracts and contended that "these contracts were specifically intended to cover and provide security for the purchase of Plaintiff[s'] cotton" under the Ginner Contracts.[30]  On March 6, 2009, Arabi, BCT, Coley, and Jones County also individually filed motions against Debtor in state court requesting temporary restraining orders and injunctive relief; the motions were granted in June of 2009 by consent order.[31] Specifically, the consent orders provide that Debtor was to be "enjoined during the pendency of [the state court actions brought by the Ginners] from making any disposition or compromise of the rights under the two [Subsidiary C]ontracts dated October 7, 2008 . . . or any contracts or

---

[30] The record does not provide evidence of similar State Court Complaints filed by the Assignor-Gins.
[31] The Court hereby takes judicial notice of the public record of the proceedings and records associated with Plaintiffs' State Court Complaints, related motions, and relevant consent orders.  *See, e.g.*, *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir.1989) ("We note that the most frequent use of judicial notice is in noticing the content of court records.") (internal citations and quotations omitted).

contract rights arising out of or directly related to these two contracts." Proceedings related to Plaintiffs' State Court Complaints were stayed as a result of Debtor filing its voluntary petition for bankruptcy under Chapter 7 on March 18, 2010.

47.    While the ACSA arbitration was pending, Debtor remained in contact with Albrecht in an attempt to receive assurances of performance from its Subsidiaries, Kaemena and HKC, under the Subsidiary Contracts. Sometime in March of 2009, Grobien of Albrecht informed Debtor that Kaemena and HKC were solvent, despite Albrecht commencing an insolvency proceeding in February of 2009, but had no intentions of taking the Subsidiary Contracts' cotton for shipment at that time. Kaemena and HKC planned to rely on the Contracts' terms which allowed shipment to be requested from Debtor as late as October of 2009 at the Subsidiaries' option. The Ginners also attempted, albeit unsuccessfully, to directly contact the Subsidiaries about their intent to perform. Later, in October of 2009, Grobien, with the input of Earlam, informed Debtor that Albrecht was unwilling to entertain any further discussion with the Ginners about the performance of the Subsidiary Contracts.[32]

48.    The ACSA arbitration committee ("Committee") rendered a damages award on or around May 8, 2009 of $10,687,356.42 upon its finding that Debtor breached the Ginner Contracts on January 12, 2009. The Committee's award took into account the cotton the Ginners successfully sold on the open market subsequent to Debtor's breach.

49.    Each Plaintiff and Assignor-Gin filed a Proof of Claim in Debtor's bankruptcy proceeding using the Committee's award as the basis for its claim. The parties filed their Proofs of Claims on May 27, 2010 for the following amounts, which total to the award provided by the

---

[32] Specifically, by way of an email apparently addressing the Ginners' requests for further information and negotiations regarding performance by the Subsidiaries, Earlam provided to Grobien what he "would say to [Debtor's] email" requesting an update on the Subsidiary Contracts: "These contracts are with Joseph Walker and Co. We are willing to discuss anything with you [Debtor] but we are not willing to discuss [the Subsidiary Contracts] with anybody else other than the party with whom the contracts exist. This would not be correct."

Committee: Arabi (Claim 12-1), $4,688,402.00; BCT (Claim 11-1), $493,809.94; Coley (Claim 10-1), $381,800.00; Henry County (Claim 6-1), $1,718,659.80; Jones County (Claim 8-1), $1,210,050.00; Tri-County (Claim 7-1), $188,294.98; and Roanoke Tar (Claim 9-1), $2,006,339.70.

50.    Plexus Limited also filed a Proof of Claim in Debtor's bankruptcy for the amount of $123,181.00,[33] arising from a consulting agreement under which Plexus Limited pledged to provide advice and assistance to Debtor in its efforts to expand its cotton business "on a global basis." Based on the Statement of Account provided in conjunction with Plexus Limited's Proof of Claim, management consulting fees for August of 2008 through March of 2009 remained unpaid at the time of Debtor's bankruptcy filing.

51.    On June 28, 2010, the Trustee, on behalf of Debtor's bankruptcy estate, initiated additional arbitration proceedings before the International Cotton Association ("ICA") which related to the Ginners' claims. With supporting affidavits provided by representatives of the Ginners, the Trustee sought to enforce the Subsidiary Contracts. Documents provided by the Trustee in support of the ICA claims against the Subsidiaries revealed repeated attempts by Debtor and the Ginners to enforce the Subsidiary Contracts and communicate with Albrecht, Kaemena, and HKC about the performance of the Subsidiary Contracts. With respect to the Ginners' efforts to enforce the Subsidiary Contracts, these supporting documents show that an individual "well known in the U.S. and international cotton merchandising community," Stuart Frazer of Production Marketing, L.L.C., "attempted to communicate with [the Subsidiaries] for the purpose of arranging for delivery of cotton on behalf of [Debtor]" pursuant to the terms of the Subsidiary Contracts. Mr. Frazer did so "on behalf of [Debtor] pursuant to an agreement

---

[33] Plexus Limited's Proof of Claim was initially filed on July 21, 2010 and amended on June 6, 2012 with an accompanying Statement of Account. Pursuant to an August 15, 2012 consent order between counsel for Plexus Limited and the Trustee, Plexus Limited's amended claim in Debtor's bankruptcy was allowed as filed.

between [Debtor] and Production Marketing, [L.L.C.], acting as representative of a coalition of U.S. cotton ginners [the Ginners] who agreed to provide sufficient 2008/2009 crop cotton to [Debtor] to enable it to fulfill the [Subsidiary] Contract[s]."

52.     On June 17, 2011, the ICA arbitration panel rendered an award and held that the Subsidiary Contracts were valid and enforceable.  Because cotton was never actually delivered to the Subsidiaries by Debtor, the ICA panel did not issue a monetary award and instead required the Subsidiaries to "invoice back" to Debtor the cotton pledged to be purchased.[34]   Neither the Trustee nor the Ginners appealed the award.  The Ginners participated in the ICA arbitration through their employment of Stuart Frazer and the related agreement between the Ginners; Mr. Frazer's company, Production Marketing, L.L.C.; and Debtor.

## CONCLUSIONS OF LAW

### I.     Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, as adopted and applied to this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The burden of demonstrating the absence of a genuine issue of material fact rests on the party seeking summary judgment; this must be accomplished through the moving party's identification of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

---

[34] The ICA award did include a monetary award for arbitration costs and fees.

any," which it believes demonstrate such an absence. *Celotex*, 477 U.S. at 323. The nonmoving

party must respond with production of "specific facts showing that there is a genuine issue for

trial." Fed. R. Civ. P. 56(e); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–61 (1970).

It is insufficient for the nonmoving party to offer only a "scintilla of evidence" that a genuine

issue of material fact exists—evidence must be produced on which a jury could reasonably find

in their favor. *Anderson*, 477 U.S. at 252; *see also Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587 (1986). In reviewing the facts and evidence produced by the parties,

the Court must "draw all reasonable inferences in favor of the nonmoving party and may not

make credibility determinations or weigh the evidence." *Williams v. Staples, Inc.*, 372 F.3d 662,

667 (4th Cir. 2004); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1896, -- U.S. --, -- (2014)

(holding that lower court failed to "adhere to the fundamental principle that at the summary

judgment stage, reasonable inferences should be drawn in favor of the nonmoving party").

In the instant case, cross motions for summary judgment have been filed. "When faced

with cross-motions for summary judgment, the court must review each motion separately on its

own merits 'to determine whether either of the parties deserves judgment as a matter of law.'"

*Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v.

Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)) (citation and internal punctuation omitted).

"[T]he court must take care to 'resolve all factual disputes and any competing, rational

inferences in the light most favorable' to the party opposing that motion." *Rossignol*, 316 F.3d at

523 (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

## II.    Choice of Law

The motions before the Court address numerous state law claims, thereby requiring

analysis of relevant choice of law principles. "Bankruptcy courts adjudicating a state law claim

should apply the choice of law rules of the forum state in the absence of federal policy concerns." *In re Hydrogen, L.L.C.*, 431 B.R. 337, 346 (Bankr. S.D.N.Y. 2010); *see also In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 205–06 (4th Cir. 1988). South Carolina is the forum state; therefore, South Carolina choice of law principles must be applied. Plaintiffs have brought veil piercing and alter ego causes of action in addition to others which sound in contract, equity, and tort.

### a.  Veil Piercing and Alter Ego Claims

"When a court considers disregarding the corporate entity, i.e., 'piercing the corporate veil,' the court applies the law of the state of incorporation." *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1376 n.11 (Fed. Cir. 1999); *see, e.g.*, *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987) ("No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations . . . ."). In the instant case, Debtor is incorporated in South Carolina. Therefore, Plaintiffs' requests for a declaratory judgment piercing the corporate veil of Debtor and additionally, or in the alternative, that Plexus Limited be deemed the alter ego of Debtor, must be governed by South Carolina law.

### b.  Contract Claims

"Generally, under South Carolina choice of law principles, if the parties to a contract specify the law under which the contract shall be governed, the court will honor this choice of law." *Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 728 (D.S.C. 2007). Here, the Ginner Contracts contain choice of law provisions stating that South Carolina law will govern disputes arising from them. Therefore, the Court will apply South Carolina law to determine Plaintiffs' breach of contract claims.

22

### c.  Equitable Claims

Plaintiffs have brought claims of promissory estoppel and breach of fiduciary duty to creditors.  As to promissory estoppel, the laws of Alabama, Georgia, and South Carolina are consistent as to the cause of action's elements.  *See, e.g.*, *Trident Const. Co., Inc. v. Austin Co.*, 272 F. Supp. 2d 566, 576–77 (D.S.C. 2003), *aff'd sub nom.*, *Trident Constr. Co., Inc. v. Austin Co.*, 93 F. App'x 509 (4th Cir. 2004); *Ford v. Jackson Square, Ltd.*, 548 So. 2d 1007, 1012–13 (Ala. 1989); *U.S. Foodservice, Inc. v. Bartow Cnty. Bank*, 685 S.E.2d 777, 780 (Ga. Ct. App. 2009); *Rushing v. McKinney*, 370 S.C. 280, 295, 633 S.E.2d 917, 925 (Ct. App. 2006). Therefore, the result does not change based on which state's law is applied.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 838 n.20 (1985).  North Carolina, on the other hand, does not recognize promissory estoppel as an affirmative cause of action.  *See, e.g.*, *Rudolph v. Buncombe Cnty. Gov't*, 846 F. Supp. 2d 461, 477 (W.D.N.C. 2012), *aff'd*, 474 F. App'x 931 (4th Cir. 2012).

As to Plaintiffs' claims that Defendants Earlam and Kirby, as corporate officers of Debtor, breached their fiduciary duties to Plaintiffs, as creditors of Debtor, South Carolina law controls because Debtor is incorporated in this State.  *See In re Infinity Bus. Grp., Inc.*, 497 B.R. 794, 804 (Bankr. D.S.C. 2013) ("[C]laims concerning fiduciary duties of corporate officers [are] governed by the state of incorporation."); *see also* Restatement (Second) of Conflict of Laws § 309 (1971) ("The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders . . . .").

### d.  Tort Claims

Plaintiffs have pled the following tort-based causes of action: (1) fraud; (2) tortious interference of contract; and (3) negligent misrepresentation.  "Under traditional South Carolina

choice of law principles, the substantive law governing a tort action is determined by the *lex loci delicti*, the law of the state in which the injury occurred." *Nash v. Tindall Corp.*, 375 S.C. 36, 39, 650 S.E.2d 81, 83 (Ct. App. 2007) (quoting *Boone v. Boone*, 345 S.C. 8, 13, 546 S.E.2d 191, 193 (2001)); *see also Infinity*, 497 B.R. at 804 ("In South Carolina, the law governing an action in tort is the law of the forum in which the injury occurred."). "According to this rule, the substantive rights and liabilities of the parties are to be determined in accordance with the law of the place of injury . . . ." *Mizell v. Eli Lilly & Co.*, 526 F. Supp. 589, 595 (D.S.C. 1981). Therefore, Plaintiffs' respective tort claims must be reviewed under the law of the state in which each Plaintiff allegedly suffered the financial losses claimed in the Amended Complaint.[35] Applying this standard, it follows that the Court must apply Alabama law with respect to Henry County; Georgia law with respect to Arabi, BCT, and Coley; and North Carolina law with respect to Jones County and the Assignor-Gins.[36]

### III.    Defendants' Motion for Summary Judgment

As an initial matter, the Court finds that summary judgment should be granted in favor of Plexus USA on all claims based upon the absence of evidence in the record indicating it was in any way involved with the Ginner Contracts. To the extent it is alleged that "Plexus" acted or failed to act to the detriment of the Ginners, the evidence before the Court indicates that such allegations must logically refer only to Debtor's parent corporation, Plexus Limited, for which

---

[35] When an entity suffers an economic injury, the situs of that injury is the state in which the entity experiences the impact of the alleged financial loss: the state in which its business operates. *See Rhone-Poulenc Argo S.A. v. Monsanto Co.*, 73 F. Supp. 2d 554 (M.D.N.C. 1999). The doctrine of *lex loci delicti* "requires that the law of the 'place of the wrong' controls; and the place of the wrong is the locale in which 'the last event necessary to make a defendant liable for an alleged tort occurs.'" *Id.* at 555 (quoting *Brendle v. Gen. Tire & Rubber Co.*, 408 F.2d 116, 117 n.3 (4th Cir. 1969)). *See also Hays v. Paul, Hastings, Janofsky & Walker L.L.P.*, CIV.A. 106CV754-CAP, 2006 WL 4448809, at *4 (N.D. Ga. Sept. 14, 2006); *Glass v. S. Wrecker Sales*, 990 F. Supp. 1344, 1348 (M.D. Ala. 1998); *Lister v. NationsBank of Del., N.A.*, 329 S.C. 133, 143, 494 S.E.2d 449, 455 (Ct. App. 1997).

[36] As noted by the Court in its findings of fact above, Plaintiffs' respective principal places of business are located in these states.

Earlam and Kirby served as managers and directors.[37]   Hereinafter, any reference by the Court

to the collective body of "Defendants" shall refer only to Plexus Limited, Earlam, and Kirby.

### a. Plaintiffs' Claims Against Defendants

A general summary of the allegations in the Amended Complaint regarding Plaintiffs'

personal and direct claims against Defendants is as follows:

(1) Alter ego and piercing of the corporate veil:

    a) Plexus Limited oversaw and "exerted control" over Debtor's operations, cotton trades, and contracts;
    b) Plexus Limited advised Debtor on certain contractual obligations and lending agreements;
    c) Plexus Limited commingled its funds with those of Debtor and used Debtor's funds to the benefit of Plexus Limited and its individual directors;
    d) Debtor was grossly undercapitalized; and
    e) Debtor ignored corporate formalities.

(2) Breach of contract:

    a) Defendants, through their control and domination over Debtor, anticipatorily repudiated the Ginner Contracts by stating to the Ginners that Debtor needed more time to pay, could not take delivery, sought to renegotiate the Ginner Contracts, and ultimately could not perform; and
    b) Plexus Limited, Earlam, and Kirby, in an alleged capacity of principals to their agent, Debtor, subsequently ratified the Ginner Contracts and therefore must be held vicariously liable for Debtor's breach.

(3) Breach of fiduciary duty to creditors:

    a) Defendants, by transfer of property, payment of cash, or avoidance of Debtor's contractual obligations, preferred themselves over other creditors of Debtor;
    b) Defendants failed to disclose and/or misrepresented facts related to Debtor's solvency in the spring and summer of 2008; and
    c) Earlam and Kirby failed to disclose to Debtor's board of directors the existence of the Plexus Limited and/or Earlam Agreements.

---

[37] There is uncontroverted evidence before the Court showing that Plexus USA was a wholly-owned subsidiary of Debtor. Plaintiffs' Amended Complaint and memoranda repeatedly refer to Defendants as a collective body and often fail to identify with any particularity the entity or persons against whom certain allegations are made.

(4) Tortious interference of contract:

    a) Defendants engaged in a willful, intentional, tortious, and inequitable course of conduct designed to cause Debtor to breach the Ginner Contracts; and

    b) Defendants, without privilege or justification, wrongfully precluded Debtor from performing the Ginner Contracts.

(5) Fraud:

    a) Contract 8001 and the Subsidiary Contracts were sham contracts, entered into by Debtor with knowledge that Albrecht, Kaemena, and HKC could not or would not perform;

    b) Defendants failed to disclose and/or misrepresented facts related to Debtor's solvency in the spring and summer of 2008;

    c) Earlam and Kirby failed to disclose to Debtor's board of directors the existence of the Plexus Limited and/or Earlam Agreements;

    d) Plexus Limited, through Earlam, falsely represented that:

        i. It stood behind the Ginner Contracts; and

        ii. The Ginner Contracts would be honored by Debtor if the Ginners delayed delivery.

(6) Negligent misrepresentation:

    a) Defendants failed to disclose and/or misrepresented facts related to Debtor's solvency in the spring and summer of 2008 and such nondisclosures and misrepresentations occurred to benefit Defendants' pecuniary interests; and

    b) Defendants misrepresented Debtor's ability to perform the Ginner Contracts.

(7) Promissory estoppel:

    a) Plexus Limited, through Earlam, made unambiguous promises and assurances that:

        i. It stood behind the Ginner Contracts; and

        ii. The Ginner Contracts would be honored by Debtor if the Ginners delayed delivery.

Defendants request summary judgment on all aforementioned claims brought by Plaintiffs.

**b. Piercing of the Corporate Veil and the Alter Ego Doctrine**

Plaintiffs seek to impose personal liability on Defendants as shareholders and board members of Debtor by piercing the corporate veil. Plaintiffs assert that the alleged

undercapitalization of Debtor, disregard for corporate formalities, absence of an independent and

functioning corporate structure, commingling of funds between Debtor and Plexus Limited, and

lack of independent control should equitably estop Defendants from utilizing Debtor's formal

corporate status as a shield from personal liability.  Plaintiffs further argue that Plexus Limited

functioned as the alter ego of Debtor, and therefore request that this Court hold Plexus Limited

liable for Debtor's breach of the Ginner Contracts.

### i.  Veil Piercing

"[I]n an appropriate case and in furtherance of the ends of justice, the corporate veil will

be pierced and the corporation and its stockholders will be treated as identical[.]"  *DeWitt  Truck*

*Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 683 (4th Cir. 1976) (applying South

Carolina law to determine whether to "impose individual liability on the president of [an]

indebted corporation . . . .").  *DeWitt* established a two-prong test for analyzing whether to pierce

an entity's corporate veil and impose personal liability on its directors.  "The first part of the test,

an eight-factor analysis, looks to observance of the corporate formalities by the dominant

shareholders."  *Sturkie v. Sifly*, 280 S.C. 453, 457, 313 S.E.2d 316, 318 (Ct. App. 1984) (citing

*DeWitt*, 540 F.2d at 685).  The eight factors include "whether there is evidence that the

corporation was grossly undercapitalized; corporate formalities were not observed; dividends

were not paid; the corporation was insolvent; corporate funds were siphoned off by controlling

shareholders; corporate records were not maintained; the corporation was a [façade] for the

operations of the controlling shareholders and whether there are non-functioning or 'frozen out'

shareholders, or directors."  *In  re  BHB  Enterprises,  L.L.C.*, C/A 97-01975-W, 1998 WL

2016846, at *8 (Bankr. D.S.C. Sept. 30, 1998) (citing *DeWitt*, 540 F.2d at 684–87).  "The second

part requires that there be an element of injustice or fundamental unfairness if the acts of the

corporation be not regarded as the acts of the individuals." *Sturkie*, 280 S.C. at 457–58, 313 S.E.2d at 318 (citing *DeWitt*, 540 F.2d at 685).

Defendants have met their burden by showing an absence of genuine issues of material fact as to the first part of the *DeWitt* test and Plaintiffs have failed to respond with more than a "scintilla of evidence" that a genuine dispute does in fact exist. *See Anderson*, 477 U.S. at 252; *Matsushita*, 475 U.S. at 587. Through affidavits and depositions, Defendants have produced ample evidence showing Debtor's adherence to corporate formalities, maintenance of books and records, and the existence of bank accounts and lines of credit owned and controlled exclusively by Debtor and *not* its individual members. Debtor held its own board meetings and recorded minutes of these meetings, maintained an organized employee and management structure, and entered into legitimate business relationships with companies other than those with an ownership interest in Debtor. Further, the report of Defendants' solvency expert, Loretta Cross, shows that Debtor was not grossly undercapitalized during the time relevant to Plaintiffs' claims and was capable of paying its operating expenses until BB&T called it into default on its credit line covenants and began forcing liquidation of certain assets of Debtor in December of 2008. This evidence is supported by additional facts showing that prior to December of 2008, Debtor was able to obtain lines of credit based on its own finances and creditworthiness.

Plaintiffs have not provided any evidence to counter that presented by Defendants aside from unsupported and generalized statements in their memoranda and briefs. *See, e.g.*, *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir. 1995) (noting that counsel's statements do not constitute evidence). Plaintiffs have regularly relied on official minutes from Debtor's properly conducted board meetings in formulating their arguments, thereby implicitly recognizing Debtor's adherence to certain corporate formalities. Furthermore, Plaintiffs'

28

evidence of management fees paid to Plexus Limited by Debtor, Debtor's receipt of a loan from

Plexus Limited to meet its margin calls, and Debtor's involvement in the Plexus Group do not

constitute grounds sufficient to otherwise indicate Debtor's ignorance of corporate formalities.

"Indeed, far from suggesting any domination or control of a corporate subsidiary, intercompany

transactions may establish the independence of corporate entities."  Douglas G. Smith, *Piercing*

*the Corporate Veil in Regulated Industries*, 2008 B.Y.U. L. Rev. 1165, 1177 (2008).  Even when

viewed in the light most favorable to Plaintiffs, the evidence is insufficient to show that Debtor

"was merely a façade for the operations of the dominant stockholder."  *Dumas v. InfoSafe Corp.*,

320 S.C. 188, 192, 463 S.E.2d 641, 644 (Ct. App. 1995).  Without a genuine issue of material

fact as to the eight factors within the first prong of analysis, the Court does not reach the second

prong.  Summary judgment is appropriate in favor of all Defendants on this cause of action.

### ii.  Alter Ego Doctrine

For Plaintiffs to prevail at summary judgment on their claims that Plexus Limited

functioned as the alter ego of Debtor, it must be shown that a genuine issue of material fact exists

as to whether Plexus Limited enjoyed total domination and control over Debtor which resulted in

inequitable consequences.  *See Oskin v. Johnson*, 400 S.C. 390, 400, 735 S.E.2d 459, 465 (2012)

("An alter-ego theory requires a showing of (1) total domination and control of one entity by

another and (2) inequitable consequences caused thereby.").  "'Control may be shown where the

subservient entity manifests no separate interest of its own and functions solely to achieve the

goals of the dominant entity.'"  *Id.* (quoting *Colleton Cnty. Taxpayers Ass'n v. Sch. Dist. of*

*Colleton Cnty.*, 371 S.C. 224, 237, 638 S.E.2d 685, 692 (2006)).

While Plaintiffs have provided evidence showing that Debtor: (1) paid Plexus Limited

management fees for the advice and experience of its directors; (2) received loans from Plexus

Limited for the purpose of meeting margin calls; (3) employed as directors several individuals who also served as directors for Plexus Limited; and (4) participated in the Plexus Group and Cotton Alliance with Plexus Limited, Plaintiffs' evidence, without more, is insufficient to demonstrate the "total domination and control" necessary for application of the alter ego doctrine.  *Id.*; *see also United States v. Bestfoods*, 524 U.S. 51, 69 (1998) ("'[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.'") (quoting *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 57 (2d Cir. 1988), *cert. denied*, 488 U.S. 852 (1988)); *Piercing the Corporate Veil in Regulated Industries*, 2008 B.Y.U. L. Rev. at 1177 ("Courts have held, for example, that '[t]he fact that [a parent corporation] requires the subsidiaries to pay a fee' for services actually 'supports [the parent's] argument that it is not the alter ego of any of its subsidiaries.'") (quoting *Joiner v. Ryder Sys. Inc.*, 966 F. Supp. 1478, 1489 (C.D. Ill. 1996)).

Furthermore, in light of evidence showing Debtor maintained separate bank accounts, obtained credit lines based solely upon its own assets and liabilities, obtained and possessed its own federal tax identification number and accordingly paid taxes when they became due, employed legal counsel and accounting firms separate of those used by Plexus Limited, and maintained the same general management and employee structure both before and after Plexus Limited became its majority shareholder, the alter ego doctrine will not apply to impose liability on Plexus Limited for Debtor's breach of the Ginner Contracts.  Without evidence from Plaintiffs to rebut Debtor's independent existence, the Court must grant Defendants' motion for summary judgment on this cause of action.

### c.   Breach of Contract

Plaintiffs have advanced two theories for the imposition of liability on Defendants for Debtor's breach of the Ginner Contracts.  First, Plaintiffs argue that Defendants, through their alleged control and domination over Debtor, anticipatorily repudiated the Ginner Contracts by stating to the Ginners that Debtor needed more time to pay, could not take delivery, sought to renegotiate the Ginner Contracts, and ultimately could not perform.  Second, Plaintiffs argue that Defendants, in their alleged capacity as principals of their agent, Debtor, subsequently ratified the Ginner Contracts and therefore must be held vicariously liable for their breach.  Both theories are dependent upon evidence establishing Defendants' domination and control of Debtor, the absence of which is discussed above in relation to Plaintiffs' veil piercing and alter ego causes of action.

The Court finds that both of Plaintiffs' theories of liability for breach of contract fail and summary judgment is appropriate in favor of Defendants on Plaintiffs' breach of contract claims.

### i.   *Defendants Cannot be Held Personally Liable for any Alleged Anticipatory Repudiation of the Ginner Contracts*

It is well-settled under the law that directors cannot be held personally liable for a corporation's obligations and debts solely by their membership on its board.[38]  *See Steinke v. Beach Bungee, Inc.*, 105 F.3d 192, 195 (4th Cir. 1997); *Hunt v. Rabon*, 275 S.C. 475, 476–78, 272 S.E.2d 643, 643 (1980).  Earlam and Kirby were not parties to the Ginner Contracts and, without more, Debtor's corporate veil protects the Defendant-directors from personal liability on the Ginner Contracts.  *See, e.g., Drafts v. Shull Sausage Co.*, 276 S.C. 52, 54, 275 S.E.2d 577,

---

[38] Although Earlam and Kirby, as board members, may be exposed to liability in tort for interference with or misrepresentations about Debtor's contractual relationships, imposition of liability in those situations would stem from an abuse of that membership—there must be evidence that their personal interests were placed above those of Debtor.

578 (1981) ("[S]ince [third-party defendant] was not a party to the original contract, between [plaintiff] and [defendant], it owed no duty or obligation thereunder.").

Similarly, Plexus Limited, as majority shareholder, cannot be held liable for breach of contract as it also stood in the position of a third-party to the Ginner Contracts, and the mere presence of dual-directors such as Earlam and Kirby[39] on its board does not provide a basis for imposition of liability. *See Carroll v. Smith-Henry, Inc.*, 281 S.C. 104, 106, 313 S.E.2d 649, 651 (Ct. App. 1984) ("Stock ownership alone ordinarily does not render a parent corporation liable for the contracts of its subsidiary . . . and the fact that a parent and subsidiary share common officers or directors does not by itself impose liability on the parent for the contracts of its subsidiary.") (internal citations omitted).   As stated above, the Court finds that Plaintiffs have failed to provide evidence showing the requisite control and domination necessary for imposition of liability via piercing of Debtor's corporate veil and a declaration that Plexus Limited functioned as the alter ego of Debtor.[40]   Absent a finding that Plexus Limited functioned as the alter ego of Debtor, Plexus Limited cannot be held liable for Debtor's alleged anticipatory repudiation of the Ginner Contracts.

### ii. *Plaintiffs have not Presented Evidence Sufficient to Support a Finding of Ratification of the Ginner Contracts by Defendants*

"Ratification, as it relates to the law of agency, means the express or implied adoption and confirmation by [a principal] of an act or contract performed or entered into in his behalf by another who at the time assumed to act as his agent." *Lincoln v. Aetna Cas. & Sur. Co.*, 300 S.C. 188, 191, 386 S.E.2d 801, 803 (Ct. App. 1989) (citing *Barber v. Carolina Auto Sales*, 236 S.C.

---

[39] Mark English also served as a board member for both Plexus Limited and Debtor but, as previously discussed, Mr. English is no longer a defendant in Plaintiffs' adversary proceeding.

[40] Plaintiffs cannot proceed in this action against Debtor for any purported breach by it of the Ginner Contracts since it is merely a nominal defendant and is not a party.  In any event, the Ginners filed proofs of claims in Debtor's bankruptcy reflecting debts owed to them by Debtor.

594, 115 S.E.2d 291 (1960)).  "Ratification exists upon the concurrence of three elements; (1) acceptance by the principal of the benefits of the agent's acts, (2) full knowledge of the facts, and (3) circumstances or an affirmative election indicating an intention to adopt the unauthorized arrangements."  *Id.* (citing 2A C.J.S. *Agency* § 71 (1972)).  Inherent in the act of ratification of a contract is the existence of an agency relationship.  Plaintiffs allege that Debtor functioned as the *agent* of Defendants and Defendants, in turn, acted as Debtor's principal.

"Agency is the fiduciary relationship resulting from the manifestation of consent by one person to another that the other shall act on behalf of and subject to the control of the first, and of consent by the other so to act."  23 S.C. Jur. Agency § 2 (2014) (citing Restatement (Second) of Agency § 1 (1958)); *see also Peoples Fed. Sav. & Loan Ass'n v. Myrtle Beach Golf & Yacht Club*, 310 S.C. 132, 425 S.E.2d 764 (Ct. App. 1992).  "To determine whether the subsidiary is functioning as a mere agent of the parent company, the courts look at four factors: '(1) common ownership, (2) financial independence, (3) degree of selection of executive personnel and failure to observe corporate formalities, and (4) the degree of control over marketing and operational policies.'"  *ScanSource, Inc. v. Mitel Networks Corp.*, 6:11-CV-00382-GRA, 2011 WL 2550719, at *6 (D.S.C. June 24, 2011) (citing *Builder Mart of Am., Inc. v. 1st Union Corp.*, 349 S.C. 500, 511, 568 S.E.2d 352, 358 (Ct. App. 2002), *overruled on unrelated grounds*, *Farmer v. Monsanto Corp.*, 353 S.C. 553, 579 S.E.2d 325 (2003)).  These elements are similar to the factors discussed at length above in relation to Plaintiffs' veil piercing and alter ego claims.   As noted in the prior discussion, Plaintiffs have failed to provide evidence of a genuine issue of material fact as to whether Debtor functioned independent of Plexus Limited; the mere fact that Plexus Limited at times loaned Debtor money to meet margin calls does not in and of itself signal financial dependence.   Additionally, the evidence previously discussed shows Debtor's adherence to

corporate formalities, independent employee and management structure, and autonomous execution of contracts and lending agreements separate and apart from the control of Plexus Limited and Earlam and Kirby as agents of Plexus Limited. Absent an agency relationship, Plaintiffs' ratification argument fails as a matter of law and summary judgment is appropriate in favor of Defendants on this issue.

### d. Breach of Fiduciary Duty to Creditors

Plaintiffs claim that Defendants breached their fiduciary duties to the Ginners, as creditors of Debtor, during a period when Debtor was insolvent through their actions in relation to the Ginner Contracts, Contract 8001, and the Subsidiary Contracts. From the outset, Plaintiffs' claims on this issue present two fundamental flaws: (1) Plaintiffs refer to the allegedly at-fault parties as the collective body of Defendants, despite Plexus Limited's distinct role as a majority shareholder rather than member of Debtor's board of directors; and (2) Plaintiffs, in reference to this cause of action, use the terms "breach of fiduciary duty" and "breach of fiduciary duty to creditors" interchangeably, as if to suggest the two carry the same definition and legal import.

As to the first matter, in regard to Plexus Limited, no applicable authority extends corporate fiduciary duties—whether owed to the corporation and its shareholders, creditors, or other parties—to an *entity* positioned as a majority shareholder. Individuals are capable of serving as members of corporate boards; the same cannot be said for a corporate entity. Any and all fiduciary duties owed in the corporate context flow from a corporation's *officers and directors*. Therefore, Plexus Limited is entitled to summary judgment on Plaintiffs' claims for breach of fiduciary duty to creditors.

As to the second matter, the Court agrees with Defendants' position that Plaintiffs have not alleged and do not possess the right to allege a claim against Defendant-directors Earlam and Kirby for an alleged breach of their fiduciary duties owed to Debtor and its shareholders. The cause of action pled by Plaintiffs is expressly listed in the Amended Complaint as: "COUNT II, BREACH OF FIDUCIARY DUTY TO CREDITORS." Further, as discussed in the Court's factual findings above, the Order of Sale gave Plaintiffs only the Trustee's interest (if any) in "the nine causes of action asserted in the Adversary Proceeding . . . ." As expressly declared by Plaintiffs' own description of the cause of action and the specific facts set forth in association with that cause of action,[41] the fiduciary duties which Plaintiffs claim Defendants breached are only those limited duties that extend to creditors of a corporation upon insolvency. The Court's Order on Plaintiffs' Motion to Intervene makes clear that "[t]he language of the Order of Sale . . . expressly limits the scope of the sale to the nine specific causes of action asserted in the [Amended] Complaint." Contrary to Plaintiffs' argument, the Order of Sale did *not* provide Plaintiffs, as creditors, with standing to assert a derivative claim on behalf of Debtor for the breach of duties owed to it by Earlam and Kirby. While it is true that "[i]n the event of bankruptcy, the existing right of *shareholders* to pursue a derivative action in the name of the [debtor-]corporation becomes part of the bankruptcy estate," such a derivative suit is not encompassed by the Amended Complaint, as pled, and, therefore, could not have been purchased from the Trustee in the Order of Sale. *In re Infinity*, 2011 WL 9375422, at *2 (June 22, 2011, Bankr. D.S.C. 2011) (citing *In re Greenwood Supply Co.*, 295 B.R. 787, 794 (Bankr. D.S.C.

---

[41] Specifically, Plaintiffs allege that:

> Pursuant to the Trust Fund Doctrine, upon the event of insolvency, the directors and managers of the Debtor became trustees of the creditors [and] owe such creditors a fiduciary duty and cannot, by transfer of property or payment of cash, or by intentional and willful avoidance of Debtor's contractual obligations, prefer themselves or their affiliates over other creditors, including but not limited to the instant Plaintiffs.

2002)).    Instead, Plaintiffs purchased only the Estate's interest, if any, in their *personal* and

*direct* claims against Defendants.[42]    *See id.* ("A cause of action is 'personal' if the claimant

himself is harmed and no other claimant or creditor has an interest in the cause.")    Therefore, the

Court's review must be limited to the applicable law on direct actions for an alleged breach of

the fiduciary duties owed to a corporation's creditors upon its insolvency.

### i. Scope of Fiduciary Duties owed to the Ginners, as Creditors, by Defendant-directors Earlam and Kirby

"When a corporation becomes insolvent, [the] fiduciary duty of the directors shifts to the

creditors of the corporation."    *In re BHB*, 1998 WL 2016846, at *13 (citing *Fed. Deposit Ins.*

*Corp. v. Sea Pines Co.*, 692 F.2d 973 (4th Cir. 1982) and *Davis v. Woolf*, 147 F.2d 629 (4th Cir.

1945)).    But the duties owed to creditors upon insolvency are limited:[43]

> The law by the great weight of authority seems to be settled that
> when a corporation becomes insolvent, or in a failing condition,
> the officers and directors no longer represent the stockholders, but
> by the fact of insolvency, become trustees for the creditors, and
> that *they cannot by transfer of its property or payment of cash,*
> *prefer themselves or other creditors . . . .*

---

[42] Defendants have urged the Court to consider law from outside of South Carolina in determining whether Plaintiffs
have the right and ability to bring a direct action against the Defendant-directors for a breach of their fiduciary duties
to Debtor's creditors. Specifically, Defendants have directed the Court to a case decided by the Delaware Supreme
Court, *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92 (Del.
2007). In *Gheewalla*, the Delaware Court refused to recognize "that directors of an insolvent corporation owe direct
fiduciary duties to creditors" and held that allowing creditors to bring direct actions against directors for a breach of
any such duties "would create uncertainty for directors . . . ." *Id.* at 103. Defendants have cited a handful of other
courts that have adopted the position taken in *Gheewalla*, but cannot point the Court to (nor has the Court been able
to find) any cases decided by South Carolina courts or under South Carolina law which have applied the rationale set
forth in *Gheewalla*. As stated above, South Carolina law governs Plaintiffs' breach of fiduciary duty to creditors
claims and, therefore, the previously cited standard set forth in the *Sea Pines* case is the appropriate standard under
which the Court must review these claims.

[43] As previously noted, Defendants have argued that *Gheewalla* and other cases which share the Delaware Supreme
Court's rationale should control here to preclude Plaintiffs from arguing that the Defendant-directors owed a
fiduciary duty to Debtor's creditors upon insolvency.  The Court rejects Defendants' arguments on this subject and
finds that the narrow scope of duties set forth in *Sea Pines*—the controlling standard under South Carolina law—
allows Plaintiffs to proceed with their claims.

*Sea Pines*, 692 F.2d at 977 (quoting *Woolf*, 147 F.2d at 633).[44]   The duty set forth in *Sea Pines*

implores directors to treat creditors equally, but it is not as broad as the fiduciary duty owed to

shareholders and the corporation during the ordinary course of business.[45]

### ii.   *Existence of a breach by Defendant-directors Earlam and Kirby of their fiduciary duties owed to the Ginners, as creditors*

A director's fiduciary duties to a corporation's creditors are triggered upon insolvency.

*See, e.g.*, *In re BHB*, 1998 WL 2016846, at *13.   According to the testimony of Defendants'

solvency expert, Loretta Cross, Debtor became insolvent sometime between September 30, 2008

and October 31, 2008.[46]   Viewing this evidence in the light most favorable to Plaintiffs as the

nonmoving party, a genuine issue of material fact exists as to the exact date of Debtor's solvency

and the question remains unanswered as to whether Debtor was insolvent at the time of its

---

[44] Plaintiffs have, on multiple occasions, attempted to broaden even this limited duty by their inclusion of additional clauses within the established *Sea Pines* standard.  In Plaintiffs' Complaints and memoranda, clauses such as ". . . by intentional and willful avoidance of Debtor's contractual obligations . . ." have been inserted as additional forms of director conduct which might serve as evidence of a preference for himself or other creditors.  There is simply no foundation in the existing law for the addition of "avoidance of contractual obligations" as grounds for establishing preferential treatment by a defendant-director nor does the Court find any legitimate legal basis for making such an expansion in the present case.  The *Sea Pines* standard does in fact encompass a "transfer of property", and it is on that ground that the Court bases its finding below that Earlam and Kirby's vote to substitute Contract 8001 may have constituted a transfer of Debtor's corporate property.

[45] For example, a director owes a duty to the corporation he serves to disclose any conflicts of interest related to transactions in which the corporation is involved.  *See, e.g.*, *Straight v. Goss*, 383 S.C. 180, 192–93, 678 S.E.2d 443, 450–51 (Ct. App. 2009) (citing S.C. Code Ann. § 33-8-310 (1976)).  Plaintiffs argue under their claims for breach of fiduciary duties to creditors that they are entitled to recover for damage caused by Earlam and Kirby's failure to disclose to Debtor's board the potential conflicts of interest created by the Plexus Limited and Earlam Agreements.  The Court disagrees.  By failing to disclose a conflict of interest, a director breaches the duty it owes only to the corporation, whether insolvent or financially stable, and the liability for this misconduct "is an asset of the corporation, ordinarily remediable by a suit in the name of the corporation."  *Ward v. Griffin*, 295 S.C. 219, 221, 367 S.E.2d 703, 704 (Ct. App. 1988) (citing *Stewart v. Ficken*, 151 S.C. 424, 424, 149 S.E.2d 164, 165 (1929)).  Plaintiffs purchased from the Trustee only the nine causes of action contained in their Complaints, which do not include a breach of the fiduciary duties owed to Debtor by its directors, such as the duty to disclose conflicts of interest.

[46] Cross arrived at this conclusion using methodology that took into account the mark-to-market value of Contract 8001.  The CFTC Glossary defines "mark-to-market" as "[p]art of the daily cash flow system used by U.S. futures exchanges to maintain a minimum level of margin equity for a given futures or option contract position by calculating the gain or loss in each contract position resulting from changes in the price of the futures or option contracts at the end of each trading session."  Plaintiffs urge the Court to consider instead Cross's alternate conclusion that was arrived upon by excluding the mark-to-market value of Contract 8001 and which placed Debtor's transition into insolvency at an earlier date; this argument is based on Plaintiffs' position that Contract 8001 was a "sham."  For reasons discussed in greater detail herein, Plaintiffs are judicially estopped from asserting the invalidity of Contract 8001 as a defense to Cross's conclusion.

board's decision on October 6, 2008 to substitute Contract 8001 with the Subsidiary Contracts.

Debtor's solvency at the time of its October 6th board meeting is a pivotal issue, because the

unanimous board vote to substitute Albrecht's purchase obligations under Contract 8001, when

drawing all reasonable inferences in favor of Plaintiffs, as the nonmoving party, may have

constituted a transfer of corporate property through which it may be found that Defendant-

directors Earlam and Kirby preferred themselves or other creditors over the Ginners, as

explained further below.  *See Sea Pines*, 692 F.2d at 977 (quoting *Woolf*, 147 F.2d at 633).

1. **Modification of Contract 8001 as transfer of corporate
property executed by Defendant-directors Earlam and Kirby
to prefer themselves and/or other creditors of Debtor**

It appears that both Debtor and the Ginners expected the Ginner contracts to be offset by

a hedge, either in the form of a physical sale or through a position held by Debtor in the futures

market.  After Debtor borrowed money from Plexus Limited to meet margin calls as a result of

the volatile futures market in the spring of 2008, Debtor sought out a physical hedge (rather than

positions in the futures market) to offset its purchase obligations under the Ginner Contracts.

Through Contract 8001, Debtor had secured a buyer (Albrecht) to purchase the Ginners'

2008/2009 new crop cotton from Debtor shortly after it arrived in Debtor's warehouse(s).

Contract 8001 required Debtor to deliver the contracted cotton to Albrecht within two to three

weeks after Debtor obtained warehouse receipts from the Ginners for the cotton purchased under

the Ginner Contracts.  Contract 8001 and Debtor's rights arising under it were assets of the

corporation.

The evidence, when viewed in the light most favorable to Plaintiffs, gives rise to the

reasonable inference that the October 6th board vote effectively eliminated Debtor's ability to

receive payment upon Albrecht's acceptance of Debtor's shipments under the aforementioned

two to three week timeframe.  Instead, after substituting Albrecht's purchase obligations with those of its Subsidiaries, Debtor would be unable to receive payment until as early as March or as late as October of 2009—the precise date of shipment could be set only at Kaemena and HKC's option, even though the cotton was expected to be delivered to Debtor by the Ginners prior to January 15, 2009.  Thus, Debtor's expectation of performance on the Ginners Contracts through an offsetting sale was substantially delayed.  As to Plaintiffs' breach of fiduciary duty to creditors claims, the relevant question in light of these facts is not whether the substitution of Contract 8001 was approved for the purpose of impairing Debtor's ability to perform the Ginner Contracts; this is an inquiry better suited for Plaintiffs' tortious interference claims.  Instead, on this cause of action, the Court must determine if there is a genuine issue of material fact as to whether Earlam and Kirby effectuated the delay in Debtor's offsetting sale for the purpose of preferring either themselves or another creditor of Debtor, namely Plexus Limited.[47]

"When there is a question as to whether a director has fulfilled his fiduciary obligations to creditors, the issues of the director's reasonableness and good faith are irrelevant, as is the severity of the breach; the *only* issue is whether there has been a breach at all."  *In re BHB*, 1998 WL 2016846, at *13 (citing *Anthony v. Padmar, Inc.*, 320 S.C. 436, 465 S.E.2d 745 (Ct. App. 1995)).  The evidence suggests that Defendant-directors Earlam and Kirby may have voted in favor of Albrecht's proposed modifications to Contract 8001 for the purpose of limiting the liability of Plexus Limited or Earlam under whichever Agreement was effective at the time of the

---

[47] Plexus Limited was situated as a creditor of Debtor at the time of the board's vote to substitute Contract 8001 with the Subsidiary Contracts.  At the time of the October 6th vote, Debtor was already two months past due on the management consulting fees which Debtor was contractually bound to pay to Plexus Limited; these fees are reflected in Plexus Limited's Proof of Claim in Debtor's bankruptcy.  The Court is without knowledge as to the status of repayment, at the time of the October 6th vote, by Debtor on the loans provided to it by Plexus Limited to satisfy its margin calls in March of 2008.

vote,[48] thereby breaching their fiduciary duties to the Ginners as creditors of Debtor. While Debtor's board voted unanimously[49] to substitute Contract 8001 with the Subsidiary Contracts, only Earlam and Kirby casted their votes knowing that the Plexus Limited and Earlam Agreements existed.   Whether this was done with the parallel and potentially reasonable purpose of assisting Albrecht, as asserted by Defendants, is not controlling in light of evidence suggesting that the substitution of Contract 8001 was a transfer of Debtor's corporate property during insolvency which may have preferred Earlam, Plexus Limited, or both over the Ginners and therefore constituted a breach of duty. *Id.*  Although the intent of Earlam and Kirby in voting in favor of the substitution of Contract 8001 may not have been to ultimately induce Debtor's breach of the Ginner Contracts, the evidence gives rise to the reasonable inference that the Defendant-directors' actions may have been taken to prefer Earlam or Plexus Limited as creditors over the Ginners.   The action taken by Earlam and Kirby with the possible goal of preferring a party other than the Ginners is what creates a genuine issue of material fact as to whether Earlam and Kirby breached their duties to Debtor's creditors.

Drawing all reasonable inferences in the light most favorable to Plaintiffs, the existing evidence, including the delayed memorialization of the Earlam Agreements, suggests that Defendant-directors Earlam and Kirby acted in favor of substituting Contract 8001 for the

---

[48] Before October 6, 2008, only the Plexus Limited Agreement between Plexus Limited and Albrecht was memorialized in writing. According to Earlam's testimony, the Plexus Limited Agreement was replaced with the Earlam Agreements by way of a verbal commitment to both Albrecht and the Subsidiaries as early as September of 2008, although neither Earlam Agreement was memorialized in writing until December 23, 2008.  Therefore, upon construing the evidence in the light most favorable to Plaintiffs, the question remains as to which Agreement was effective and enforceable at the time of the October 6th vote and prior to December 23rd when the Earlam Agreements were committed to writing.  As to the verbal Earlam Agreement purportedly given in September, based upon the evidence the Court finds it reasonable to infer that its terms were the same or at least sufficiently similar to those memorialized in December of 2008.

[49] According to their testimony, Adams and E. Clarke were completely unaware of the Agreements' existence and voted in favor of modifications while under the impression that doing so was Debtor's best option for keeping a contract in place for the purchase of Debtor's incoming 2008/2009 new crop cotton.  Although Adams and E. Clarke have since provided affidavits stating that their decision would have been the same even if aware of the Agreements, their statements do not negate the competing issues of fact surrounding Earlam and Kirby's motivations for transferring Debtor's corporate property (Contract 8001).

purpose of protecting and preferring Plexus Limited over other creditors. Furthermore, the evidence also suggests that Earlam preferred himself over the creditors of Debtor, including Plexus Limited, by taking steps to insulate himself from liability under the Earlam Agreements, if they were in fact effective as of October 6th. Defendants argue that even if Earlam and Kirby's actions are viewed as effectuating a preference for themselves or Plexus Limited, Plaintiffs cannot show such acts caused damage to the Ginners. "[W]ant of causation must not be determined as a matter of law unless, from the evidence, the only reasonable hypothesis is that such want exists; if reasonable minds may differ, it is a jury question." 75A Am. Jur. 2d Trial § 657 (2014). When drawing all reasonable inferences in the light most favorable to Plaintiffs, the Court finds that a genuine issue of material fact exists as to the relation between the Defendant-directors' vote to substitute Contract 8001 with the Subsidiary Contracts and Debtor's ultimate inability to perform the Ginner Contracts. Although Earlam and Kirby may not have voted in favor of the substitution with an intent to induce Debtor's breach, the evidence, when viewed in the light most favorable to Plaintiffs, suggests that the Subsidiary Contracts' delayed delivery dates may have contributed to Plaintiffs' damages. Therefore, for the reasons discussed above, the Court hereby denies Earlam and Kirby's motion for summary judgment on this claim.

### e. Tortious Interference of Contract

Plaintiffs allege that Defendants, without privilege or justification, engaged in a course of conduct designed to prevent Debtor from performing the Ginner Contracts and that such conduct ultimately caused Debtor to breach those Contracts. According to Plaintiffs, Defendants' interference with the Ginner Contracts was related to or arose from a failure by Earlam and Kirby to disclose the Plexus Limited and Earlam Agreements to their fellow board members[50] as

---

[50] As discussed above regarding the narrow scope of fiduciary duties owed to Debtor's *creditors* by Defendant-directors Earlam and Kirby, Plaintiffs did not plead, have not purchased, and do not presently possess the right to

well as their approval on October 6, 2008 of the substitution of Contract 8001 with the Subsidiary Contracts, which included terms that Plaintiffs contend impaired Debtor's ability to perform the Ginner Contracts.

Although the elements for tortious interference vary slightly between the Plaintiffs' home states, among the common elements is the requirement that the defendant took some action for the purpose of inducing the related breach of contract. *See, e.g.*, *Coloplast Corp. v. Am. Breast Care, L.P.*, 209 F. App'x 945, 946 (11th Cir. 2006) (applying Georgia law to plaintiff's tortious interference claim, including the requirement of evidence that "'defendant acted purposely'" and "'induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff'") (quoting *Disaster Serv., Inc. v. ERC P'ship*, 492 S.E.2d 526, 528–29 (Ga. Ct. App. 1997)); *Bill Fitzgibbons, L.L.C. v. REV Birmingham, Inc.*, No. 2:14-CV-268-VEH, 2014 WL 1923813, at *6 (N.D. Ala. May 12, 2014) ("To establish the tort of interference with contractual or business relationships a plaintiff must prove . . . [that] the defendant intentionally interfered . . . .") (internal quotation marks omitted); *King v. N.C. Dep't of Transp., Div. of Motor Vehicles*, 468 S.E.2d 486, 490 (N.C. Ct. App. 1996) (requiring proof that defendant was an outsider to plaintiff's contract with a third party and "intentionally induced the third person not to perform"). Defendants have shown an absence of genuine issues of material fact as to this element and Plaintiffs have failed to produce more than a scintilla of evidence to contradict that which has been provided by Defendants.

Under the breach of fiduciary duty to creditors claims, Plaintiffs assert that Earlam, Kirby, and Plexus Limited acted to modify Contract 8001 in order to escape or limit liability

---

pursue on behalf of Debtor claims against Earlam and Kirby for the alleged breach of the separate and distinct duties owed by directors to the corporation and shareholders they serve. Therefore, the Court's review of Plaintiffs' tortious interference claims must involve only the question of whether Earlam and Kirby's actions relating to the substitution of Contract 8001 with the Subsidiary Contracts constituted tortious interference with the contractual relationship between Debtor and the Ginners.

under the Agreements.  However, it is also undisputed that the modification of Contract 8001, by substituting the Subsidiary Contracts, was also due to Albrecht's indication that it could not perform and this preserved, albeit delayed, Debtor's ability to perform.  It is inconsistent and contradictory for Plaintiffs to then assert in *this* cause of action for tortious interference that the same Defendants additionally desired Debtor not to perform.  In the event Debtor failed to perform the Ginner Contracts, Defendants would be exposed to liability under the Agreements— contrary to the goal on which the prior cause is based.  In fact, there is no evidence indicating that Defendants had any intent or desire for Debtor not to perform the Ginner Contracts and Plaintiffs have not provided any evidence suggesting that Defendants engaged in a willful, intentional, tortious, and inequitable course of conduct with the aim of inducing Debtor's breach. Instead, the evidence in the record shows that several of Debtor's board members, including Earlam, made repeated efforts through discussions prior to the January 12, 2009 breach to negotiate with the Ginners for the purpose of ensuring Debtor's performance.[51] No evidence in the record indicates that Earlam, at the time of these October visits to the Ginners, either intended or knew that Debtor would ultimately breach the Ginner Contracts.  At the time of Earlam's statements, Debtor was operating and its credit line with BB&T remained in place. The evidence indicated that in his discussions with the Ginners, Earlam openly discussed the deterioration of the global cotton market and Debtor's cash flow problems, encouraged placing the farmers in the loan program to mitigate against their losses in the event the Contracts were not performed, indicated the need for delay to allow performance, and offered additional assurances that Debtor's performance would be supported.

---

[51] Statements by Earlam as to Debtor's ability and desire to perform are further discussed below with regard to Plaintiffs' fraud and negligent misrepresentation claims.  The record is devoid of evidence showing Kirby made any such statements; this is also addressed more fully below.

Accepting as true the facts of Plaintiffs' Complaints and construing the evidence in the light most favorable to Plaintiffs as the nonmoving parties, the reasonable inference is that Defendants did not act to purposefully induce Debtor's breach of the Ginner Contracts, whether acting individually or on behalf of and for the benefit of Plexus Limited. Therefore, in the absence of evidence showing that Earlam and Kirby's approval of Contract 8001's substitution with the Subsidiary Contracts was an action taken for the purpose of inducing Debtor's breach of the Ginner Contracts, summary judgment is appropriate in favor of all Defendants.

### f.  Claims by Plaintiffs Allegedly Arising from Statements made to Ginners by Earlam

Plaintiffs have set forth claims for fraud, negligent misrepresentation, and promissory estoppel which arise at least in part from statements Plaintiffs contend Earlam made when visiting the Ginners at their respective places of business.[52] While the elements required to prove each of the foregoing causes of action are different, the alleged statements to which they must be applied are the same regardless of whether the Court is reviewing an allegation of fraud, negligent misrepresentation, or promissory estoppel. Therefore, a review of the testimony provided by the Ginners' representatives is necessary.[53]

(1) Alabama Plaintiff Henry County, _Mike DeShazo_

    a.  "[Earlam] just said [Debtor] had a shortage of cash, they were not going to be able to pay us for the cotton at this time, but if we'd work with them, put the cotton in the loan and give them some time, they would have the money. They said they

---

[52] To the extent Plaintiffs' fraud, negligent misrepresentation, or promissory estoppel claims arise from events independent of statements allegedly made by Earlam, such alternative grounds for recovery are discussed below with respect to the cause of action to which they relate.

[53] The Court need not consider evidence of statements by Earlam as it might relate to the Assignor-Gins in light of the parties' agreement that the Assignor-Gins' fraud and negligent misrepresentation claims were not assignable in addition to the non-recognition of promissory estoppel as an affirmative cause of action in North Carolina, the home state of both Assignor-Gins.

had the cotton sold for the fall, and the buyer had pushed it to the spring, and they needed some time, but they would be able to come through with the money, that Plexus [Limited] was okay, and Plexus [Limited] stood behind it."

b. "Q: And you specifically recall Mr. Earlam saying that Plexus [Limited] guaranteed it a hundred percent?    A: Yes sir.    Q: Guaranteed what a hundred percent?    A: Guaranteed [Henry County] getting paid for the cotton we had contracted. They just needed time and our patience.    Q: But when Mr. Earlam was saying that Plexus [Limited] guaranteed it a hundred percent, you didn't take that as being a contract between Henry County Gin and Plexus [Limited], though, did you?    A: I took it as being – as [Earlam] being the majority stockholder in Plexus [Limited], someone who could make that decision on [Debtor's] behalf. Q: But you didn't take it as being a contract between Plexus [Limited] and Henry County Gin, did you?    A: To me, I guess it would be a verbal contract."

c. When speaking about a meeting at which Earlam allegedly made the above referenced statements:[54] "It wasn't a panic meeting. And we had full faith a confidence that we would get paid, and we weren't panicking."

(2) Georgia Plaintiff Arabi, *Craig Huckaby*

a. "Q: And it was [Debtor] that you looked towards in the performance of [the Ginner Contracts], correct?    A: Until Nick Earlam stood up and said if we would work with them they would pay us for the cotton."

b. "Nick Earlam said if we would delay shipment of the cotton – this was in October [2008], if we would delay shipment of the cotton . . . until January, they would pay us for the cotton.    [Earlam] said that there was some I believe 2007

---

[54] Two other members of Debtor's board, Adams and E.Clarke, were also present at the meeting.

shipments, they [were] still shipping their old crop cotton and there was a lag of payment on that cotton. If [Arabi] would give them time to resolve those issues before we delivered it, they would pay us for the cotton."  After making these statements in his deposition, Huckaby stood firm in his position that his references to "they" were *not* references to Debtor, but rather Earlam and Plexus Limited.  Huckaby also noted that he perceived Earlam's use of the word "we" to be a reference to Earlam personally.

c.  "[Arabi] did tell our farmers that Plexus [Limited] was going to back up [Debtor] because that's what we [were] told. We used that to assure our farmers that they would get paid for the cotton."

d.  "[Earlam's] plan was we would ask our farmers to put the cotton in the loan, they would make up the difference between the loan rate and the contract price. They would pay the interest on the money, they would pay storage cost, they would pay LDP payments that might come about."   In the context of the questions surrounding these statements, "they" can be reasonably assumed to refer to Debtor.

e.  "Q:  Didn't you have concerns that [Debtor] couldn't – may not be able to sell the cotton anywhere near the price of the fixation?     A: They had the cotton hedged. They [were] protected.     Q: It's your understanding that there was a physical hedge in place for the [Ginner Contracts]?     A: We [were] told the cotton was hedged."

(3) Georgia Plaintiff BCT, *Van Murphy and Linda Exum*

*Van Murphy*

a.   "I felt like . . . Earlam was the key representative for [Debtor] once he came to our office and told us that he was – that Plexus [Limited] had a controlling interest of [Debtor] and that was the first time we had heard that, and that [BCT] felt like [Earlam] was the responsible party from that point on."

b.   "[Earlam] stated that he was concerned about . . . paying us for the cotton [and] was going to do everything in his effort to make sure that we were paid, and that's when [BCT] found out that [Plexus Limited] owned a controlling interest of [Debtor]."

c.   When asked to expand upon his handwritten note stating "Plexus was behind Joseph Walker," Murphy replied: "I'm referring to [Earlam] taking responsibility at these meetings that he was going to do everything in his power to [make] BCT whole in this, that he was humble about it and he was very convincing that he was going to be responsible, and that he hated that the situation had come, but he was going to see to it that we were going to be taken care of. And we believed him."

d.   In response to a question asking for his best recollection of what Earlam said while visiting BCT, Murphy replied: "Earlam said and as he presented himself at this meeting, that he was taking full responsibility for [Debtor] and the contract they had with BCT Gin Company, and that they were going to make us whole no matter what."

e.   "[BCT] expected to get paid as we invoiced that cotton and sent [Debtor] receipts. And they were coming up with a new plan as far as putting the cotton to loan at the first meeting. And I think at the second meeting, [Debtor] realized that wasn't going to work, they wanted BCT to pay for the cotton and then they would come

back and pay us at a later date when they delivered the cotton and the farm merchants had paid them for the cotton. At this time we became concerned, but they still were reassuring us that hey, that [Debtor was] going to pay us in the end. And then they came back at a later date and explained how humble they were that they still could not honor the contracts, but they still had plans to deliver the cotton on into 2009, and once they got paid, that they would pay us. And that's what I'm referring as feeling misled."

*Linda Exum*

f.   In discussing Earlam's comments at the October 26th meeting at Debtor's Columbia headquarters, Exum recalled Earlam stating the following: "[W]e're not going to be able to perform, we're not going to be able to do the things we've told you we could do, but we're going to stand behind you, stand behind this, Plexus [Limited] is going to do all it can to make BCT whole. And basically, those words. He might have used something a little different, but that is what he said to us."

g.   "Q: My question is, did anybody ask him for what he meant . . . – how Plexus was going to stand behind Joseph Walker?    A: I don't remember that and I don't – I don't think so, that they said, well, how do you intend to do that? Nobody asked are you going to put up a letter of credit? We did not get that far in there. But that was the reason Mr. Earlam was there."

h.   "[Earlam] clearly stated that [Debtor's] problems were his, also. And all I can tell you is he led us to believe that he, Nick Earlam and Plexus [Limited], were

behind [Debtor], [Debtor] was not by themselves in trying to honor these [Ginner C]ontracts."

i. "Q: As you sit here today, in hindsight, under oath, can you tell me a fact that shows that during those meetings when you spoke to Nick Earlam, that at that time he intended to lie to you or to deceive you or anybody at BCT?   A: Yes, sir. The fact is that he sat there just like you're sitting there, and he looked me in the eye, and looked Van [Murphy] in the eye, and the other people in that room, and his wife, and said, 'We will make you people whole.' And now he is saying he has no responsibility for it. That's a lie. I don't have it – I don't have it in writing, I don't have it in a document, but that's the facts."

(4) Georgia Plaintiff Coley, *Charles Coley*

a. When describing his reaction to learning that Earlam was the chairman on Plexus Limited, which he had just learned to be Debtor's majority owner: "[A]nd at the time I thought, well, I must be a pretty important customer if the Chairman and majority owner of [Debtor] wants to come over here and sit down and say hello or whatever."

b. "After they introduced Mr. Earlam, they said he wanted to come over here and talk to us – talk to me about this situation, this global economy mess, global economic mess, and Mr. Earlam . . . was talking about maybe the possibility of putting the cotton in the loan. . . . He said, you know, we might need to put this cotton in the loan and then as we can sell this cotton, pay for it in January or delay delivery; you know, maybe if I can hold delivery into January they will collect some of their cotton – some of their money for the '07 cotton that they had sold

and delivered that they were waiting on the money. Because he had told me that with the economic downturn, that they're having a hard time collecting some of their money from the '07 crop and they might need to put the cotton in the loan, if we were interested in signing an addendum to put the cotton in the loan with the growers. . . . And he was pretty much gloom and doom, that the world was about – you know, it's crashing, the world economy is crashing. You know . . . I said 'Well, what about, are you all going to be able to pay me?' He said, 'I guarantee you we'll pay you.' I said, you know, 'But when?' He said it might be after the first of January. And I said, 'Well, you know, if you all can – you know, if you're going to pay me, I mean, I'll do what I can to deliver the cotton later or borrow some money on it.' I said, 'I really don't want to go to the farmers and create anxiety in them by having cotton put in the loan and not be eligible . . . .' I said, 'You know, if you're pretty sure, guarantee me you're going to pay me, then I'll try to work with you to delay delivery or whatever.' And I think after that most of the conversation was talking about, you know, how tough the world economy was, it was just comments about that. And I said, 'You know, I don't need to be worried about this, about eventually getting my money, do I?' And he said, 'No, I guarantee you we'll pay you.'"  Mr. Coley took Earlam's "guarantee" to mean that Earlam was speaking at least on behalf of Plexus Limited.

(5) North Carolina Plaintiff Jones County, *Thomas Waller*

    a.  In response to the question of why Waller understood Earlam to be a board member for both Debtor and Plexus Limited, Waller stated: "Well, from him [Earlam]. I mean, he said . . . I'm going to stand behind these contracts. And it's

my understanding he represented Plexus and [Debtor].   Q :  Did  [Earlam]  say anything else other than what you just said to give you that understanding?   A:    Other than he explained their situation, that they had a cashflow [sic] problem, that they had foreign merchants, and wanted to assure the farmers that they would be able to fulfill their contracts.   Q: Who would?   A: [Earlam] said we would be able to fulfill the contracts. My understanding of that is [Debtor], Nick Earlam, and Plexus [Limited]."

b.   "He will stand behind the contracts. That's the best of my recollection, that's what [Earlam] said."

c.   "Q: And what was your understanding of what Nick Earlam meant when you say he said not these words, but your recollection generally, that he would stand behind the contracts? . . .   A:  It was my understanding that he stated that he would stand behind the contracts that he meant he and Plexus [Limited], being they were the controlling interest of [Debtor].   Q:  What does it mean to stand behind the contract?   A: It means that he would make the [Ginner C]ontracts good. That's what my opinion is.   Q: How did you understand [Earlam] would do that?   A:  I didn't know how – what means. But, it means he would assume the contracts.   Q:   Really. Did he – that he personally, Nick Earlam, would assume the contracts?   A:  [That i]s my understanding, Nick Earlam and Plexus [Limited] would assume them as being controlling interest of [Debtor].   Q:

That's what you understood on October 9th that [Earlam] meant?   A: Yes."

Contrary to the testimony of the Ginners' representatives, Earlam testified that his conversations with the Ginners were limited to talk of volatile market conditions and that "[a]t no stage did [he] ever say Plexus [Limited] would guarantee the contracts of [Debtor]."

In considering the contents of the statements provided above from the Ginners' representatives in light of Earlam's competing testimony, there are genuine issues of material fact as to the extent of representations made by Earlam. As to Kirby, on the other hand, no evidence has been presented showing that he made any verbal representations to the Ginners, and therefore summary judgment is appropriate in Kirby's favor as to all Plaintiffs' fraud, negligent misrepresentation, and promissory estoppel claims. With summary judgment granted in Kirby's favor on these remaining causes of action, the discussion below will address only the liability of Defendants Earlam and Plexus Limited.

### i.  Fraud[55]

Plaintiffs allege that Defendants should be held liable for fraud because they: (1) failed to disclose Debtor's solvency issues in the spring of 2008; (2) entered into Contract 8001 and the Subsidiary Contracts, which Plaintiffs assert were "sham" contracts; and (3) made false representations to Plaintiffs about Debtor's ability to perform its obligations under the Ginner Contracts.

As to the first allegation of fraud, Plaintiffs have failed to present evidence demonstrating Debtor's insolvency in the spring of 2008. The evidence before the Court shows that Debtor remained solvent until at least the end of September of 2008. Therefore, Plaintiffs' claims that Defendants made fraudulent misrepresentations as to Debtor's solvency in the spring of 2008 fail as a matter of law.

---

[55] The parties have agreed that the Assignor-Gins' fraud claims were not and are not capable of assignment. Therefore, summary judgment is appropriate in favor of all Defendants against the fraud claims of the Assignor-Gins.

As to the second allegation of fraud, in this proceeding Plaintiffs have argued that the substitution of Contract 8001 with the Subsidiary Contracts by Debtor's board constituted a breach of the Defendant-directors' fiduciary duties to creditors of Debtor.   Alleging a loss of benefits under Contract 8001 necessarily presumes that it was enforceable.   Additionally, the parties agree that the Subsidiary Contracts came into existence as a result of transferring and splitting Contract 8001's purchase obligations; this too acknowledges that Contract 8001's terms were valid, enforceable, and therefore able to be modified.   Furthermore, Plaintiffs asserted the enforceability of the Subsidiary Contracts—the direct byproducts of Contract 8001—in a prior state court proceeding, as evidenced in Plaintiffs' State Court Complaints,[56] as well as in the ICA arbitration.   Plaintiffs are therefore judicially estopped from arguing before this Court that Contract 8001 and the Subsidiary Contracts were unenforceable "sham" contracts.   *See, e.g.*, *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("'The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.'") (quoting 18 Moore's Federal Practice § 134.30, p. 134–62 (3d ed. 2000)).   In state court, Plaintiffs obtained a result in their favor in relation to this position by receiving a preliminary injunction against Debtor prohibiting it "from making any disposition or compromise of the rights under" the Subsidiary Contracts during the pendency of the state court proceedings.   Plaintiffs are not entitled to advance a contrary position in this adversary proceeding.   *Id.* ("'[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of [Debtor] who has acquiesced in the position formerly taken by him.'") (quoting *Davis v. Wakelee*, 156 U.S. 680,

---

[56] As discussed in the findings of fact, the Court has taken judicial notice of Plaintiffs' proceedings in state court against Debtor.

689 (1895)).   Having defended and benefitted from the supposed legitimacy of the Subsidiary Contracts in state court actions against Debtor, Plaintiffs cannot now argue the Contracts' illegitimacy in this action against members of Debtor's board, all of whom remain protected by Debtor's corporate veil.  Even beyond Plaintiffs' state court proceedings, Plaintiffs, as previously noted, advocated for the enforcement of the Subsidiary Contracts in the ICA arbitration initiated by the Trustee against the Subsidiaries by supplying supporting affidavits and hiring a third-party, Mr. Stuart Frazer of Production Marketing, L.L.C., to act on their behalf in attempts to negotiate a tender of cotton directly from the Ginners to the Subsidiaries. The ICA arbitration panel declared the Subsidiary Contracts to have been valid and enforceable at the time of their execution, a finding favorable to the Ginners.[57]  Plaintiffs never appealed or contested this finding.  For these reasons, Defendants are entitled to summary judgment on all Plaintiffs' fraud claims on the grounds that Contract 8001 and the Subsidiary Contracts were "shams."

Plaintiffs' third and final remaining allegation of fraud is related to representations allegedly made to the Ginners by Earlam, either in his individual capacity or on behalf of Plexus Limited, regarding Debtor's ability to perform the Ginner Contracts, including statements that he or Plexus Limited "stood behind" the Ginner Contracts.  Plaintiffs have presented the Court with two separate representations made to the Ginners by Earlam: (1) assurances as to Debtor's performance; and (2) statements related to Earlam and/or Plexus Limited's support of the Ginner Contracts.

Although the law within each Plaintiff's home state varies to a degree as to the elements of fraud based upon promises of future performance such as those allegedly made by Earlam, all require a threshold showing of the existence of a false representation made by a defendant

---

[57] As discussed in the Court's findings of fact, no monetary award was provided by the ICA arbitration panel. Instead, the Subsidiaries were required to invoice back to Debtor the cotton the Subsidiaries had contracted to purchase; no payment to Debtor was required due to Debtor's failure to deliver the contracted cotton.

with the intent to deceive. *See, e.g.*, *Olympus Managed Health Care, Inc. v. Am. Housecall Physicians, Inc.*, 662 F. Supp. 2d 427, 438 (W.D.N.C. 2009) ("A promissory misrepresentation may constitute actionable fraud when it is made with intent to deceive the promisee, and the promisor, at the time of making it, has no intent to comply.") (citing *Leftwich v. Gaines*, 521 S.E.2d 717, 723 (N.C. Ct. App. 1999)); *Super Valu Stores, Inc. v. 1ˢᵗ Nat'l Bank of Columbus, Ga.*, 463 F. Supp. 1183, 1195 (M.D. Ga. 1979) (holding that allegations of promises to pay in the future require evidence "that the promisor at the time of the promise knows that the corporation cannot or will not fulfill the promise") (citing *Nixon v. Brown*, 157 S.E.2d 20, 22–23 (Ga. 1967)); *Exxon Mobil Corp. v. Ala. Dep't of Conservation & Natural Res.*, 986 So. 2d 1093, 1114 (Ala. 2007) ("The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation.") (quoting *Saia Food Distribs. & Club, Inc. v. SecurityLink from Ameritech, Inc.*, 902 So. 2d 46, 57 (Ala. 2004)) (internal quotation marks omitted); *Baker v. Hanks*, 661 So. 2d 1155, 1157 (Ala. 1995) (expanding the elements of fraud where allegations are "based on a promise to perform in the future" and requiring plaintiff to "prove two additional elements: (1) that the defendant intended, at the time of the misrepresentation, not to perform the act promised; and (2) that the defendant intended to deceive"); *Crawford v. Williams*, 375 S.E.2d 223, 224 (Ga. 1989) (holding that under Georgia common law, proof of fraud requires: (1) a false representation by a defendant; (2) scienter; (3) an intent to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff resulting from the reliance); *Ragsdale v. Kennedy*, 209 S.E.2d 494, 500 (N.C. 1974) (stating the elements of fraud under North Carolina as "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which

does in fact deceive, (5) resulting in damage to the injured party"). "A party cannot rely on representations consisting of 'general commendations or mere expressions of opinion, hope, expectation, and the like.'" *Williams v. Dresser Indus., Inc.*, 120 F.3d 1163, 1171 (11th Cir. 1997) (quoting *Charter Med. Mgmt. Co. v. Ware Manor, Inc.*, 283 S.E.2d 330, 336 (Ga. Ct. App. 1981)).

The assurances provided by Earlam relating to Debtor's performance of the Ginner Contracts, as set forth above, do not rise to the level of actionable fraud. Plaintiffs have failed to provide evidence suggesting falsity regarding Debtor's desire to stand behind the Ginner Contracts and, with optimistic hopes for the cotton market, its intention to perform if the Ginners could provide flexibility as to delivery dates. "The existence of actual fraud is not deducible from facts and circumstances which would be equally consistent with honest intentions" such as these. *White v. Nat'l Steel Corp.*, 938 F.2d 474, 490 (4th Cir. 1991); *see also In re Shadinger*, 357 B.R. 158, 167 (Bankr. N.D. Ala. 2006) (stating that "overly optimistic" representations cannot rise to the level of fraud where there is "no credible evidence the representations were made to intentionally mislead . . . or that the [d]ebtor did not honestly believe his representations were true"); *Fuller v. Perry*, 476 S.E.2d 793, 796 (Ga. Ct. App. 1996) ("'Representations concerning expectations and hopes are not actionable.'") (quoting *Smith v. McClung*, 452 S.E.2d 229, 231 (Ga. Ct. App. 1994)). Furthermore, as to the requirement that the representations at issue be made with an intent to deceive, the evidence before the Court is insufficient to create a genuine issue of material fact as to whether Earlam genuinely believed Debtor would perform the Ginner Contracts. No evidence in the record indicates that Earlam, at the time of these October visits to the Ginners, either intended or knew that Debtor would ultimately breach the Ginner Contracts. At the time of Earlam's statements, Debtor was operating and its credit line

with BB&T remained in place.  The evidence indicated that in his discussions with the Ginners, Earlam openly discussed the deterioration of the global cotton market and Debtor's cash flow problems, encouraged placing the farmers in the loan program to mitigate against their losses in the event the Contracts were not performed, indicated the need for delay to allow performance, and offered additional assurances that Debtor's performance would be supported.  Moreover, as discussed in relation to Plaintiffs' tortious interference claims, the evidence does not suggest that Earlam engaged in a course of conduct designed to induce Debtor's breach of the Ginner Contracts.  The absence of a genuine issue of material fact as to that element of tortious interference only further supports Defendants' position on the intent to deceive element of Plaintiffs' fraud claims.  Summary judgment is appropriate for both Earlam and Plexus Limited as to Plaintiffs' claims for fraud related to assurances of Debtor's performance on the Ginner Contracts due to evidence indicating that Earlam's statements, whether made in an individual capacity or on behalf of Plexus Limited, were neither false nor made with intent to deceive the Ginners.

As to statements made by Earlam that Earlam, Plexus Limited, or both "stood behind" the Ginner Contracts, Plaintiffs have provided evidence sufficient to show genuine issues of material fact as to each element required for fraud.  Defendants have not produced evidence indicating a contrary meaning of the alleged statements that Earlam, Plexus Limited, or both would stand behind the Ginners Contracts.

Initially, Defendants argue that the Court should find in their favor on this cause of action pursuant to the common law statute of frauds.  Although it is true that Alabama, Georgia, and North Carolina require a promise to answer for the debts of another to be in writing to be enforceable, the three states also recognize the "main purpose" exception to the statute of frauds.

This exception "states that 'if it is concluded that a promisor has the requisite personal, immediate, and pecuniary interest in the transaction in which a third party is the primary obligor, then the promise is said to be original rather than collateral and therefore need not be in writing to be binding.'" *FRS, Inc. v. Cox*, 3:05-CV-00521, 2008 WL 2635488, at *2 (W.D.N.C. July 1, 2008) (quoting *Terrell v. Kaplan*, 613 S.E.2d 526, 528 (N.C. Ct. App. 2005)); *see also Alexander, Corder, Plunk, Baker & Shelly, P.C. v. Jackson*, 811 So. 2d 506, 513 (Ala. 2001) (stating that a promise to pay the debts of another "'is not within the Statute of Frauds as a promise to answer for the duty of another if the consideration for the promise is in fact or apparently desired by the promisor mainly for his own economic advantage, rather than in order to benefit the third person'") (citing Restatement (Second) of Contracts § 116 (1981)); *Howard, Weil, Labouisse, Fredericks, Inc. v. Abercrombie*, 231 S.E.2d 451, 454 (Ga. Ct. App. 1976) ("[I]f the agreement of the third party guarantor is an original undertaking; that is, one furthering his own interests rather than underwriting the debt of another, it is not within the Statute of Frauds . . . ."). When viewing the evidence in the light most favorable to Plaintiffs, genuine issues of material fact exist as to whether Earlam and Plexus Limited had personal, immediate, and pecuniary interests in the performance of the Ginner Contracts. As discussed above in regard to the Plaintiffs' breach of fiduciary duty to creditor claims, the evidence could be construed to indicate that Earlam, Plexus Limited, or both stood to benefit financially from Debtor's performance of the Ginner Contracts by way of a reduction in liability under whichever Agreement(s) were valid and enforceable. Therefore, granting summary judgment in favor of Defendants through an application of the statute of frauds, in light of the foregoing exception, would be inappropriate.

As testified to by the representatives of the Ginners, various experts, and Earlam himself, the cotton trade is and continues to be a business in which oral agreements are commonplace.[58] When the Ginners were told by an announced executive (Earlam) for the majority owner (Plexus Limited) of the company with which the Ginners were doing business (Debtor), the evidence suggests that the Ginners were both reasonable and justified in their reliance on Earlam's statements. Representatives of the Ginners have taken inconsistent positions as to which party Earlam was referring to as "standing behind" the Ginner Contracts. Representatives for Georgia Plaintiffs BCT and Coley as well as North Carolina Plaintiff Jones County testified that they believed Earlam was speaking both individually and on behalf of Plexus Limited, whereas the representative for Alabama Plaintiff Henry County instead interpreted Earlam's statements as referring only to Plexus Limited. The representative for Georgia Plaintiff Arabi believed that Earlam was referring only to himself. As to the Ginners which interpreted Earlam's statements to be made on Plexus Limited's behalf in addition to or separate from Earlam's individual capacity, his role as a representative of Plexus Limited was made known at the time of his statements and the circumstances do not appear to have necessitated further exploration by these particular Ginners into Earlam's authority to speak on Plexus Limited's behalf. As to Georgia Plaintiff Arabi, summary judgment is appropriate in favor of Plexus Limited on this particular fraud claim absent an allegation that Earlam spoke on its behalf when stating that he stood behind Debtor's contract with Arabi. The opposite must be said for Alabama Plaintiff Henry County—summary judgment is appropriate for Earlam on Henry County's claim absent an allegation that Earlam made the alleged statements in an individual capacity. Therefore, the following fraud claims remain as to Earlam's statements that he and/or Plexus Limited stood

---

[58] Linda Exum of BCT, for example, testified at length as to how BCT initiates many of its dealings with cotton merchants and farmers with a phone conversation; paperwork, signed contracts, and written price fixations often appear sometime after the oral commitments to buy, sell or store.

behind the Ginner Contracts: (1) Claims against Earlam and Plexus Limited by Georgia Plaintiffs BCT and Coley as well as North Carolina Plaintiff Jones County; (2) Claim against Earlam by Georgia Plaintiff Arabi; and (3) Claim against Plexus Limited by Alabama Plaintiff Henry County.

Actionable fraud for representations relating to promises to pay in the future, such as Earlam's, which Plaintiffs understood to be a promise that Plexus Limited and/or Earlam would financially support Debtor in its performance of the Ginner Contracts, requires evidence of the speaker's intent to deceive by knowing at the time of the representations that the future payor did not intend to or was not capable of performing. "Intent to deceive is one of the more difficult elements to prove in a fraud action since it involves the defendant's state of mind." *In re Chesson*, B-09-81328C-7D, 2012 WL 4794148, at *5 (Bankr. M.D.N.C. Oct. 15, 2012). "Because it is nearly impossible to obtain direct proof of a debtor's state of mind, a creditor may present evidence of the surrounding circumstances from which such intent may be inferred." *Id.*; *see also Marshall Durbin Farms, Inc. v. Landers*, 470 So. 2d 1098, 1101 (Ala. 1985) ("Since present intent not to perform a future act is difficult to prove by direct evidence of a defendant's state of mind, a plaintiff may meet this burden by circumstantial evidence."); *John W. Rooker & Assocs. v. Wilen Mfg. Co.*, 439 S.E.2d 740, 742 (Ga. Ct. App. 1993) ("'Intent, good faith, motive, and other such matters relating to the state of a person's mind are usually not easily susceptible of direct proof.'") (quoting *Tapley v. Youmans*, 97 S.E.2d 365, 374 (Ga. Ct. App. 1957)); *Canady v. Mann*, 419 S.E.2d 597, 601 (N.C. Ct. App. 1992) ("The intent of a party is a state of mind generally within the exclusive knowledge of that party and, by necessity, must be proved by circumstantial evidence. Summary judgment is generally inappropriate under such circumstances."). Earlam and Plexus Limited have denied that Earlam, while acting either in his

individual capacity or as an agent for Plexus Limited or Debtor, intended to deceive Plaintiffs with any representations he allegedly made to the Ginners.[59]   Upon Defendants' denial, it becomes Plaintiffs' burden to show a genuine issue of material fact as to Earlam's intent. *Canady*, 419 S.E.2d at 601; *see also Adickes*, 398 U.S. at 159–61; Fed. R. Civ. P. 56(e).

Plaintiffs have provided circumstantial evidence sufficient to survive summary judgment as to this element. There is no evidence in the record to date that either Earlam or Plexus Limited has made any effort to directly assist the Ginners following Debtor's breach.  Plaintiffs argue that the evidence shows Earlam was aware of Albrecht's issues with performance of Contract 8001 and knew that Debtor's board intended to or already had modified the Contract's terms.[60] Without Contract 8001's physical hedge being in place to contractually require Albrecht to take delivery from Debtor within two to three weeks of Debtor's receipt of warehouse receipts from the Ginners, Earlam knew at the time of his statements that Debtor needed the Ginners to continue relying on its performance.  Even if unaware of the likelihood of Debtor's impending breach, Earlam was aware of Debtor's desire that the Ginners delay their deliveries and take other steps to aid in mitigating losses (i.e., putting the farmers' cotton into the loan program). With the promise that Earlam, Plexus Limited, or both supported and ensured Debtor's ultimate performance, Earlam knew or should have known that the Ginners would expect such a guarantee to be fulfilled.

Drawing all reasonable inferences in the light most favorable to Plaintiffs, the circumstantial evidence before the Court leaves open a genuine issue of material fact as to

---

[59] Defendants have failed to specifically address these "stand behind" representations in their memoranda to the Court and have focused exclusively on statements allegedly made by Earlam as to *Debtor's* future performance, requests for delayed delivery, and suggestions that the Ginners' farmers enter into the loan program.

[60] The timing of Earlam's visits to each Ginner was in close proximity to the October 6th board meeting; some took place before and others after.  The evidence shows that Debtor knew of Albrecht's issues with performance in late September and that the October 6th board meeting was called to address those issues.  It is reasonable to assume that October 6th was not the initial date on which Earlam knew that Albrecht requested modifications to Contract 8001.

whether Earlam made these "stand behind" representations for the purpose of instilling a sense of security in the Ginners while never actually intending to offer the support his words suggested.

With regard to causation and damages, the final elements of fraud, Plaintiffs have presented evidence sufficient to show a genuine issue of material fact. Plaintiffs have presented testimony of the Ginners' representatives showing that their decisions to delay delivery, forego earlier arbitration or litigation, and continue working with Debtor caused damages, including the loss of sales and profits and were brought about in large part due to their belief that Plexus Limited, Earlam, or both stood behind the Ginner Contracts.[61] Therefore, after a thorough review of the allegations contained in the Original and Amended Complaints as well as the deposition testimony of Earlam and representatives for the Ginners, the Court denies Earlam's motion for summary judgment on these particular fraud claims made by Georgia Plaintiffs Arabi, BCT, and Coley as well as North Carolina Plaintiff Jones County. The Court also denies Plexus Limited's motion for summary judgment on these particular fraud claims made by Alabama Plaintiff Henry County, Georgia Plaintiffs BCT and Coley, and North Carolina Plaintiff Jones County. Further, for the reasons set forth above, Earlam's motion for summary judgment is granted as to Alabama Plaintiff Henry County, and Plexus Limited's motion for summary judgment is granted as to Georgia Plaintiff Arabi.

### ii.  *Negligent Misrepresentation*

Plaintiffs allege that they justifiably relied on express and implied representations made by Defendants Earlam and Plexus Limited[62] concerning Debtor's ongoing solvency and its ability to perform the Ginner Contracts. Further, Plaintiffs contend Defendants owed Plaintiffs a duty of care to truthfully communicate the state of Debtor's insolvency and breached this duty by

---

[61] The Ginners also point to the award of damages by the ACSA Arbitration Committee.

[62] As noted above, there is no evidence in the record of statements made to the Ginners by Kirby and summary judgment has been granted in his favor on Plaintiffs' negligent misrepresentation claims.

misrepresenting or, in the alternative, failing to disclose the true state of Debtor's financial condition. For the same reasons set forth above, Plaintiffs' claims for negligent misrepresentations related to Debtor's solvency in the spring of 2008 fail as a matter of law. The record before the Court, even when viewed in the light most favorable to Plaintiffs, indicates that Debtor was solvent until at least September 30, 2008. Therefore, Plaintiffs' remaining negligent misrepresentation claims relate only to Earlam's statements, made on his own behalf or as an agent of Plexus Limited: (1) relating to Debtor's solvency in the months following September 30, 2008 and prior to Debtor's ultimate breach of the Ginner Contracts in January of 2009; and (2) regarding Debtor's ability to perform the Ginner Contracts.

### 1. Duty to disclose owed to the Ginners by Earlam and/or Plexus Limited

Under the state law of each Plaintiff's home state, liability for negligent misrepresentation is predicated upon the existence of a duty. Privity of contract may give rise to this duty, but absent privity of contract, recovery is limited in a business context to foreseeable plaintiffs affected by the misrepresentations of defendants that make "'it a part of their business or profession to supply information *for the guidance of others* in their business transactions.'" *Fisher v. Comer Plantation, Inc.*, 772 So. 2d 455, 461 (Ala. 2000); *see also Carolina Cas. Ins. Co. v. R.L. Brown & Assocs., Inc.*, No. 1:04-CV-3537-GET, 2006 WL 2842733, at *6 (N.D. Ga. Sept. 29, 2006); *Abraham v. Jauregui*, No. 09 CVS 3608, 2012 WL 2052691, at *4 (NCBC June 7, 2012) (quoting *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 367 S.E.2d 609, 612 (N.C. 1988), *rev'd on other grounds*, 407 S.E.2d 178 (N.C. 1991)). The Original and Amended Complaints allege facts showing privity of contract between Debtor and the Ginners only and that Earlam made the representations at issue to further his own best interests or those of Plexus Limited, and not while acting on Debtor's behalf. Therefore, for liability for negligent

63

misrepresentation to attach to Earlam or Plexus Limited, there must be evidence showing a

genuine issue of material fact as to whether Earlam and Plexus Limited owed Plaintiffs a duty of

care independent of Plaintiffs' contractual relationship with Debtor.

When considering whether a party may be liable for negligent misrepresentation where

the parties do not share privity of contract, Alabama, Georgia, and North Carolina have each

adopted the approach embodied in Restatement (Second) of Torts. *See, e.g.*, *Fisher*, 772 So. 2d

at 461; *Robert & Co. Assocs. v. Rhodes-Haverty P'ship*, 300 S.E.2d 503, 504 (Ga. 1983) ("We

think the best rule for resolution . . . is the one enunciated in the Restatement of Torts 2d, § 552

(1977)."); *Powell v. Wold*, 362 S.E.2d 796, 799 (N.C. Ct. App. 1987) ("North Carolina has

adopted the Restatement of Torts definition of the requirements for an action based on negligent

misrepresentation.") (citing *Stanford v. Owens*, 332 S.E.2d 730, 731–32 (N.C. Ct. App. 1985)).

Subsection (1) of § 552 reads as follows:

> One who, in the course of his business, profession or employment, or in
> any other transaction in which he has a pecuniary interest, supplies
> false information *for the guidance of others* in their business
> transactions, is subject to liability for pecuniary loss caused to them by
> their justifiable reliance upon the information, if he fails to exercise
> reasonable care or competence in obtaining or communicating the
> information.

Restatement (Second) of Torts § 552(1) (1977) (emphasis added). "[T]he liability stated in

Subsection (1) is limited to loss suffered . . . by the person or one of a limited group of persons

for whose benefit and guidance he intends to supply the information . . . and . . . through reliance

upon it in a transaction that he intends the information to influence . . . or in a substantially

similar transaction." *Id.* at (2)(a)–(b).[63]

---

[63] The omitted portions of § 552 include reference to an extension of liability to third parties who receive the false
information at issue from the party to whom the defendant originally supplied it. *See* Restatement (Second) of Torts
§ 552(2)(a)–(b) (1977). Under the facts as plead and argued in this case, these omitted portions would not be
applicable here; Plaintiffs allege that Earlam individually and/or on behalf of Plexus Limited made representations

In comparison to Alabama and North Carolina, Georgia has adopted a slightly broader scope for the class of persons to whom liability for negligent misrepresentation may attach under § 552. The Court addresses the relevant distinctions below.

> ### a. Interpretation of § 552 as applied to Alabama Plaintiff Henry County and North Carolina Plaintiff Jones County

In Alabama and North Carolina, a defendant that is not in privity of contract with a plaintiff can only be held liable for negligent misrepresentation if it, in the course of its business, profession, or employment, engages in an activity that meets the requirements set forth in Subsection (1) of Restatement (Second) of Torts § 552. To survive Earlam and Plexus Limited's motion for summary judgment on this claim, the Alabama and North Carolina Plaintiffs must show that, at the time of the representations, Earlam and Plexus Limited made "'it a part of [their] business or profession to supply information *for the guidance of others* in their business transactions.'" *Fisher*, 772 So. 2d at 462 (quoting Restatement (Second) of Torts § 552 cmt. c (1977)).

"Although Alabama's Supreme Court has made clear that its 'application of the Restatement approach' is not 'restrict[ed] . . . to . . . one class of professionals,' it has indicated that the rule 'subjects to liability only such persons as make it a *part of their business or profession* to supply information for the guidance of others in their business transactions.'" *Mosley v. Wyeth, Inc.*, 719 F. Supp. 2d 1340, 1345 (S.D. Ala. 2010) (citing *Fisher*, 772 So. 2d at 462) (emphasis added). Likewise, North Carolina courts have held that the type of party that may be liable for negligent misrepresentation is only "[o]ne who *in the course of his business or*

---

to Plaintiffs directly. Additionally, subsection (3) of § 552, which refers to individuals "under a public duty to give information," is also inapplicable here as Plaintiffs have not alleged any such public duty conferred upon any of Defendants.

*profession* supplies information for the guidance of others in their business transactions . . . ."
*Powell*, 362 S.E.2d at 799 (citing *Stanford*, 332 S.E.2d at 731–32) (emphasis added).

Henry County and Jones County have not provided sufficient evidence to create a genuine issue of material fact as to whether Earlam, Plexus Limited, or both are of the class of professionals to which liability for negligent misrepresentation can attach absent privity of contract. Although Plaintiffs have pled that Plexus Limited had a pecuniary interest in the Ginner Contracts and the related Agreements provided by Earlam and Plexus Limited, there is no evidence suggesting that Plexus Limited or Earlam were or are in the business of providing "guidance of others in their business transactions." *Id.*; *see also Mosley*, 719 F. Supp. 2d at 1345. Therefore, absent the requisite duty under Alabama and North Carolina law, summary judgment is appropriate in favor of Earlam and Plexus Limited as to the negligent misrepresentation claims brought by Henry County and Jones County.

### b. *Interpretation of § 552 as applied to Georgia Plaintiffs Arabi, BCT, and Coley*

As adopted by the Georgia Supreme Court in *Rhodes-Haverty*, the rule for negligent misrepresentation resulting in economic loss provided by § 552 is interpreted under Georgia state law to provide the following:

> [O]ne who supplies information during the course of his business, profession, employment, or in any transaction in which he has a pecuniary interest has a duty of reasonable care and competence to parties who rely upon the information in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended that it be so used. This liability is limited to a foreseeable person or limited class of persons for whom the information was intended, either directly or indirectly. In making a determination of whether the reliance by the third party is justifiable, we will look to the purpose for which the . . . representation was made. If it can be shown that the representation was made for the purpose of inducing third parties to rely and act upon the reliance, then liability to the third party can

> attach. If such cannot be shown there will be no liability in the
> absence of privity, wilfulness or physical harm or property
> damage. The additional duty that this rule imposes may be, of
> course, limited by appropriate disclaimers which would alert those
> not in privity with the supplier of information that they may rely
> upon it only at their peril.

*Wingate Land, LLC v. ValueFirst, Inc.*, 722 S.E.2d 868, 869–70 (Ga. Ct. App. 2012) (quoting

*Rhodes-Haverty*, 300 S.E.2d at 504). Unlike Alabama and North Carolina, Georgia courts have

not interpreted § 552 as a limitation on the class of persons to whom liability can attach absent

privity of contract—instead, the important limiting factor under Georgia law is that of reliance

by the plaintiff. Therefore, Arabi, BCT, and Coley must provide evidence showing a genuine

issue of material fact as to whether their "reliance was the desired result of the representation[s]"

made by Earlam. *Rhodes-Haverty*, 300 S.E.2d at 504.

The Court finds that upon review of the evidence and drawing all reasonable inferences

therefrom in the light most favorable to Plaintiffs, the Georgia Plaintiffs were both reasonable

and justified in their reliance on Earlam's statements as to Debtor's ability to perform the Ginner

Contracts. Earlam traveled from England to the United States to visit the Georgia Plaintiffs with

the hope that they would act or refrain from acting as a result of his representations. Unlike

Plaintiffs' fraud claims, actionable negligent misrepresentation does not require proof that

Earlam intended to deceive the Ginners with his assurances of future performance; Earlam's

honest intentions do not insulate him from liability for negligent misrepresentation. The more

relevant focus, particularly under Georgia law, is whether the Ginners' reliance by way of

withholding delivery and foregoing earlier arbitration or litigation was Earlam's desired result of

his representations. The evidence suggests that it was. Therefore, applying Georgia's

interpretation of § 552, a genuine issue of fact exists regarding reliance by Arabi, BCT, and

Coley on Earlam's representations.

Furthermore, with respect to the liability of Plexus Limited for Earlam's statements, Earlam was introduced to the Georgia Plaintiffs as a Plexus Limited executive. It was at this time that the Georgia Plaintiffs learned of Plexus Limited's majority ownership position with Debtor. A genuine issue of material fact remains as to whether the Georgia Plaintiffs were reasonable in their belief that Earlam made the alleged representations regarding Debtor's future performance while acting in his authority as an agent of Plexus Limited rather than on behalf of Debtor. *See, e.g.*, 2A C.J.S. Agency § 421 (2014) ("If the agent is authorized to speak, an agent's statements are binding on the principal since when a principal gives a person authority, either actual or apparent, to do certain acts, those acts become binding on the principal as the acts of the principal.").

With regard to causation and damages, the final elements of negligent misrepresentation, Plaintiffs have presented evidence sufficient to show a genuine issue of material fact. Plaintiffs have presented testimony of the Ginners' representatives showing that their decisions to delay delivery, forego earlier arbitration or litigation, and continue working with Debtor caused damages, including the loss of sales and profits and were brought about in large part due to their belief that Plexus Limited, Earlam, or both stood behind the Ginner Contracts.[64] For this reason, the motion for summary judgment by Earlam and Plexus Limited against Georgia Plaintiffs Arabi, BCT, and Coley must be denied.

### iii.  *Promissory Estoppel*

Plaintiffs contend that Plexus Limited should be required to perform certain promises allegedly made to the Ginners during various visits to the Ginners' places of business.

---

[64] The Ginners also point to the award of damages by the ACSA Arbitration Committee.

Specifically, Plaintiffs argue that Earlam individually or Plexus Limited, through Earlam,[65] made

unambiguous promises and assurances that it ensured performance of the Ginner Contracts by

Debtor and that the Contracts would be honored by Debtor if the Ginners delayed delivery.[66]

Promissory estoppel is a cause of action rooted in state law.  *See, e.g.*, *Cohen v. Cowles*

*Media Co.*, 501 U.S. 663, 672 (1991); *Long v. Lockheed Missiles & Space Co.*, 783 F. Supp. 249,

252 (D.S.C. 1992).  Reaching conclusions of law on Defendants' motion for summary judgment

on each Plaintiff's promissory estoppel cause of action requires application of the laws of the

state in which each Plaintiff suffered its injury.  Two of the three states represented by the

Ginners share essentially identical elements for their respective state law cause of action for

promissory estoppel—Alabama and Georgia require a plaintiff to prove: (1) the existence of an

unambiguous promise; (2) reasonable reliance upon that promise by the party to whom the

promise is made; (3) the party's reliance on the promise was both expected and foreseeable by

the party making the promise; and (4) the party to whom the promise was made suffers injury or

damage as a result of its reliance on the promise.  *See, e.g.*, *Bush v. Bush*, 177 So. 2d 568, 570

(Ala. 1964) ("'A promise which the promisor should reasonably expect to induce action or

forbearance of a definite and substantial character on the part of the promisee and which does

induce such action or forbearance is binding if injustice can be avoided only by enforcement of

the promise.'") (citing Restatement (First) of Contracts § 90 (1932)); *U.S. Foodservice, Inc. v.*

*Bartow Cnty. Bank*, 685 S.E.2d 777, 780 (Ga. Ct. App. 2009) ("'The doctrine of promissory

estoppel provides . . . that '[a] promise which the promisor should reasonably expect to induce

action or forbearance on the part of the promisee or a third person and which does induce such

---

[65] As previously discussed, representatives of the Ginners have taken inconsistent positions as to the party which they believed Earlam to be referring to as "standing behind" the Ginner Contracts.

[66] As noted above, there is no evidence in the record of statements made to the Ginners by Kirby and summary judgment has been granted in his favor on Plaintiffs' promissory estoppel claims.

action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'") (quoting Ga. Code Ann. § 13-3-44(a) (1981)).[67]

"North Carolina, however, does not recognize promissory estoppel as an affirmative cause of action." *Rudolph*, 846 F. Supp. 2d at 477 (citing *Home Elec. Co. of Lenoir, Inc. v. Hall & Underdown Heating & Air Conditioning Co.*, 358 S.E.2d 539, 541 (N.C. Ct. App. 1987), *aff'd* 322 N.C. 107, 366 S.E.2d 441 (1988) and *Dealers Supply Co. v. Cheil Indus.*, 348 F. Supp. 2d 579, 587 (M.D.N.C. 2004)).  As a result, the claims of promissory estoppel brought by Plaintiff Jones County and the Assignor-Gins fail as a matter of law.  Summary judgment in favor of Defendants as to North Carolina Plaintiff Jones County and the Assignor-Gins will, therefore, be granted with respect to this claim.

As to the Alabama and Georgia Plaintiffs, "[t]he threshold requirement of a promissory estoppel claim is, of course, that there be some enforceable promise by the defendant." *Foley Co. v. Warren Eng'g, Inc.*, 804 F. Supp. 1540, 1544 (N.D. Ga. 1992).  Although both states have adopted the same definition for promissory estoppel, the two differ on the class of actionable promises.  Georgia law allows recovery only for express promises with definite terms.  *See, e.g.*, *Ga. Invs. Int'l, Inc. v. Branch Banking & Trust Co.*, 700 S.E.2d 662, 675–76 (Ga. Ct. App. 2010) (reviewing case law where courts held promissory estoppel actions could not lie due to indefinite nature of promises).  Alabama state courts, on the other hand, will entertain promissory estoppel actions where the contents of the statement contain "promissory elements." *See, e.g.*, *Sykes v. Payton*, 441 F. Supp. 2d 1220, 1224 (M.D. Ala. 2006); *Mazer v. Jackson Ins. Agency*, 340 So. 2d 770, 774 (Ala. 1976) ("An *express promise* is *not* necessary to establish a promissory estoppel. It

---

[67] As suggested by the similarity of the quoted law from Alabama and Georgia, both states have adopted the Restatement's definition for promissory estoppel. *See* Restatement (First) of Contracts § 90 (1932).

is sufficient that there be promissory elements which would lull the promisee into a false sense of security.") (emphasis added).

### 1. Summary Judgment is Appropriate for Claims of Georgia Plaintiffs, Arabi, BCT, and Coley

The Georgia Plaintiffs, Arabi, BCT, and Coley, have not met their burden of demonstrating the required element of an enforceable promise by Defendants. The promises and assurances in evidence as set forth by the Georgia Plaintiffs, while containing "promissory elements," lack the certainty and definiteness required to be actionable under Georgia law. The promises allegedly made by Earlam involved contingencies (i.e., that Debtor would perform if Plaintiffs delayed delivery and/or placed their cotton into a U.S. Department of Agriculture loan program) and lacked material terms (i.e., bare statements from Earlam "that Plexus [Limited] would stand behind the [Ginner] contracts").[68] *See, e.g.*, *Jackson v. Ford*, 555 S.E.2d 143, 147 (Ga. Ct. App. 2001); *Mooney v. Mooney*, 538 S.E.2d 864, 867–68 (Ga. Ct. App. 2000). As a result, summary judgment in favor of both Earlam and Plexus Limited is hereby appropriate against Georgia Plaintiffs Arabi, BCT, and Coley.

### 2. Summary Judgment Should be Denied as to Promissory Estoppel Claim of Alabama Plaintiff Henry County

Conversely, the Court is unable to conclude from the evidence presented regarding Earlam's statements to Alabama Plaintiff Henry County, even viewing such evidence in the light most favorable to Plaintiffs, that these statements qualify as unambiguous representations with at least "promissory elements." *See, e.g.*, *Sykes*, 441 F. Supp. 2d at 1224. According to his

---

[68] Deposition testimony, as provided by representatives of the Ginners, makes clear that at no point in time did any officer, employee, or agent of the Ginners seek out additional details or explanation as to what Earlam meant when he allegedly stated that Plexus Limited stood behind the Ginner Contracts. Therefore, although Earlam's "stand behind" statements may constitute actionable *fraud*, these particular Plaintiffs are prevented from surviving Defendants' motion for summary judgment on their promissory estoppel claim as it relates to such statements in light of Georgia's requirement that an enforceable promise include certain and definite terms.

testimony, the representative for Alabama Plaintiff Henry County interpreted Earlam's statements as referring only to Plexus Limited. Therefore, absent an allegation that Earlam was speaking on his own behalf, summary judgment is appropriate in his favor against Henry County. The Court must proceed in reviewing Earlam's representations to Henry County which ensured performance by Debtor and pledged that Plexus Limited stood behind the Ginner Contracts as being provided by Earlam exclusively as an agent for Plexus Limited.

The evidence before the Court, when viewed in the light most favorable to Henry County, indicates that Henry County was justified in its reliance on Earlam's promises and representations made on behalf of Plexus Limited for the same reasons its reliance was validated in the Court's review of Henry County's fraud claims related to these "stand behind" representations. From the evidence, it is reasonably inferable that Earlam's visits to Henry County, in his apparent official capacity on behalf of Plexus Limited, created no obvious reason for further inquiry into his authority to speak on Plexus Limited's behalf. The Court also finds that Henry County's reliance—displayed by delaying delivery, foregoing arbitration at an earlier date, and withholding attempts to sell on the open market the cotton contracted to be sold to Debtor—was foreseeable by Earlam when he traveled to visit Henry County, presumably on Plexus Limited's behalf. Although Mike DeShazo of Henry County admits that he "didn't hit the panic button" when Earlam came to visit his office, he did delay his company's delivery under the Ginner Contracts as a result of the visit. DeShazo's instinct not to panic upon hearing from Earlam on Plexus Limited's behalf suggests that a "false sense of security" existed in him, as a representative for Henry County, and was brought about by the promissory nature of Earlam's statement. *See Mazer*, 340 So. 2d at 774. Genuine issues of material fact exist as to the causal link between Earlam's promise on behalf of Plexus Limited and Henry County's

decision to forego other alternatives which ultimately led to a prolonged arbitration process in which Henry County was forced to participate in order to seek any sort of recovery following Debtor's breach of the Ginner Contracts.  Furthermore, the evidence appears to support Henry County's position that it was reasonable in its belief in and reliance upon assurances that the Ginner Contracts would ultimately be performed.  The confidence in such assurances arose in large part as a result of Earlam, as a perceived agent of Plexus Limited, representing to the Georgia Plaintiff that Plexus Limited stood behind the Ginner Contracts.

With regard to causation and damages, the final elements of promissory estoppel, Plaintiffs have presented evidence sufficient to show a genuine issue of material fact.  Plaintiffs have presented testimony of the Ginners' representatives showing that their decisions to delay delivery, forego earlier arbitration or litigation, and continue working with Debtor caused damages, including the loss of sales and profits and were brought about in large part due to their belief that Plexus Limited, Earlam, or both stood behind the Ginner Contracts.[69]  As a result, Plexus Limited's motion for summary judgment against Plaintiff Henry County on its promissory estoppel claim is hereby denied.

### IV.     Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs argue they are entitled to summary judgment on their claims against Defendants for breach of fiduciary duty to creditors and tortious interference of contract.  For the reasons set forth above, the Court finds genuine issues of material fact remain as to Plaintiffs' breach of fiduciary duty to creditors claims against Earlam and Kirby.  Furthermore, their motion for summary judgment on their tortious interference claims against Earlam and Kirby is moot in light of the Court's grant of summary judgment to in favor of the Defendant-directors as discussed above.

---

[69] The Ginners also point to the award of damages by the ACSA Arbitration Committee.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court hereby **DENIES** Plaintiffs' motion in its entirety. Further, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motion. Specifically, Defendants' motion is **GRANTED** in favor of:

(1) Plexus USA on all claims brought by Plaintiffs;

(2) Plexus Limited on each Plaintiff's claims for alter ego, piercing of Debtor's corporate veil, breach of fiduciary duty to creditors, breach of contract, certain allegations of fraud, and tortious interference of contract as well as on the Alabama and North Carolina Plaintiffs' claims for negligent misrepresentation and the Georgia and North Carolina Plaintiffs' and Assignor-Gins' claims for promissory estoppel;

(3) Earlam on each Plaintiff's claims for alter ego, piercing of Debtor's corporate veil, breach of contract, tortious interference of contract, certain allegations of fraud, and promissory estoppel as well as on the Alabama and North Carolina Plaintiffs' claims for negligent misrepresentation; and

(4) Kirby on each Plaintiff's claims for alter ego, piercing of Debtor's corporate veil, breach of contract, fraud, negligent misrepresentation, tortious interference of contract, and promissory estoppel.

Defendants' motion is **DENIED** as to:

(1) Plaintiffs' claims for breach of fiduciary duty of creditors against Earlam and Kirby;

(2) all Georgia and North Carolina Plaintiffs' fraud claims against Earlam specifically related to statements that a third-party ensured Debtor's performance of the Ginner Contracts;

(3) all Alabama and North Carolina Plaintiffs' and Georgia Plaintiffs BCT and Coley's fraud claims against Plexus Limited specifically related to statements that a third-party ensured Debtor's performance of the Ginner Contracts;

(4) Georgia Plaintiffs Arabi, BCT, and Coley's claims for negligent misrepresentation against Earlam and Plexus Limited; and

(5) Alabama Plaintiff Henry County's claim for promissory estoppel against Plexus Limited.

**AND IT IS SO ORDERED**.

**FILED BY THE COURT**
**09/25/2014**



_JohnEWaites_

US Bankruptcy Judge
District of South Carolina

Entered: 09/25/2014