## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number:  **10-01948-jw**
Adversary Proceeding Number:  **11-80023-jw**

## ORDER

The relief set forth on the following pages, for a total of 50 pages including this page, is hereby ORDERED.

---

**FILED BY THE COURT**
**07/21/2015**



*John E. Waites* (signature)

US Bankruptcy Judge
District of South Carolina

Entered: 07/21/2015

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Joseph Walker & Company, Inc.,<br><br>Debtor(s). | C/A No. 10-01948-JW<br><br>Adv. Pro. No. 11-80023-JW<br><br>Chapter 7 |
| Arabi Gin Co.<br>BCT Gin Co., Inc.<br>Coley Gin & Fertilizer Co.<br>Jones County Cotton Gin, Inc.<br>Henry County Gin, LLC,<br><br>Plaintiff(s),<br><br>v.<br><br>Plexus Cotton, Ltd.<br>Nicholas Peter Francis Earlam<br>Laurence Kirby<br>Joseph Walker & Co., Inc., a nominal<br>defendant,<br><br>Defendant(s). | **ORDER** |

This matter is before the Court following a trial on the complaint in the above-captioned

adversary proceeding.  The parties have expressly consented to this Court's entry of final orders

and judgments. Therefore, the Court is permitted "to hear and determine and to enter appropriate

orders and judgments."[1]   28 U.S.C. § 157(c)(2) (2012); *see Wellness Int'l Network, Ltd. v. Sharif*,

— U.S. — , 135 S.Ct. 1932 (2015) (holding that Article III of the Constitution "is not violated

when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge").  The

Court, having considered the pleadings, the evidence presented at trial, and the arguments of

---

[1] Plaintiffs state in their Original and Amended Complaints their position that this adversary proceeding "may be finally determined" by this Court.  Defendants consented to this Court's entry of final orders or judgments in their Answer to Plaintiffs' Amended Complaint filed November 23, 2011.

counsel, now finds that a judgment should be entered in favor of Defendants as to each of

Plaintiffs' remaining causes of action for the reasons set forth in the following findings of fact and

conclusions of law.[2]

## FINDINGS OF FACT

### Procedural History and Relevant Parties

1.      On March 23, 2011, Plaintiffs commenced this adversary proceeding by filing a

complaint asserting personal, state-law based claims against Defendants for piercing Debtor's

corporate veil, alter ego, breach of fiduciary duty to creditors, breach of contract, fraud, negligent

misrepresentation, civil conspiracy, tortious interference, promissory estoppel, and constructive

trust.[3]  Plaintiffs initially sought compensatory damages of $10,687,356.72 and punitive damages

of $100,000,000.00, but ultimately withdrew their claim for punitive damages voluntarily prior to

trial.[4]  Each of Plaintiffs' claims relate to separate contracts entered into by Joseph Walker &

Company, Inc. ("Debtor") in the fall of 2007 and spring of 2008 to purchase cotton to be harvested

in the fall of 2008 from seven cotton gins, including the five Plaintiffs ("Ginner Contracts").

Plaintiffs' Complaint was subsequently amended on November 10, 2011.

2.      On August 30, 2013, Defendants filed a Motion for Summary Judgment on all

causes of action included in Plaintiffs' amended complaint.  Plaintiffs thereafter filed a Motion for

Partial Summary Judgment on their claims for breach of fiduciary duty to creditors and tortious

interference on September 27, 2013.

---

[2] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any conclusions of law constitute findings of fact, they are so adopted.
[3] At the hearing on the parties' later-filed cross-motions for summary judgment, Plaintiffs formally withdrew their claims for civil conspiracy and constructive trust.
[4] In Plaintiffs' Motion in Limine to Set ACSA Arbitration Award as Measure of Damages, filed March 19, 2015, Plaintiffs expressly struck their punitive damages claim.  The aforementioned "ACSA Arbitration Award" is discussed further below.

3.      As a result of certain amendments to the complaint, motions, and stipulations, the remaining Defendants at the time of the Court's consideration of the cross-motions included only Nicholas Peter Francis Earlam, Laurence Kirby, Plexus Cotton, Ltd. and Plexus Cotton USA, Inc. As further discussed in the Court's ruling upon the parties' cross-motions for summary judgment ("Summary Judgment Order"),[5] Plexus Cotton USA, Inc. was released from liability on any of Plaintiffs' claims due to its status as a wholly-owned subsidiary of Debtor and the absence of any evidence suggesting the subsidiary's involvement with the circumstances germane to this adversary proceeding.

4.      Plaintiffs are five cotton gins located in Alabama, Georgia, and North Carolina:

   a.   Plaintiff Henry County Gin, L.L.C. ("Henry County") is a domestic limited liability company organized under the laws of Alabama with its principal place of business located in Alabama.

   b.   Plaintiffs Arabi Gin Company ("Arabi"), BCT Gin Company, Inc. ("BCT"), and Coley Gin & Fertilizer Company ("Coley") are corporations organized under Georgia law with their principal places of business located in Georgia.

   c.   Plaintiff Jones County Cotton Gin, Inc. ("Jones County") is a corporation organized under North Carolina law with its principal place of business located in North Carolina.

5.      Roanoke Tar Cotton ("RTC") and Tri-County Gin, Inc. ("Tri-County") are the remaining two of the seven gins involved in the Ginner Contracts.  RTC and Tri-County (collectively, "Assignor-Gins") are corporations, both organized under North Carolina law with their principal places of business located in North Carolina.  Plaintiffs acquired by assignment the

---

[5] *Arabi Gin Co. v. Plexus Cotton, Ltd. (In re Joseph Walker & Co.)*, 522 B.R. 165 (Bankr. D.S.C. 2014).

Assignor-Gins' interests in the claims at issue.[6]  Collectively, the Court will refer to Plaintiffs and the Assignor-Gins as the "Ginners."

6.       Debtor is a nominal defendant in this adversary proceeding.   Debtor, as a corporation organized under South Carolina law with its principal place of business located in Columbia, South Carolina, filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on March 18, 2010.  At the time of trial and as of the date of this Order, Debtor's bankruptcy case is still pending.

7.       Defendant Plexus Cotton, Ltd. ("Plexus Limited") is a foreign corporation organized under the laws of the United Kingdom with its principal place of business located in the United Kingdom, wherefrom Plexus Limited, under Earlam's leadership, engaged in the international cotton trade.  Plexus Limited was the majority shareholder of Debtor prior to its bankruptcy filing and Debtor functioned as its overseas subsidiary.

8.       Debtor, Plexus Limited, and Debtor's wholly-owned subsidiary, Plexus Cotton USA, Inc., were members of a cooperative of businesses referred to by the parties as the Plexus Group.  These entities also engaged in joint marketing efforts to advance the Group's business interests.

9.       Nicholas Peter Francis Earlam ("Earlam") and Laurence Kirby are the two remaining individual Defendants and both are residents of Liverpool, United Kingdom.  During

---

[6] RTC assigned "any and all rights it may have for any claims resulting from any losses to which it may have been entitled for a breach of contract between it and [Debtor], for 9,815 bales of cotton . . . and any other claim giving rise to civil liability against [Debtor], its officers and directors, and any other responsible party" in the following percentages to certain Plaintiffs: (1) Jones County, 18%; (2) Coley, 43.3%; and (3) BCT, 38.7%.  Π Exh. 3 at p. 1. Arabi is the sole assignee of "any and all rights [Tri-County] may have for any claims resulting from any losses to which it may have been entitled arising out of a breach of contract between it and [Debtor], for 900 bales of cotton represented by . . . contracts between it and [Debtor], its officers and directors, and any other responsible party . . . ." Π Exh. 3 at p. 2.  The language of RTC's assignment appears slightly broader than that of the assignment given by Tri-County, the latter of which does not include any reference to "any other claim giving rise to civil liability" against Debtor, its agents, or "any other responsible party."  Π Exh. 3 at p. 1.

the relevant time period, Earlam served Plexus Limited as the chairman of its board of directors
and as a high-level executive manager. Earlam also served on Debtor's board of directors,
becoming its chairman on or around October 6, 2008.[7]  During this same time, Laurence Kirby
served as the chief financial officer, corporate secretary, and a member of the board of directors
for Plexus Limited and also served on Debtor's board of directors.  Laurence Kirby was not called
as a witness in Plaintiffs' case-in-chief and, as discussed further below, Plaintiffs' only causes of
action remaining against him for a breach of his fiduciary duty to Debtor's creditors were
dismissed following the Court's ruling on Defendants' mid-trial motion for a judgment as a matter
of law in his favor.

        10.     During the time relevant to these proceedings, Debtor's board of directors was
comprised of five individuals.  Three representatives of Plexus Limited—Mark English, Laurence
Kirby, and Earlam—served on Debtor's five-person board of directors.   Forester Adams
("Adams") and Edward Clarke ("Clarke")[8] also served on Debtor's board.  Adams began serving
as Debtor's corporate president in 2006 after spending time in the company's management. Clarke,
the grandson of one of Debtor's founders, first became employed by Debtor in 1998 and, at the
time relevant to this proceeding, served as Debtor's senior vice president and head of purchasing.
Clarke formally became a member of Debtor's board at a special meeting held on October 6, 2008;
the purpose of this meeting is discussed further below.[9]  Dave McCarthy, though not a member of
Debtor's board of directors, served as Debtor's chief financial officer during the relevant time

---

[7] October 6, 2008 is an important date in this litigation. As discussed more fully below, Debtor's board of directors
voted on October 6, 2008 to modify Contract 8001.

[8] Adams and Clarke were originally named as defendants in this proceeding.  Subsequent to the hearing on summary
judgment motions filed in this case and discussed herein, the parties entered into a Stipulation of Dismissal of Certain
Defendants, filed February 3, 2014, which dismissed with prejudice Adams and Clarke as well as J. Walker Clarke,
Sr., who was not a member of Debtor's board of directors during the time in question, and Mark English, who served
as a dual-director for Debtor and Plexus Limited.  Adams and Clarke were the only of these former-defendants called
to testify at trial.

[9] *See* Π Exh. 13 (reflecting minutes from Debtor's October 6, 2008 board of directors meeting).

period and at trial testified as to his knowledge of Debtor's financial state and various board activities in 2008 and early 2009.

11.    Albrecht Mueller-Pearse ("Albrecht") was a German corporation which shared an established business relationship with the Plexus Group and Earlam.  Albrecht went into German insolvency proceedings and receivership in February of 2009 and its assets have since been liquidated.  Two of Albrecht's subsidiaries, Friedrich W. Kaemena & Company ("Kaemena") and Hong Kong Cotton Company ("HKC"), remained viable enterprises after the liquidation.  Fritz Grobien ("Grobien") served as a managing partner at Albrecht during the time leading up to Albrecht's entrance into insolvency proceedings and maintained a close professional and personal relationship with Earlam spanning over twenty years.

12.    At all relevant times, the following parties held an ownership interest in the following entities: (1) Plexus Limited held a 57% share of Debtor, positioning it as Debtor's controlling majority shareholder; (2) Earlam held a 36.5% share of Plexus Limited; (3) Mrs. Earlam held a 23.8% share of Plexus Limited which, combined with her husband's interest, provided the couple with a 60.3% controlling majority share of the entity; (4) Albrecht held a 31.4% share in Plexus Limited; (5) Earlam held a 7% share of Albrecht; and (6) Kaemena and HKC (collectively, "Subsidiaries") were 100% wholly-owned subsidiaries of Albrecht. Additionally, as part of Albrecht's insolvency proceedings, its shares in the Subsidiaries and Plexus Limited were ultimately purchased by Grobien from the insolvency receiver.

13.    On September 25, 2014, the Court entered the Summary Judgment Order which denied certain of Plaintiffs' and the Assignor-Gins' causes of action in favor of all or some Defendants.  After entry of the Summary Judgment Order, the following causes of action remained to be heard at trial:

Case 11-80023-jw    Doc 363    Filed 07/21/15    Entered 07/21/15 09:29:02    Desc Main
Document      Page 8 of 50

    a.   All Plaintiffs' claims for breach of fiduciary duty to creditors by Earlam and Laurence Kirby, as well as Plaintiffs' interest in the Assignor-Gins' breach of fiduciary duty claims[10] against Earlam and Laurence Kirby;

    b.   Alabama Plaintiff Henry County's fraud and promissory estoppel claims against Plexus Limited;

    c.   Georgia Plaintiff Arabi's fraud claim against Earlam as well as its negligent misrepresentation claims against Earlam and Plexus Limited;

    d.   Georgia Plaintiffs BCT and Coley's fraud claims against Earlam and Plexus Limited as well as their negligent misrepresentation claims against Earlam and Plexus Limited; and

    e.   North Carolina Plaintiff Jones County's fraud claims against Earlam and Plexus Limited.

14.    On January 15, 2015, the Court entered an Order Setting Trial Date, which scheduled the trial in this proceeding to begin on April 13, 2015. Shortly thereafter, the Court entered an Order Requiring Parties to Submit a Joint Pretrial Order with a deadline for submission of March 19, 2015 and the requirement that any and all pretrial motions be submitted by or before the same date. In compliance with this deadline, the parties submitted multiple motions in limine which were heard by the Court on April 1, 2015 and April 6, 2015. The parties' proposed joint pretrial order was submitted to the Court on March 19, 2015 and entered by the Court on April 9, 2015 following a period of review and revision. The trial began on April 13, 2015 as scheduled.

---

[10] Prior to the Court's entry of the Summary Judgment Order, the parties agreed that the Assignor-Gins' interests in any claims of fraud and negligent misrepresentation were not assignable as a matter of law. Additionally, considering applicable choice of law principles, the Court found in favor of Defendants as to the Assignor-Gins' promissory estoppel claims due to the non-recognition of promissory estoppel as an affirmative cause of action in North Carolina, the home state of both Assignor-Gins. This matter was further clarified at trial in the Court's ruling on Defendants' mid-trial motions, as discussed further herein.

15.     During trial, Defendants moved for a judgment as a matter of law pursuant to
Federal Rule of Civil Procedure 52(c), which is made applicable to adversary proceedings pursuant
to Federal Rule of Bankruptcy Procedure 7052, as to (1) Plaintiffs' various claims for fraud,
negligent misrepresentation, and promissory estoppel based on statements made by Earlam,
individually and/or on behalf of Plexus Limited based upon the absence of proof of reliance and
causation; (2) Plaintiffs' claims for breach of fiduciary duty to creditors by Earlam due to a failure
to prove causation and damages; (3) the Assignor-Gins' remaining claims for breach of fiduciary
duty to creditors on the grounds that Plaintiffs were incapable of proving the Assignor-Gins'
damages based upon the absence of testimony from relevant corporate representatives; and (4)
Plaintiffs' claims for breach of fiduciary duty to creditors by Laurence Kirby due to Plaintiffs'
failure to provide evidence showing that Laurence Kirby acted to prefer himself or other creditors
over Plaintiffs.  The first two motions were taken under advisement but are now made moot by the
Court's decision as reflected in this Order.  Defendants' third motion was denied as to the
Plaintiffs' ability to continue to assert on the Assignor-Gins' behalf their claims for breach of
fiduciary duty to creditors.  Defendants' fourth motion was granted in favor of Defendant Laurence
Kirby in light of Plaintiffs' failure to present any evidence in relation to his intent to prefer himself
or other creditors.

16.     At the conclusion of the trial, the matter was taken under advisement and the Court
requested that counsel for the parties provide the Court with a finalized list of exhibits to be
considered in the Court's ruling, the contents of which were made a matter of record on June 19,
2015 through the Court's entry of a supplemental order with the parties' consent modifying the
earlier joint pretrial order.  Therefore, this Order considers only those exhibits included in the joint
pretrial order which are not otherwise identified as withdrawn in the June 19th supplemental order.

**Factual Background**

17.     Between July 10, 2007 and March 5, 2008,[11] Debtor entered into the Ginner

Contracts through which it agreed to purchase from the Ginners a total of 51,825 bales of

2008/2009 new crop cotton.[12]  The Ginners were to deliver the contracted cotton to Debtor within

thirty days of classing,[13] but no later than January 15, 2009.  Cotton delivered after January 15,

2009 could be accepted only at Debtor's option.  According to the Ginner Contracts, the price to

be paid by Debtor for the cotton was to be set at a later point in time.

18.     In March and April of 2008, fluctuations in the futures market and other issues and

unpredictable activity in cotton commodity pricing prompted Debtor to borrow funds from Plexus

Limited to satisfy margin calls[14] and protect its futures contract positions on at least two occasions.

On or around March 18, 2008, Plexus Limited loaned Debtor $500,000.00.  According to the

deposition and trial testimony of Dave McCarthy, Debtor thereafter borrowed an additional

$118,000.00 from Plexus Limited.  In addition to these loans, the terms nor repayment of which

---

[11] Specifically, the Ginners executed their respective agreements with Debtor on the following dates: (1) Arabi –
January 14, 2008, January 15, 2008, and January 24, 2008; (2) BCT – January 11, 2008, January 14, 2008, January
15, 2008, and February 21, 2008; (3) Coley – January 18, 2008; (4) Jones County – July 10, 2007 and January 14,
2008; (5) RTC – September 20, 2007 and February 26, 2008; (6) Tri-County – January 15, 2008; and (7) Henry County
– September 7, 2007, January 22, 2008, and March 5, 2008.

[12] The Court's understanding of the term "2008/2009 new crop cotton," as used in the Ginner Contracts, is that it refers
to cotton harvested by farmers and thereafter obtained by the Ginners in the months of September through December
of 2008.  Testimony from witnesses on both sides supported this interpretation.

[13] "Classing" refers to the process which occurs after raw cotton is delivered by farmers to a cotton gin to be baled.
Samples are taken from each bale and are classed according to fiber strength, length, uniformity, color, and other
factors.  Classing establishes the quality of each bale of ginned cotton and plays a role in its ultimate pricing.  The
Ginner Contracts set general parameters for the quality of cotton Debtor contracted to purchase, but the official
determination of each bale's quality level could not be determined until the raw cotton was harvested, ginned, baled,
and sent to a classing service or agency.

[14] The United States Commodity Futures Trading Commission's Glossary ("CFTC Glossary") defines this type of
"margin call" as a "request from a brokerage firm to a customer to bring margin deposits up to initial levels." CFTC
defines a "margin" as "[t]he amount of money or collateral deposited by a customer with his broker, by a broker with
a clearing member, or by a clearing member with a clearing organization," and notes that "[t]he margin is not partial
payment on a purchase"—when a futures position is opened, the amount of margin required by a broker at that stage
is     referred     to     as     the     "initial     margin."     *See*     CFTC     Glossary,     at
http://www.cftc.gov/consumerprotection/educationcenter/cftcglossary/index.htm.  "'A margin call usually occurs
when the market prices of the securities are falling.'"  *Huffington v. T.C. Grp., L.L.C.*, 685 F. Supp. 2d 239, 241 n.5
(D. Mass. 2010), *aff'd*, 637 F.3d 18 (1st Cir. 2011) (quoting Black's Law Dictionary 217 (8th ed. 2004)).

were explored to any significant degree at trial, Plexus Limited provided Debtor with assistance in

its efforts to expand its cotton business on a global scale for a fee to be paid pursuant to a consulting

agreement.   The outstanding fees owed to Plexus Limited by Debtor in conjunction with this

consulting arrangement are evidenced by Plexus Limited's Proof of Claim as filed in Debtor's

bankruptcy in the amount of $123,181.00.[15]   Based on the Statement of Account provided in

conjunction with Plexus Limited's Proof of Claim, management consulting fees for August of

2008 through March of 2009 remained unpaid at the time of Debtor's bankruptcy filing.

19.     In the spring of 2008, around the same time that Debtor obtained the

aforementioned loans from Plexus Limited, Adams began discussing with Grobien the possibility

of arranging a sale of cotton from Debtor to Albrecht which would function to offset Debtor's

obligations under the Ginner Contracts and replace Debtor's futures positions used for the same

purpose which were put at risk by fluctuations in the market during the prior months.   Such an

offsetting contractual commitment is known as a "hedge"[16] and is intended to function as a form

of insurance to protect against unfavorable fluctuations in the price of cotton.   During 2008, the

cotton market experienced periods of extreme volatility—evidence introduced at trial regarding

various market spot pricing throughout the year as well as a letter submitted to the Commodity

Futures Trading Commission by Charles Coley of Plaintiff Coley[17] indicated that the price per

bale of cotton fell drastically and unpredictably at various times throughout the year.   The parties

---

[15] Plexus Limited's Proof of Claim was initially filed on July 21, 2010 and amended on June 6, 2012 with an accompanying Statement of Account.  Pursuant to an August 15, 2012 consent order between Plexus Limited and the Trustee, Plexus Limited's amended claim in Debtor's bankruptcy was allowed as filed.

[16] "'A hedge . . . is a form of insurance against unfavorable fluctuations in the price of a commodity in which a position has already become fixed or, as in the case of a producer such as a cotton grower, will become fixed in normal course and the sale, liquidation, or use of the commodity is to occur at some time in the future.'"  *Carpenter v. C.I.R.*, 25 T.C.M. (CCH) 965 (T.C. 1966) (quoting *Muldrow v. C.I.R.*, 38 T.C. 907, 913 (1962)).

[17] In a formal letter submitted for consideration by the Commodity Futures Trading Commission and dated April 22, 2008, Charles Coley expressed concerns with the volatility of the futures market and the impact of its unpredictable shifts on farmers and growers alike.  *See* Δ Exh. 37.

agreed at trial that hedges are most often in place to limit the risk of such fluctuations with respect to already-existing contractual relationships.

20.     On April 1, 2008, Adams emailed Dave McCarthy and Earlam separately to confirm having reached an agreement with Albrecht on either March 3, 2008 or March 4, 2008 for Albrecht's purchase from Debtor of 61,000 bales of cotton on a specified future date ("Contract 8001"). Adams' emails to Dave McCarthy and Earlam are practically identical with the exception of the discrepancy in dates for the formation of Contract 8001 (March 3 versus March 4, respectively) and the reference in the McCarthy email to an "initial payment" due from Albrecht forty-five (45) days from April 1, 2008 with the Earlam email referring to the same payment as a "provisional payment."[18]  The date on which Contract 8001 was formally executed remains unresolved, due in large part to the absence of any date or time stamp on the Contract itself.[19]

21.     The specific terms of Contract 8001 provided for Albrecht's purchase of 61,000 bales of "2008/2009 crop" cotton from Debtor, which encompassed the 51,825 bales of 2008/2009 new crop cotton Debtor was to purchase from the Ginners. Per the Contract's terms, the price for 45,090 bales of the cotton to be sold was fixed based on the market price for cotton on the earlier date of March 4, 2008. Additional price fixations occurred on March 5th and 11th, which were two of the year's highest price days for cotton at the time of Contract 8001's execution.

22.     The parties agree that Contract 8001 was relied upon by Debtor as a physical hedge against the Ginner Contracts. This position as supported by testimonial evidence, the express terms of Contract 8001, and a provision common to all of the Ginner Contracts ("Hedge Clause"), the terms of which are discussed further below. As to the Contract's express terms, Contract 8001 provided for "prompt delivery" of the cotton, which would have required Debtor to deliver the

---

[18] *See* Δ Exh. 31 & 33.
[19] *See* Δ Exh. 32.

contracted cotton to Albrecht within two to three weeks after Debtor obtained warehouse receipts

from the Ginners for the cotton purchased under the Ginner Contracts.  The evidence at trial

demonstrated that the close proximity in time between Debtor's obtaining of warehouse receipts

from the Ginners and Debtor's subsequent "prompt delivery" to Albrecht was a key component of

Contract 8001's ability to offset the Ginner Contracts and Debtor's obligations thereunder.

Additionally, each of the Ginner Contracts contained the aforementioned Hedge Clause, which

reflected Debtor's intent to have in place the sort of offsetting commitment embodied by Contract

8001:

> Seller [Ginner] agrees and understands that Buyer
> [Debtor] in reliance on this contract and the fixations
> above will enter into offsetting contractual
> commitments to sell such cotton, and should Seller
> [Ginner] fail to deliver all eligible production from
> the specific acreage, Seller agrees to pay the Buyer
> [Debtor] on demand the amount of actual damages
> suffered by Buyer by reason of Seller's [Ginner's]
> failure to so deliver, such damages to include but not
> be limited to consequential damages, expenses
> related to commodities exchange margin calls, costs
> of cover, legal fees, and expenses and any other
> damages or losses.

23.    Representatives of Plaintiffs testified at trial that Earlam, Clarke, and Adams

repeatedly assured them in the summer and/or fall of 2008 that Debtor had in place a contract with

a foreign buyer that would function to offset the Ginner Contracts.  The testimony was unclear as

to when, if at all prior to the start of litigation, any of the Ginners became aware that Albrecht was

the foreign buyer of which Debtor's representatives spoke at that time and that Contract 8001 (or,

potentially. the later-executed Subsidiary Contracts, as discussed below) was the memorialization

of the agreement as referenced by Earlam and the others and alluded to by the Hedge Clause.

24.    On April 9, 2008, Earlam sent an email to Grobien regarding Contract 8001 which stated in pertinent part that "Plexus will write a letter to [Albrecht] saying that they take over all obligations of this contract . . . ."[20]  This promise was formally memorialized on April 15, 2008 in a writing ("Plexus Limited Agreement"), signed by Earlam on behalf of Plexus Limited, which reads as follows:

> Dear Fritz
>
> Ref: Joseph Walker Company's Sale no. 8001
>
> This letter serves to confirm that the performance of this contract is one hundred percent at the responsibility of Plexus Cotton Limited.
>
> I appreciate your signing it and sending it back to Joseph Walker Co.
>
> With kindest regards and thanks for your help.
>
>
> Yours sincerely,
>
>
> NPF Earlam

Grobien's trial testimony indicated that this letter was kept in a safe at Albrecht's office after receiving it from Earlam.

25.    Despite the Plexus Limited Agreement's express reference to responsibility for the "performance" of Contract 8001 itself, Earlam testified at trial that liability under the Agreement would only arise if Albrecht incurred a loss in selling the cotton *after* performing its obligations to purchase the contracted cotton from Debtor; this form of loss has been referred to regularly by the

---

[20] *See* Δ Exh. 48.

parties as "trading losses." At trial, Grobien and Defendants' foreign law expert, Veronique Buehrlen,[21] also testified in support of Earlam's interpretation of the Plexus Limited Agreement's scope. Plaintiffs, on the other hand, argued that the Agreement's language offered a broader promise: Plexus Limited would be liable for Contract 8001's performance in the event Albrecht was unable to perform its obligations under it to Debtor in any way.

26.     In the summer of 2008, during the months following the execution of Contract 8001, Clarke visited several of Plaintiffs' respective places of business to discuss the Ginner Contracts and check on the progress with the 2008/2009 crop cotton. The testimony of Clarke as well as representatives of Plaintiffs at trial indicated that at these meetings Clarke suggested that Plaintiffs consider placing some or all of the contracted cotton into a government-subsidized loan program to ensure and protect their payment for the cotton. Although Clarke contends this recommendation was made only in light of volatile market conditions, extreme and unpredictable price decreases, and a desire to protect Plaintiffs, the testimony of representatives of Plaintiffs indicated that such a recommendation by Clarke raised in their minds some concern as to Debtor's future ability to perform under the Ginner Contracts.

27.     In the early fall of 2008, Laurence Kirby informed Earlam that the Plexus Limited Agreement would need to be reflected as a contingent liability on Plexus Limited's books unless it was replaced with a new agreement under which liability would be placed on an individual or entity other than Plexus Limited. According to Earlam's testimony at trial, Laurence Kirby indicated that the Plexus Limited Agreement would have required some sort of approval or

---

[21] At various points throughout litigation, the parties have disputed which law governs the enforceability and scope of the Plexus Limited Agreement as well as the agreement provided later by Earlam personally in support of Debtor's contracts with Albrecht and/or its Subsidiaries. The Court, in ruling on one of Plaintiffs' motions in limine requesting the exclusion of Veronique Buehrlen's testimony on this subject, found that the Plexus Limited Agreement and other agreement(s) of similar form and function appear to be governed by English law, thus necessitating the inclusion of Buehrlen's testimony for the Court's edification on the matter.

14

authorization from Plexus Limited's board of directors to remain effective.  There was additional testimony that such a significant contingent liability may also have drawn sharp criticism from Plexus Limited's board, particularly with regard to whether Earlam possessed the proper authority to execute such an Agreement on the corporation's behalf without prior approval.  It is unclear following the trial whether Grobien was ever made aware of potential issues with the Plexus Limited Agreement's enforceability and effectiveness absent board approval.  Considering that the Agreement was housed in a safe at Albrecht's place of business, the evidence indicates that Grobien viewed it as a binding commitment between Plexus Limited and Albrecht.

28.     According to Earlam, the shifting of liability away from Plexus Limited was accomplished by a verbal agreement between himself and Grobien in September of 2008 in which Earlam elected to take on personal liability in relation to Contract 8001 ("Verbal Earlam Agreement").  However, the parties disagree as to the specific level and timing of the liability Earlam assumed.   Plaintiffs have argued throughout this litigation that the Verbal Earlam Agreement mirrored the scope of the Plexus Limited Agreement; all that changed between the two was the party responsible for performance, as requested by Laurence Kirby.  Additionally, Plaintiffs have argued that the terms of the Verbal Earlam Agreement were the same as those later memorialized on December 23, 2008, and not of the limited scope about which Earlam first testified at trial.  Prior to trial, Earlam made no mention in his deposition testimony or elsewhere that the Verbal Earlam Agreement differed in scope from the later-discussed December 23rd writings.  At trial, for the first time, Earlam testified that the Verbal Earlam Agreement with Albrecht only exposed him to personal liability in the event Albrecht performed Contract 8001 and then incurred a "trading loss."  This interpretation of the Verbal Earlam Agreement's meaning is analogous with the position he has also taken, albeit more consistently, with respect to his

15

understanding of the liability encompassed by the aforementioned Plexus Limited Agreement—"trading losses" only.

29.    The evidence indicates that at least as early as September 27, 2008, Debtor was aware of Albrecht's desire to renegotiate Contract 8001.[22]  Additionally, emails between Adams and Grobien indicate that certain revised terms were proposed and discussed on or around October 3, 2008.[23]  Then, on October 6, 2008, Albrecht formally communicated to Debtor via email that its performance under Contract 8001 would no longer be possible.  Albrecht, in the October 6th email, sought to modify Contract 8001 to transfer and split its purchase obligations between Albrecht's Subsidiaries, Kaemena and HKC, and include an extended delivery timeframe rather than the "prompt delivery" term included in Contract 8001, thereby delaying any duty to perform.  Debtor, in compliance with its corporate bylaws, convened a special meeting of its board on that same day to consider Albrecht's proposed modifications to Contract 8001.   No prior meetings were called to discuss the negotiations which took place in the earlier emails between Adams and Grobien.

30.    At the October 6, 2008 special board meeting, Earlam, Laurence Kirby, Adams, and Clarke unanimously voted[24] to modify Contract 8001 under the terms proposed in Albrecht's October 6th email.  As previously noted, Earlam became the chairman of Debtor's board of directors on or around this time.

31.    On October 7, 2008, Debtor executed contracts with Albrecht Subsidiaries Kaemena and HKC, effectively replacing Contract 8001.  As requested by Albrecht, Contract

---

[22] See Π Exh. 33 (reflecting handwritten notes of Dave McCarthy dated September 27, 2008 and referencing a need to renegotiate Contract 8001).
[23] See Δ Exh. 52.
[24] The fifth member of Debtor's board and the third of the dual-directors serving Debtor and Plexus Limited, Mark English, was not present for this meeting and did not participate in the vote.  Laurence Kirby attended by telephone whereas Earlam was physically present at the meeting in South Carolina.

8001's purchase obligations were split between the Subsidiaries and Contracts 8001A and 8001B were thereby executed ("Subsidiary Contracts").[25]    Collectively, the Subsidiary Contracts provided for the purchase of 55,000 bales of cotton at ninety cents ($0.90) per pound[26] for shipment from March 2009 through October 2009 at the Subsidiaries' option.    The Ginners were not informed of the actions taken by Debtor's board on October 6th or 7th.    Although the Ginners did know through representations made by Adams, Clarke, and Earlam that Debtor was engaged with a foreign buyer, the evidence suggests that the Ginners were never made aware of the specifics of any offsetting contractual commitments considered during the relevant time period, whether embodied in futures positions, Contract 8001, or the Subsidiary Contracts.    Later, in the fall of 2008, as discussed below, the Ginners (through counsel) demanded immediate disclosure by Debtor of these details to no avail.

32.    On various dates in fall of 2008, Earlam and other members of Debtor's board communicated with representatives of Plaintiffs[27] in an attempt to restructure the terms of the Ginner Contracts.    Specifically, around the same time as the October 6th board meeting, Earlam and other board members[28] asked Plaintiffs to delay delivery under the Ginner Contracts because Debtor had outstanding inventory for which it had yet to receive payment from third parties.    This

---

[25] Contract 8001 and the Subsidiary Contracts were memorialized on practically identical forms, save one detail: Contract 8001 does not bear a date of execution whereas the Subsidiary Contracts are marked with "October 7, 2008" on the first page.

[26] The Subsidiary Contracts' price fixation of ninety cents per pound was slightly higher than the price at which the bulk of the contracted cotton under Contract 8001 was fixed ($0.8939 per pound for 45,090 bales).    Defendants have argued this higher price made substitution of the Subsidiary Contracts for Contract 8001 an objectively sound option for Debtor's board.    Notably though, Contract 8001's backdated per pound price fixations for 6,775 bales on March 5, 2008 and 650 bales on March 11, 2008 were set at much higher prices than those included in the Subsidiary Contracts—$0.9641 and $0.9386, respectively.    Furthermore, the Subsidiary Contracts covered the sale of 6,000 bales less than Debtor originally agreed to sell to Albrecht under Contract 8001.

[27] The Court refers only to representatives of Plaintiffs and not representatives of the collective group of Ginners in light of Plaintiffs' election not to call any representatives of the Assignor-Gins to testify with regard to the meetings discussed further in this paragraph.

[28] The composition of the delegation from Debtor's board that visited Plaintiffs varied from location to location. Earlam was present for all of the visits discussed herein, but on certain occasions he also traveled with Clarke, Adams, and/or his wife.

cotton inventory was referred to by the parties at trial as "old crop cotton" and Debtor's inability

to collect on it reduced its revenue stream and weakened Debtor financially, particularly in light

of unstable market conditions.  Earlam also spoke to Plaintiffs about existing market volatility and

the unpredictable swings in cotton pricing observed in months prior.[29]  Additionally, Earlam

discussed Debtor's desire to perform under the Ginner Contracts, and, on several occasions,

suggested that Plaintiffs place the contracted cotton into a government-subsidized loan program to

protect against losses they might incur if performance was delayed or market prices further

declined.  Plaintiffs' representatives also consistently testified at trial that Earlam stated at these

meetings that he and/or Plexus Limited "stood behind" the Ginner Contracts.[30]  Earlam denies

making such statements and other attendees of these meetings who testified at trial, Clarke and

Adams, deny ever hearing Earlam making these "stand behind" remarks.

33.    Near the time of the fall 2008 meetings with representatives of Plaintiffs, Debtor

circulated a proposed addendum to certain of the Ginner Contracts that, if accepted, would delay

performance, shift the Ginners' delivery timeframe forward to January through July 31, 2009 (a

time period more in line with that set forth for Kaemena and HKC's purchases under the Subsidiary

Contracts), and delay Debtor's obligation to accept and pay for the contracted cotton.  Ultimately,

this addendum was withdrawn at a meeting held at Debtor's Columbia, South Carolina

headquarters on October 26, 2008.  Trial testimony consistently indicated that the addendum's

withdrawal was due to ongoing market fluctuations and Debtor's doubts that it could perform at

all.  A specific example relating to impending issues with Debtor's performance was discussed in

---

[29] Testimony provided by representatives of Plaintiffs at trial and in their depositions indicates that Plaintiffs were equally aware of the issues facing the cotton market and those trading in it.
[30] The precise understanding of what Earlam meant varied among Plaintiffs, according to testimony at trial and other documents filed in this case.  These differences in understanding resulted in certain Plaintiffs' claims relating to these "stand behind" statements surviving summary judgment only against Earlam or only against Plexus Limited, whereas others possessed claims at the time of trial against both Earlam and Plexus Limited.

the trial testimony of Linda Exum and Van Murphy, two representatives for Plaintiff BCT.  BCT attempted to deliver a portion of the cotton it contracted to sell to Debtor prior to the Ginner Contracts' January 15, 2009 deadline for delivery but it was rejected by Debtor.  After Debtor accepted and paid for 100 bales from BCT, Debtor subsequently rejected a second shipment of another 100 bales.

34.    The evidence indicates that further delivery by BCT and initial deliveries by other Plaintiffs were not attempted because of representations made by members of Debtor's board, including Earlam, at the fall 2008 meetings stressing a need for delayed delivery to assist Debtor in its efforts to fully perform in light of outstanding inventory issues and the timeline provided to Debtor by a foreign buyer.

35.    On November 4, 2008, a letter was sent to Adams by counsel at the law firm of Nexsen Pruet on behalf of Arabi, Jones County, RTC, and Coley.[31]  The letter noted that it was the understanding of these Plaintiffs that Debtor, at the time of the letter, was "not in a position to honor its contracts for purchase of the '08 cotton crop."[32]  The November 4th letter also stated the following:

> Our clients face an exposure of approximately $10,000,000 in the event that [Debtor] breaches its contracts for purchase of the '08 crop.  [Debtor] representatives have at various times over the past several weeks explored with our clients the possibility of deferring payment on the [Ginner C]ontracts; proposed an amendment to the [Ginner C]ontracts covering the '08 crop, then withdrawn [sic] the proposed amendment; then informed our clients that [Debtor] actually had the '08 crop sold to undisclosed buyers, for delivery in late Spring 2009, necessitating a deferral of payment to our clients.

---

[31] On November 5, 2008, Linda Exum on behalf of Plaintiff BCT requested that Nexsen Pruet include BCT "in the representation of action concerning [Debtor]." *See* Δ Exh. 75.  Exum's request, which is reflected in an email, makes no mention of the alleged "stand behind" statements or any supposed assumption of liability on the Ginner Contracts undertaken by Earlam and/or Plexus Limited.

[32] *See* Δ Exh. 75.

> . . . Our clients are entitled to pursue strict enforcement of these contracts. Our clients are, however, willing to consider working with [Debtor] to find a mutually agreeable solution to any cash-flow or other payment problems that [Debtor] is experiencing <u>ON THE CONDITION</u> that [Debtor] share all relevant information concerning arrangements for the '08 crop, status and terms of the purchase agreements for this crop, and sources of funding to make good any under-payment by [Debtor] on its contracts with our clients.
>
> To date, [Debtor] has requested our clients' patience and forbearance—without, however, providing any meaningful information that would enable our clients to evaluate the likelihood of payment, or the viability of any plan for ultimate payment.

(emphasis in original).

The letter also requests a meeting with Debtor and its representatives within ten (10) days at which time Debtor would disclose the requested information. There is no evidence in the record that this meeting took place or that the requested disclosures were ever provided to the satisfaction of the Ginners.[33] Notably, the November 4th letter makes no reference, express or implied, to the "stand behind" statements allegedly made by Earlam at the fall meetings at Plaintiffs' respective places of business.

36.    On December 17, 2008, Debtor's primary lender, BB&T, formally asserting a default under an applicable lending agreement between it and Debtor, significantly restricted Debtor's credit availability, and forced Debtor to begin liquidating some of its assets and winding down its business. According to Dave McCarthy, Debtor's default under the terms of its credit line with BB&T came about as a result of Debtor's failure to maintain its physical cotton inventory

---

[33] Plaintiffs initially alleged that Defendants breached a duty to disclose this information. Such claims were resolved in favor of Defendants in the Summary Judgment Order and were no longer before the Court for consideration at the time of trial.

with no more than 10,000 unhedged bales.[34]  The parties agree Debtor's default with BB&T was unrelated to the Ginner Contracts or the board's decision to modify Contract 8001.

37.    On December 23, 2008, the aforementioned Verbal Earlam Agreement was memorialized by Earlam in two separate writings ("December Earlam Agreements").  The December Earlam Agreements were entered into by Earlam with the Subsidiaries and the Subsidiaries' directors as well as Albrecht, despite the fact that Contract 8001 was no longer in effect following the October 6, 2008 meeting and vote of Debtor's board of directors.  The December Earlam Agreements were secured by shares of Plexus Limited stock owned by Earlam and his wife, who together stood as its majority shareholders.

38.    The December Earlam Agreements provided promises consisting of language of similar effect to that of the Plexus Limited Agreement.  Specifically, the December Earlam Agreements, if enforced against Earlam, would have imposed liability on him for "any loss incurred" either by Albrecht as a result of entering into Contract 8001 or by the Subsidiaries as a result of entering into Contract 8001A and 8001B, the Subsidiary Contracts.  The December Earlam Agreement with Albrecht stated, in pertinent part:

> [T]he Guarantor [Earlam] unconditionally and irrevocably undertakes . . . to pay [Albrecht] an amount equal to any loss incurred by [Albrecht] as a result of [Albrecht] having entered into the Contract [8001] or as a result of the Subsidiaries having entered into contracts 8001A and/or 8001B dated 7 October 2008 with [Debtor] in place of the [C]ontract [8001] . . . .

Similarly, the December Earlam Agreement with the Subsidiaries and their directors stated, in pertinent part:

---

[34] "Inventory" in this context includes only the cotton for which Debtor had already paid and put into its storage facilities.

> [T]he Guarantor [Earlam] unconditionally and
> irrevocably undertakes . . . to pay the Companies an
> amount equal to any loss incurred by the Companies
> as a result of the Companies having entered into the
> [Subsidiary] Contracts . . . .

The scope of the Verbal Earlam Agreement provided to Albrecht in September prior to the October 6th board vote effectively eliminating Contract 8001 is similar in effect to the December Earlam Agreements. The December Earlam Agreements' imposition of liability for "any loss incurred" as a result of having entered into Contract 8001 and/or the Subsidiary Contracts is akin to the Plexus Limited Agreement's promise to assume "one hundred percent . . . responsibility" for Contract 8001's performance. The plain language of each of Earlam's agreements to be personally liable is not limited solely to "trading losses." Because the evidence suggests that the Verbal Earlam Agreements and December Earlam Agreements have the same legal effect, the Court refers to the body of the three as the "Earlam Agreements."

39.    On January 12, 2009—three days before the Ginner Contracts' deadline for delivery—Plaintiffs received formal notice from Debtor that it would not be able to perform.[35]

40.    On January 19, 2009, shortly after receiving notice of nonperformance, another letter was issued from counsel for Plaintiffs.[36] This letter was sent to counsel for Debtor and, similar to the letter sent in November, made no reference, express or implied, to the alleged "stand behind" statements or any assumption of liability by Earlam and/or Plexus Limited. Instead, the January 19th letter recites the following "statement of the current status" of the Ginner Contracts and Debtor's inability to perform its obligations thereunder:

---

[35] The Ginner Contracts provided that any delivery attempted by the Ginners after January 15, 2009 could be accepted only at Debtor's option; Debtor's notice of nonperformance indicated that Debtor would not exercise its right to accept delivery under such an option.

[36] *See* Δ Exh. 94.

1. [Debtor] is currently liquidating, and has no credit available under its lending arrangement to purchase any of the cotton under contract with our clients.
2. [Debtor] does not have cash or other assets that enable it to purchase these Gin[ner]s' cotton.
3. [Debtor] does not expect any of these Gin[ner]s' to hold their cotton for purchase by [Debtor].
4. These Gin[ner]s are free to dispose of the cotton in any manner that is reasonable in order to mitigate their damages.

According to the letter, the foregoing statements were "[b]ased on the conversations that have taken place between [Debtor] and these Gin[ner]s . . . ."

41.    Immediately following the January notice of Debtor's inability to perform the Ginner Contracts, Plaintiffs began to seek alternative buyers for certain portions of the contracted cotton and maintained their relationship with previously retained counsel for the purpose of attempting to seek performance by Debtor.  This is supported by the statements contained in the January 19th letter from Plaintiffs' counsel and the trial testimony of representatives of Plaintiffs. Plaintiffs presented evidence of costs incurred for their storage of the already-ginned cotton contracted to be sold to Debtor during the time leading up to the notice of nonperformance as well as shortly thereafter while the Ginners continued to seek performance by Debtor.  As a result of the failure to pay for the cotton from Debtor, several Plaintiffs experienced difficulty paying their farmers.[37]

42.    After receiving notice of Debtor's inability to meet its contractual obligations under the Ginner Contracts, the Ginners filed an arbitration complaint on or around February 25, 2009, with the American Cotton Shippers Association ("ACSA") against Debtor and Plexus Limited claiming a loss of $11,973,472.67 arising from Debtor's non-performance.  The ACSA determined it did not have jurisdiction over Plexus Limited, but continued in the proceedings against Debtor.

---

[37] Craig Huckaby on behalf of Arabi and Charles Coley on behalf of Coley testified as to measures taken to obtain financing in order to pay the farmers from whom they obtained the cotton originally contracted to be sold to Debtor.

Debtor filed a response to the Ginners' complaint, admitting liability but disputing the amount of damages sought.

43.    While the ACSA arbitration was pending, Debtor remained in contact with Albrecht in an attempt to receive assurances of performance from its Subsidiaries under the Subsidiary Contracts.  Despite Albrecht commencing an insolvency proceeding in February of 2009, Grobien informed Debtor that Albrecht's wholly-owned Subsidiaries planned to rely on the Contracts' terms allowing shipment to be requested from Debtor as late as October of 2009 at the Subsidiaries' option.  The Ginners also attempted, albeit unsuccessfully, to directly contact the Subsidiaries about their intent to perform.  Ultimately, Grobien, with the input of Earlam, informed Debtor that Albrecht was unwilling to entertain any further discussion about the performance of the Subsidiary Contracts.[38]

44.    On or around May 8, 2009, the ACSA arbitration committee ("Committee") rendered a damages award of $10,687,356.42 against Debtor upon its finding that Debtor breached the Ginner Contracts on January 12, 2009.  Each Plaintiff and Assignor-Gin filed a Proof of Claim in Debtor's bankruptcy proceeding using the Committee's award as the basis for its claim against Debtor.

45.    Subsequent to Debtor's filing for relief under the Bankruptcy Code, the Chapter 7 Trustee, on behalf of Debtor's bankruptcy estate, initiated additional arbitration proceedings before the International Cotton Association ("ICA")—with supporting affidavits provided by representatives of the Ginners—and sought to enforce the Subsidiary Contracts.  Documents

---

[38] Specifically, by way of an email apparently addressing the Ginners' requests for further information and negotiations regarding performance by the Subsidiaries, Earlam provided to Grobien what he "would say to [Debtor's] email" requesting an update on the Subsidiary Contracts: "These contracts are with Joseph Walker and Co. We are willing to discuss anything with you [Debtor] but we are not willing to discuss [the Subsidiary Contracts] with anybody else other than the party with whom the contracts exist. This would not be correct."  Π Exh. 25.

provided by the Trustee in support of the ICA claims against the Subsidiaries revealed repeated attempts throughout 2009 (after Debtor's notice to the Ginners of its inability to perform the Ginner Contracts) by Debtor and the Ginners to enforce the Subsidiary Contracts and communicate with Albrecht, Kaemena, and HKC about the performance of the Subsidiary Contracts.

46.    On June 17, 2011, the ICA arbitration panel rendered an award and held that the Subsidiary Contracts were valid and enforceable.  However, because cotton was never actually delivered to the Subsidiaries by Debtor, the ICA panel did not issue a monetary award for contract damages and instead required the Subsidiaries to "invoice back" to Debtor the cotton pledged to be purchased.[39]   Neither the Trustee nor the Ginners appealed the award.

## <u>CONCLUSIONS OF LAW</u>

As a result of the Court's ruling in the Summary Judgment Order, the following claims remained before the Court for consideration at the time of trial:

(1) Breach of fiduciary duty to creditors by Earlam as to all Plaintiffs and the Assignor-Gins;

(2) Breach of fiduciary duty to creditors by Kirby as to all Plaintiffs and the Assignor-Gins;[40]

(3) Fraud committed upon Arabi, BCT, Coley, and Jones County by Earlam;

(4) Fraud committed upon BCT, Coley, Henry County, and Jones County by Plexus Limited;

(5) Negligent misrepresentations made to Arabi, BCT, and Coley by Earlam;

(6) Negligent misrepresentations made to Arabi, BCT, and Coley by Plexus Limited; and

(7) Promissory estoppel against Plexus Limited as to promises made to Henry County.

---

[39] The ICA award did include a monetary award for arbitration costs and fees.
[40] As noted in the Court's findings of fact, Plaintiffs' claims for breach of fiduciary duty to creditors by Laurence Kirby were dismissed upon Defendants' receipt of a favorable ruling on their motion for judgment as a matter of law prior to presenting their case-in-chief.

Following a review of Plaintiffs' burden of proof and the choice of law provisions applicable to these claims, the Court will first address Plaintiffs' breach of fiduciary duty claims before turning to the remaining claims of fraud, negligent misrepresentation, and promissory estoppel.

## I.      Burden of Proof

Plaintiffs, as the proponents of the foregoing claims, were required at trial to prove each element of each claim by a preponderance of the evidence.  "A preponderance is such proof as leads the trier of fact to find that it is more probable than not, or more likely than not, that a contested fact exists."  32A C.J.S. Evidence § 1628 (2015); *see also* 75A Am. Jur. 2d Trial § 1152 (2015) ("A proper definition [of 'preponderance of the evidence'] suggests a comparison of the convincing power of evidence on one side with that upon the other, and a determination of which outweighs the other as to the probabilities.").  Therefore, it was incumbent upon Plaintiffs to present to the Court, as the finder of fact in a bench trial, evidence sufficient to satisfy this standard with respect to each individual Plaintiff and the specific elements of law applicable to each individual Plaintiff's various claims.

## II.     Choice of Law

"Bankruptcy courts adjudicating a state law claim should apply the choice of law rules of the forum state in the absence of federal policy concerns."  *In re Hydrogen, L.L.C.*, 431 B.R. 337, 346 (Bankr. S.D.N.Y. 2010); *see also In re Merritt Dredging Co.*, 839 F.2d 203, 205–06 (4th Cir. 1988).  As discussed in the Summary Judgment Order, South Carolina is the forum state; therefore, South Carolina choice of law principles must be applied to Plaintiffs claims as presented at trial.

As to Plaintiffs' claims that Earlam, as a corporate officer of Debtor, breached his fiduciary duties to Plaintiffs, as creditors of Debtor, South Carolina law controls because Debtor is incorporated in this State.[41]  *See In re Infinity Bus. Grp., Inc.*, 497 B.R. 794, 804 (Bankr. D.S.C. 2013) ("[C]laims concerning fiduciary duties of corporate officers [are] governed by the state of incorporation."); *see also* Restatement (Second) of Conflict of Laws § 309 (1971) ("The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders . . . .").

Various Plaintiffs presented their claims against Earlam and/or Plexus Limited for tort-based causes of action arising from statements allegedly made by Earlam during his visits to Plaintiffs' respective places of business in the fall of 2008.  Plaintiffs' array of fraud and negligent misrepresentation claims are governed by the substantive law of the state in which their respective injuries occurred.  *See Nash v. Tindall Corp.*, 375 S.C. 36, 39, 650 S.E.2d 81, 83 (Ct. App. 2007) ("Under traditional South Carolina choice of law principles, the substantive law governing a tort action is determined by the *lex loci delicti*, the law of the state in which the injury occurred.") (quoting *Boone v. Boone*, 345 S.C. 8, 13, 546 S.E.2d 191, 193 (2001)).  As a result, the law applicable to any fraud and negligent misrepresentation claims remaining at the time of trial is that of the state in which each particular Plaintiff suffered its purported financial losses.  Therefore, the Court considers its decision on such claims under Alabama law with respect to Henry County; Georgia law with respect to Arabi, BCT, and Coley; and North Carolina law with respect to Jones County.  Additionally, Henry County was the only Plaintiff to present a claim of promissory estoppel at trial based on the aforementioned statements by Earlam. Henry County's state law

---

[41] As noted above in the findings of fact, the Court granted Laurence Kirby's motion for judgment as a matter of law as to Plaintiffs' breach of fiduciary duty claims against him in light of the absence of evidence presented by Plaintiffs establishing liability on Kirby's part for any alleged breach.

based claim for promissory estoppel against Plexus Limited is governed by the laws of Alabama. *See Ford v. Jackson Square, Ltd.*, 548 So. 2d 1007, 1012–13 (Ala. 1989) (setting forth elements of promissory estoppel under Alabama law).

### III.   Breach of Fiduciary Duty to Creditors

Plaintiffs contend that by voting to modify Contract 8001 during a time at which Debtor was insolvent or in a failing condition, Defendant-directors Earlam and Kirby[42] breached their fiduciary duties to Plaintiffs, as contract creditors of Debtor, by transferring an asset of Debtor (rights under Contract 8001) for the purpose of preferring themselves or other of Debtor's creditors.  Plaintiffs' arguments are based on South Carolina common law which states that "when a corporation becomes insolvent, or in a failing condition, the officers and directors no longer represent the stockholders, but by the fact of insolvency, become trustees for the creditors . . . ." *Fed. Deposit Ins. Corp. v. Sea Pines Co.*, 692 F.2d 973, 977 (4th Cir. 1982) (quoting *Davis v. Woolf*, 147 F.2d 629, 633 (4th Cir. 1945)) (internal quotation marks omitted).  In the event of Debtor becoming insolvent or entering a failing condition, Earlam and other directors of Debtor would have been prohibited from preferring themselves or other of Debtor's creditors through a transfer of Debtor's property.  *Id.* ("[B]y the fact of insolvency, [officers and directors] become trustees for the creditors, and . . . they cannot by transfer of its property or payment of cash, prefer themselves or other creditors . . . ."); *see also Helm Fin. Corp. v. MNVA R.R., Inc.*, 212 F.3d 1076, 1081 (8th Cir. 2000) ("'When a corporation is insolvent, or on the *verge of insolvency*, its directors and officers become fiduciaries of the corporate assets for the benefit of creditors.'") (emphasis added) (quoting *Synder Elec. Co. v. Fleming*, 305 N.W.2d 863, 869 (Minn. 1981)); *Davis v. Woolf*,

---

[42] In light of the Court's dismissal of Plaintiffs' claims against Laurence Kirby for any alleged breach of his fiduciary duties to Debtor's creditors following Defendants' midtrial motion for judgment as a matter of law as discussed above, further reference under this cause of action shall be to Earlam only.

147 F.2d 629, 632–34 (4th Cir. 1945); *Poth v. Russey*, 281 F. Supp. 2d 814, 826 (E.D. Va. 2003)

("When a corporation *approaches* insolvency, the fiduciary duty of the directors shifts from the

stockholders to the creditors . . . .") (interpreting *Sea Pines*) (emphasis added); *In re BHB*

*Enterprises, L.L.C.*, C/A 97-01975-W, 1998 WL 2016846 (Bankr. D.S.C. Sept. 30, 1998).   The

proponent of such a breach of fiduciary duty claim must prove the following baseline elements:

"(1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) damages proximately

resulting from the wrongful conduct of the defendant." *Turpin v. Lowther*, 404 S.C. 581, 589, 745

S.E.2d 397, 401 (Ct. App. 2013) (citing *RFT Mgmt. Co. v. Tinsley & Adams, L.L.P.*, 399 S.C. 322,

335–36, 732 S.E.2d 166, 173 (2012)).[43]

    **a.   Existence of a Fiduciary Duty Owed by Earlam to the Ginners: Whether Plaintiffs proved by a preponderance of the evidence that Debtor was insolvent or in a failing condition at the time of the alleged preferential action.**

The existence of a fiduciary duty under *Sea Pines* and its progeny first turns on the issue

of Debtor's solvency.  As a prerequisite to the shifting of the Defendant-directors' fiduciary duties

to its creditors (rather than solely to the corporation they serve and its stockholders), Plaintiffs

were required to demonstrate by a preponderance of the evidence that Debtor was insolvent, in a

failing condition, or at least approaching insolvency at the time of the alleged preferential action.

*See, e.g.*, *Sea Pines*, 692 F.2d 973; *Poth*, 281 F. Supp. 2d 814; *In re BHB*, 1998 WL 2016846, at

*13 (referring to shifting of duties upon insolvency).   "Because insolvency turns on complicated

(and debatable) facts, a debtor and its creditors may disagree on whether the moment of insolvency

has arrived."   Michael M. Krauss & Abby E. Wilkinson, *Digging Deeper: Damages When an*

*Insolvent Corporation Plunges Further into Debt*, JNL. OF BANKR. L. 2008.10–2.   Earlam's expert

---

[43] "The duty set forth in *Sea Pines* implores directors to treat creditors equally, but it is not as broad as the fiduciary duty owed to shareholders and the corporation during the ordinary course of business." *In re Joseph Walker & Co.*, 522 B.R. 165, 197 (Bankr. D.S.C. 2014) (discussing distinction between duties owed to other constituencies which are not owed to creditors during insolvency such as the duty to disclose conflicts of interest).

Loretta Cross testified that Debtor was solvent on October 6, 2008, the date of the board vote regarding Contract 8001.  Plaintiffs did not present an expert on solvency and instead relied on evidence of events and circumstances leading up to and shortly after October 6, 2008 to demonstrate that Debtor was in a failing condition or at least approaching insolvency by the time of the board's vote.  The following facts regarding Debtor's financial condition were presented: (1) Debtor incurred margin calls in the spring of 2008 which required financing from Plexus Limited; (2) Debtor experienced issues with its futures positions in the spring of 2008 which prompted Adams to enter into discussions with Grobien to establish a physical hedge to offset the Ginner Contracts in the absence of the earlier-held futures positions; (3) During the summer of 2008, Clarke visited Plaintiffs and offered the suggestion that the Ginners begin considering placing the contracted cotton into a government-subsidized loan program to protect them from losses; (4) Debtor, in various meetings at Plaintiffs' respective places of business in the summer and fall of 2008, indicated through verbal representations by Adams, Clarke, and/or Earlam that it would be unable to perform the Ginner Contracts absent delayed delivery; (5) Debtor failed to pay Plexus Limited certain fees owed for its role in advising and consulting Debtor for the months of August of 2008 through March of 2009; (6) Prior to the October 6th board meeting, Earlam, Adams, and Debtor's chief financial officer, Dave McCarthy, were aware that Albrecht was unsure as to its ability to perform Contract 8001 as originally written; (7) In October of 2008, Debtor sought a formal addendum to the Ginner Contracts that would delay Debtor's obligations to perform and provided protection to the Ginners and the farmers from whom they purchased the contracted cotton; (8) Debtor rejected an attempted delivery of 100 bales of the contracted cotton from BCT due to an inability to pay around the same time as the October board vote; (9) The uncertainty of Debtor's ability to purchase all of the contracted cotton under its existing credit lines, without

30

additional financing sources or forms of support, in the event Plaintiffs began shipping cotton to

Debtor during the earlier months allowed by the Ginner Contracts;[44] (10) The testimony of Earlam,

Clarke, and Dave McCarthy revealed that Debtor's inability to deliver and collect for old crop

cotton inventory throughout the fall of 2008 resulted in a decrease in overall revenues and cash

flow, thereby placing Debtor in a weakened financial state; (11) BB&T's declaration of Debtor's

default on its credit line covenants, restriction of Debtor's access to credit, and subsequent forced

liquidation of certain of Debtor's assets on December 17, 2008; (12) Debtor provided the Ginners

with formal notice of its inability to perform the Ginner Contracts on January 12, 2009; and (13)

The ACSA Committee ultimately determined that Debtor breached the Ginner Contracts on the

same date as the aforementioned formal notice of nonperformance and, as a result, issued an award

in full against Debtor for the Ginners' contract damages.  Considering this evidence and the

timeline represented thereby, the Court finds that, according to the plain meaning of the term,

Debtor was in a "failing condition" or at least approaching insolvency at the time of the October

6, 2008 vote to modify Contract 8001.  While Defendants have focused their arguments against

such a finding on the status of Debtor's books and balance sheets on the precise moment in time

at which Debtor's board voted to release Contract 8001, the weight of the evidence and the facts

of this case necessitate a broader review of Debtor's financial picture, which cannot be properly

conducted without also taking into account the steady and unresolved financial crisis Debtor

experienced before and after the October 6th meeting.  Therefore, the Court concludes that

Plaintiffs demonstrated by a preponderance of the evidence that there existed a fiduciary duty owed

to them by Defendant-director Earlam during the relevant time period.

---

[44] Counsel for Plaintiffs engaged solvency expert Loretta Cross in a mathematical exchange in which she was asked
to calculate the hypothetical impact that delivery of the contracted cotton would have had on Debtor's credit lines in
the event Plaintiffs had not withheld delivery as allegedly requested of them by Earlam and other members of Debtor's
board during the fall of 2008.

**b. Earlam's Breach of his Fiduciary Duties to the Ginners: Whether the modification of Contract 8001 constituted a transfer of property carried out by Earlam for the purpose of preferring himself or another of Debtor's creditors.**

Plaintiffs' breach of fiduciary duty to creditors claim also requires a showing that Defendant-director Earlam breached the duties he owed to the Ginners which arose upon Debtor's failing financial condition.  *See Turpin*, 404 S.C. at 589, 745 S.E.2d at 401.  Under *Sea Pines*, the existence of a breach requires a two-part inquiry: (1) Whether a transfer of corporate property occurred with the replacement of Contract 8001 and the transfer of its purchase rights and obligations to the Subsidiaries; and (2) whether such a transfer resulted in a preference to Earlam and/or another of Debtor's creditors.  *Sea Pines*, 692 F.2d at 977.  The corporate property to be considered in this case are Debtor's rights under Contract 8001 and the question of any resulting preference centers on Earlam's exposure to personal liability under the Earlam Agreements.

### i.    Transfer of Property

As determined in the Summary Judgment Order and reinforced through the evidence provided at trial, the replacement of Contract 8001 constituted a "transfer of property" under the relevant standard for this cause of action.  Debtor's rights arising under Contract 8001, precisely its right to payment from Albrecht and the Contract's requirement of "prompt delivery" which controlled the timing of payment, were assets of the corporation.  Plaintiffs showed by a preponderance of the evidence that the October 6, 2008 board vote effectively eliminated Debtor's ability to receive payment under Contract 8001 through substitution of Albrecht's purchase obligations with those of its Subsidiaries.  Upon the substitution, Debtor was contractually unable to collect payment upon the delivery of the subject cotton until March of 2009, at the earliest, and potentially as late as October of 2009 due to the provision in the Subsidiary Contracts giving the Subsidiaries the exclusive control over the delayed delivery timeframe.  Plaintiffs successfully

demonstrated that this delay in Debtor's contractual ability to facilitate a timely offsetting sale of the cotton contracted to be sold to Debtor by Plaintiffs[45] through the sale embodied by Contract 8001 constituted a loss of Debtor's contractual rights and, therefore, a transfer of Debtor's corporate property.

## ii.    Preference

The term "preference" in this context has been viewed to mean a transfer of a corporate asset (Contract 8001)—made while the subject corporate entity was insolvent or operating in a failing condition—which had the effect of allowing a corporate insider or director to (1) recover a greater percentage of his debt than other creditors of the corporation, or (2) otherwise limit his liability on other obligations related to the corporation's business. *See, e.g.*, *Helm Fin. Corp. v. MNVA R.R., Inc.*, 212 F.3d 1076, 1081 (8th Cir. 2000); *Bank of Am. v. Musselman*, 222 F. Supp. 2d 792, 799-801 (E.D. Va. 2002) (reviewing importance of allegations of preferential action and self-dealing by directors in viable claims for breach of fiduciary duty to creditors); *Synder Elec. Co.*, 305 N.W.2d at 869. The term does not necessarily require ill motive or design.

> Proof of a preference for the claim of a corporate insider does not depend on a showing of fraud or bad faith, but upon a showing of the violation of the fiduciary relation of the directors; when the officers of an insolvent corporation [prefer] themselves . . . there is a presumption that such officers took unfair advantage of their insider positions and special knowledge.

---

[45] The Hedge Clause common to each of the Ginner Contracts and discussed further above in the findings of fact at a minimum put the Ginners on notice that Debtor intended to enter into one or more contractual relationships to offset the obligations under the Ginner Contracts. Under the Hedge Clause, the Ginners were subject to liability for certain of Debtor's losses in the event a hedge was entered into between Debtor and a third-party and the Ginners' nonperformance left Debtor without the necessary cotton to fulfill its hedge contract obligations to the third-party. *See* Π Exh. 1. Though not written as expressly conferring the benefit of a physical hedge upon the Ginners, the Hedge Clause does lend itself favorably to Plaintiffs' position that the offsetting contractual commitment encompassed by Contract 8001 was contemplated at the time of their entrance into the Ginner Contracts and capable of acting as an assurance of Debtor's ultimate performance.

33

18B Am. Jur. 2d Corporations § 1856; *see, e.g.*, *BHB*, 1998 WL 2016846 at *13 ("When there is a question as to whether a director has fulfilled his fiduciary obligations to creditors, the issues of the director's reasonableness and good faith are irrelevant, as is the severity of the breach; the only issue is whether there has been a breach at all.") (citing *Anthony v. Padmar, Inc.*, 320 S.C. 436, 465 S.E.2d 745 (Ct. App. 1995)).

According to its terms, the Plexus Limited Agreement provides broad protection to Albrecht, likely ensuring performance which served to benefit Debtor and its creditors.  In his deposition, Earlam testified that prior to October 6, 2008, only the Plexus Limited Agreement was memorialized in writing and that the Plexus Limited Agreement was replaced with the Verbal Earlam Agreement given to Albrecht during a conversation between Grobien and Earlam as early as September of 2008.  The tenor of that testimony demonstrated that the creation of the Verbal Earlam Agreement was motivated by a desire to avoid review by Plexus Limited's board of directors and served to change the *party* which would be liable, not the *terms*.  This reasoning is substantiated by Earlam's actions in the final weeks of 2008 in memorializing the written December Earlam Agreements.  At trial, however, Earlam testified that the scope of the Verbal Earlam Agreement only covered "trading losses," which could only be incurred after Albrecht received and later sold the subject cotton at a loss, and thus was far narrower than the plain language of the Plexus Limited Agreement and the later-memorialized December Earlam Agreements.[46]

---

[46] While certain excerpts of Grobien's video deposition testimony presented at trial on the same subject could be interpreted to align with the interpretation of the Verbal Earlam Agreement that was advanced at trial by Earlam, the Court finds that based upon its review of Grobien's deposition as a whole and other facts, the greater weight of the evidence demonstrates that the terms and scope of the Earlam Agreement provided verbally in September were the same as those memorialized later in the year.  Therefore, the Court will not refer to the two forms of the same Agreement as separate items, but rather as a whole through reference to the Earlam Agreement in this Order.

Even if the Court were to assume Earlam's trial testimony to be true, why would Earlam on December 23, 2008 execute a broader promise to Albrecht involving greater exposure to liability than that which he claims was created by the Verbal Earlam Agreement in September of 2008, particularly considering that Contract 8001 (according to Earlam's own testimony) was not previously performed and considered to be fully replaced by the Subsidiary Contracts and no longer binding on Debtor or Albrecht after the October 6, 2008 board vote?  It seems more credible to accept the December Earlam Agreements as the memorialization of the same promise provided in the earlier Verbal Earlam Agreement as spoken to Grobien.[47]

Regardless, whether Earlam would be liable for "any loss" suffered by Albrecht or its Subsidiaries or only "trading losses" is not determinative to the finding of a preference if, as the Court believes upon its review of the evidence, Earlam sought, at least in part, to limit his exposure to liability in either form by releasing Contract 8001.  It is undisputed that the effect of the October 6, 2008 board vote was to allow for a delay in the obligation to purchase the subject cotton from Debtor in hopes of an improvement in market conditions.  The delay of the purchase effectively delayed Earlam's personal exposure to any loss incurred by the purchaser "as a result of . . . having entered into the Contract . . . ."  Considering Earlam's state of knowledge and his failure to disclose the Verbal Earlam Agreement with Albrecht to the other members of Debtor's board of directors, plus his inconsistent testimony on the nature of the Earlam Agreements collectively, the Court is led to conclude that Earlam acted, at least in part, to protect his personal interests, effectively putting them ahead of those of Debtor and its creditors.  Earlam's actions, through the use of his insider position (as not only a dual-director but also as a close friend and business associate of

---

[47] What need existed that would prompt Earlam, over two months after the board vote, to assume personal responsibility in the December Earlam Agreement to Albrecht for "any loss incurred by [Albrecht] as a result of [Albrecht] having entered into the Contract [8001]," other than the existence of an outstanding verbal commitment reflecting similar, if not identical, terms?

Grobien) and his special knowledge of the relevant entities' financial statuses as well as Debtor's financial strain at the time surrounding the October 6th board vote, limited his exposure to potential personal liability if the Verbal Earlam Agreement was called upon in the event Albrecht was unable to perform Contract 8001 (as indicated by the negotiations found in emails between Adams and Grobien prior to the October 6th meeting and ultimately declared in Grobien's October 6th email).   While Defendants did provide evidence that preferring himself may not have been Earlam's sole motivation for his actions in relation to Contract 8001, the Court nonetheless finds that his actions to limit or delay his personal liability or the prospect thereof at the time of the transfer created a preference for himself.

### c.   Damages to Ginners Proximately Resulting from Earlam's Breach of Duty: Whether Earlam's preference proximately caused the Ginners' breach of contract-based damages.

To establish liability for Earlam's breach of fiduciary duty, Plaintiffs were required to show that their damages were proximately caused by Earlam's actions regarding the replacement of Contract 8001, for which Earlam had potential liability to Albrecht under the Earlam Agreements. The evidence at trial indicated that Plaintiffs' damages were proximately caused by Debtor's breach of the Ginner Contracts due to its inability to purchase the Ginners' cotton—an inability unrelated to the replacement of Contract 8001.  The preponderance of evidence shows that Debtor lacked the ability to accept and pay for the cotton contracted to be sold to it by Plaintiffs during the periods for performance set forth in the Ginner Contracts.[48]   The combination and timing of three primary factors caused Debtor's failure to perform the Ginner Contracts according to the

---

[48] The trial testimony of various representatives of Plaintiffs consistently emphasized that Plaintiffs were made aware in October meetings at their respective gins that Debtor was in no position to accept the contracted cotton in the fall of 2008.  This is further indicated by express references to issues with delivery found in letters sent during the relevant time period, two of which are specifically discussed herein in relation to Plaintiffs' remaining claims for fraud, negligent misrepresentation, and promissory estoppel.

original terms: (1) unpredictable market fluctuations which affected pricing and buyer interest;[49]

(2) Debtor's limited cash flow/revenues due to the failure to sell and collect on existing old crop

cotton; and (3) BB&T's declaration of default based upon a violation of its credit line agreement,

which forced Debtor to liquidate and wind down its business by denying access to critical operating

capital. Each of these contributing factors were independent of Earlam's preferential action and

the replacement of Contract 8001 with the Subsidiary Contracts.

As discussed in relation to the issue of Debtor's solvency at the time of the October 6th

vote, Debtor's financial condition was incredibly weakened by a falling cotton market beginning

on or around January of 2008 with sharp and unpredictable declines continuing throughout the

year. The market was so volatile that it wreaked havoc on many old and established cotton

merchants, many of which also ultimately closed as a result during this time period. Without

revenues from the old crop cotton and without a stable market in which Debtor could obtain new

buyers, the evidence indicates that Debtor would have been forced to rely almost entirely on an

advancement of credit under its largest credit line to purchase the contracted cotton from the

Ginners. When Debtor lost access to the BB&T credit line, Debtor's inability to perform the

Ginner Contracts became inevitable, regardless of whether Contract 8001 remained in place. In

order to demand or receive payment under Contract 8001, Debtor was first required to actually

purchase the cotton from the Ginners, something it could not do subsequent to the BB&T default.[50]

Although evidence was presented that Debtor had access to other smaller credit lines, they

appeared insufficient to allow for performance of the Ginner Contracts.

---

[49] Even representatives for Plaintiffs testified at trial that the cotton market in 2008 was experiencing unpredictable
fluctuations.
[50] As proven by testimony and evidence at trial, including the introduction of Debtor's credit line agreement with
BB&T, Debtor's default on its largest and most important credit line was brought about because of inventory issues
created by unhedged cotton in Debtor's possession (which it received prior to the timeframe for any delivery under
the Ginner Contracts). Plaintiffs did not offer any evidence indicating a causal relationship between these inventory
issues and the Ginner Contracts or Earlam's preferential action.

Because Debtor's breach of the Ginner Contracts—which, as Plaintiffs have repeatedly agreed, caused the damages alleged in this action—was not proximately caused by Earlam's efforts to prefer himself by replacing Contract 8001, Plaintiffs cannot succeed on their claims against Earlam for a breach of fiduciary duty to creditors and judgment is appropriate in favor of Defendants. The Court is not convinced that Debtor's loss of Contract 8001 was the proximate cause of Plaintiffs' damages in light of other factors and finds Plaintiffs failed to meet their burden of proof. Therefore, in the absence of proof of proximate cause, the Court must find in favor of Defendant Earlam as to all Plaintiffs' claims for breach of fiduciary duty.[51]

## IV.    Representation Claims

At trial, the following causes of action were asserted based on statements Earlam allegedly made during various visits to Plaintiffs' respective cotton gins in October of 2008: (1) fraud claims against Earlam personally, brought by Arabi, BCT, Coley, and Jones County; (2) fraud claims against Plexus Limited, brought by BCT, Coley, Henry County, and Jones County; (3) negligent misrepresentation claims against Earlam personally, brought by Arabi, BCT, and Coley; (4) negligent misrepresentation claims against Plexus Limited, brought by Arabi, BCT, and Coley; and (5) a promissory estoppel claim against Plexus Limited, brought by Henry County.[52]

---

[51] The Court also notes that even if the Ginners had chosen to exercise their rights under the Ginner Contracts to subject Debtor to arbitration based on Clarke, Adams, and Earlam's representations as to Debtor's ultimate ability to perform, the fact that Earlam acted to prefer himself by replacing Contract 8001's purchase obligations and delivery rights would be of no consequence. Debtor lacked the financing to purchase and deliver the Ginners' cotton in the first place, the necessary predicate for Albrecht or the Subsidiaries to call upon the Earlam Agreements. Considering the evidence indicating Debtor's inability to purchase the Ginners' cotton on the "front end" of the transaction (prior to Debtor's required performance under either Contract 8001 or the Subsidiary Contracts), the Ginners' arbitration efforts against Debtor, if pursued at an earlier time, would have likely resulted in the very same outcome the Ginners faced after entering arbitration later in 2009.

[52] As noted in the Court's prior Summary Judgment Order and as clarified at trial in response to Defendants' motion for judgment as a matter of law in relation to certain claims of the Assignor-Gins, Plaintiffs do not possess the right to pursue any claims on behalf of the Assignor-Gins based on the representations allegedly made by Earlam due to issues with assignability of such claims and the absence of admissible evidence in relation to such claims.

Specifically, Plaintiffs contend that Earlam stated that he and/or Plexus Limited[53] "stood behind" the Ginner Contracts, which Plaintiffs interpreted to mean that Earlam and/or Plexus Limited intended to ensure Debtor's performance.[54] Considering common factual allegations and the basic elements of each cause of action related to the alleged statements, the Court will refer to these claims collectively as Plaintiffs' "representation claims."

Representatives of Plaintiffs offered testimony at trial which was identical to that offered during their prior depositions on this subject.[55] Consistently Plaintiffs testified through their respective representatives that Earlam and other members of Debtor's board of directors visited their places of business during the month of October 2008 and discussed the volatility of the cotton market, Debtor's inability to perform the Ginner Contracts, outstanding issues with Debtor's old crop cotton, and, most importantly to these representation claims, the alleged promises offered by Earlam that he and/or Plexus Limited "stood behind" Debtor's performance of the Ginner Contracts. Throughout the course of this litigation, Earlam has vehemently denied he made such statements, stating during trial that he, being English, was not familiar with the phrase "stand behind" being used to mean a promise or guarantee of performance and has never used such a phrase when speaking with the Ginners or others. Regardless of the competing testimony as to whether these "stand behind" statements were made during the October 2008 meetings, the Court

---

[53] Some representatives of Plaintiffs who participated in the meetings testified that they believed Earlam was functioning as a representative of Plexus Limited with an apparent authority to speak on the corporation's behalf, whereas others believed he spoke in either his personal capacity only or both personally and as an agent of Plexus Limited.

[54] Other claims relating to Plexus Limited's and/or Earlam's failure to disclose and/or misrepresentation of Debtor's solvency in the spring and summer of 2008 were dismissed in the Summary Judgment Order in favor of Defendants. Furthermore, when reviewing Plaintiffs' claims at summary judgment regarding other representations made by Plexus Limited and/or Earlam aside from the "stand behind" statements—namely, any assurances as to *Debtor's* future performance of the Ginner Contracts—the Court found an absence of genuine issues of material fact and dismissed those claims as well in favor of Defendants. The representations presently at issue are only those described as the "stand behind" statements.

[55] Specific relevant excerpts from these depositions are included in the Court's prior Summary Judgment Order. *See Joseph Walker*, 522 B.R. at 202–06.

finds that Plaintiffs' representation claims fail based upon the absence of evidence indicating that Plaintiffs did in fact rely on the "stand behind" statements and that any alleged reliance was the proximate cause of their damages. Even accepting Plaintiffs' testimony about the alleged promises made by Earlam, individually and/or on behalf of Plexus Limited, their respective claims for fraud, negligent misrepresentation, and promissory estoppel cannot be successful because each of these causes of action require proof that Plaintiffs' damages stemming from Debtor's ultimate nonperformance of the Ginner Contracts[56] were proximately caused by their reliance on these alleged statements. *See, e.g., Carolina Cas. Ins. Co. v. R.L. Brown & Assocs., Inc.*, No. Civ. A. 1:04-CV-3537, 2006 WL 3625891, at *5 (N.D. Ga. 2006) (stating that a viable cause of action for negligent misrepresentation requires proof that the statements at issue were "'reasonably relied upon to the detriment of a third party whose reliance was foreseeable'") (quoting *Smiley v. S & J Invs., Inc.*, 260 Ga. App. 493, 496, 580 S.E.2d 283, 287 (2003)); *In re Peak*, No. 12-01424-8-ATS, 2013 WL 4478954, at *3 (Bankr. E.D.N.C. Aug. 20, 2013) (describing fraud as requiring proof of a "(1) false representation; (2) knowledge that the representation was false; (3) intent to deceive; (4) justifiable reliance on the representation; and (5) proximate cause of the damages"); *In re Steinmetz*, C/A No. 07-00628 & 07-00579, Adv. P. No. 10-80177, 2011 WL 4543894, at *6 (Bankr. D.S.C. Mar. 18, 2011) ("'The failure to prove any element of fraud or misrepresentation is fatal to the claim.'") (quoting *Schnellmann v. Roettger*, 373 S.C. 379, 382, 645 S.E.2d 239, 241 (2007)); *ExxonMobil Corp. v. Ala. Dep't of Conservation & Natural Res.*, 986 So.2d 1093, 1114 (Ala. 2007) ("The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation.") (quoting *Saia Food Distribs. & Club, Inc. v. SecurityLink from Ameritech,*

---

[56] At trial, Plaintiffs presented three methods for the Court to consider in any calculation of their alleged damages. All three methods centered on Debtor's ultimate breach of the Ginner Contracts in January of 2009.

*Inc.*, 902 So.2d 46, 57 (Ala. 2004)) (internal quotation marks omitted); *Helms v. Holland*, 124 N.C.

App. 629, 635, 478 S.E.2d 513, 517 (1996) ("Justifiable reliance is an essential element of both

fraud and negligent misrepresentation."); *Crawford v. Williams*, 258 Ga. 806, 375 S.E.2d 223, 224

(1989) (holding that under Georgia common law, proof of fraud requires: (1) a false representation

by a defendant; (2) scienter; (3) an intent to induce the plaintiff to act or refrain from acting; (4)

justifiable reliance by the plaintiff; and (5) damage to the plaintiff resulting from the reliance);

*Mazer v. Jackson Ins. Agency*, 340 So.2d 770, 773 (Ala. 1976) (requiring a plaintiff to show that

he acted upon a defendant's promissory statements "in such a manner as to change his position for

the worse; in other words, he must so act that he would suffer a loss if he were compelled to

surrender or forego or alter what he has done" in order to hold the defendant liable under a claim

of promissory estoppel according to Alabama law) (quoting *Jacksonville Pub. Serv. Corp. v.

Calhoun Water Co.*, 219 Ala. 616, 618–19, 123 So. 79 (1929)).  The Court will address Plaintiffs'

failure to meet their burden on these elements common to the representation claims, beginning

first with reliance.

### a.  Reliance

Plaintiffs' separate causes of action for fraud, negligent misrepresentation, and promissory

estoppel under the state laws of Alabama, Georgia, and North Carolina each require proof of a

particular form or level of reliance on the "stand behind" statements as a prerequisite for their

recovery of damages against Earlam and/or Plexus Limited.  *See Sykes v. Payton*, 441 F. Supp. 2d

1220, 1223 (M.D. Ala. 2006) ("'[T]he gravamen of the claim of promissory estoppel [in Alabama]

is detrimental reliance.'") (quoting *Wyatt v. BellSouth, Inc.*, 18 F. Supp. 2d 1324, 1325 (M.D. Ala.

1998)) (alterations in original); *Wingate Land, LLC v. ValueFirst, Inc.*, 722 S.E.2d 868, 869–70

(Ga. Ct. App. 2012) (allowing for liability to attach to third parties for negligent misrepresentation

only "[i]f it can be shown that the representation was made for the purpose of inducing third parties to rely" and the "reliance by the third party [was] justifiable"); *Saia Food Distribs.*, 902 So.2d at 57 (listing reasonable reliance as an essential element of fraud claims under Alabama law); *Helms*, 478 S.E.2d at 517 (listing justifiable reliance as "an essential element of . . . fraud"); *Crawford*, 375 S.E.2d at 224 (requiring proof of "justifiable reliance by the plaintiff" for viable action for fraud under Georgia law).  The Court finds that Plaintiffs did not meet their burden of proof on this issue.

While the reliance elements within Plaintiffs' various representation claims differ slightly, the overall theme and baseline standard is essentially the same: Reliance, in a general sense, is evidenced by "dependence or trust by a person, esp[ecially] when combined with action based on that dependence or trust."  Black's Law Dictionary (10th ed. 2014).  The testimony from the various representatives of Plaintiffs at trial made clear that while Plaintiffs may have taken and/or limited certain actions or delayed delivery to some degree under the terms of the Ginner Contracts due to statements from agents of Debtor regarding Debtor's ability to perform, the evidence does not support the allegation that Plaintiffs' actions or lack thereof were caused by their reliance on any promise that Plexus Limited and/or Earlam stood behind the performance of the Ginner Contracts.  The November 4th letter sent to Debtor by counsel for the Ginners[57] and the actions (or inaction) from Plaintiffs which arose in conjunction with this letter bear upon this determination.

The evidence indicates that Plaintiffs had collectively discussed Debtor's situation as they understood it based on several separate meetings with Clarke, Adams, and/or Earlam and thereafter sought out legal representation as a group.  The November 4th letter makes clear that: (1) the Ginners understood at that time that Debtor was not in the financial position to perform the Ginner

---

[57] *See* Δ Exh. 75.

Contracts in accordance with their original terms as to the delivery timeframe; (2) Debtor had

openly sought delayed delivery from the Ginners, which the Ginners understood to be due at least

in part to Debtor's involvement with a foreign buyer that sought additional time to perform as well

as issues Debtor was experiencing in collecting on old crop cotton still in its inventory; (3) the

Ginner Contracts remained binding on the Ginners and Debtor, therefore entitling the Ginners to

strict enforcement of the obligations therein; (4) the Ginners hoped to find a mutually agreeable

solution to Debtor's known cash flow problems "ON THE CONDITION"[58] that Debtor fully

disclose, at a meeting requested to be held ten days after the letter's date, various requested

information relating to the aforementioned foreign buyer, Debtor's financial state, available

financing, and other details which the Ginners believed necessary for such a solution to be reached;

and (5) Debtor's failure to so disclose would prompt the Ginners to pursue all available legal

remedies.  But there is no evidence before the Court that Debtor met Plaintiffs' conditions, that the

requested meeting took place, or that Debtor disclosed to the Ginners the information demanded.

Instead, the record reflects that a meeting of the parties (other than those held at the Ginners'

various places of business in the fall of 2008) did not occur until January 12, 2009, after BB&T's

action to force Debtor's liquidation.  The greater weight of the evidence indicates that Plaintiffs'

reliance arose from its hope that Debtor would "rebound" and find solutions to its cash flow issues.

Notably absent from the November 4th letter was any specific reference to or description of

Earlam's alleged "stand behind" statements, despite the recent timing of their alleged utterance.

Neither the November 4th letter nor any other document in evidence mentions any statements made

by Earlam regarding a promise that he and/or Plexus Limited would "stand behind" Debtor's

performance of the Ginner Contracts.  In fact, the letter indicates the opposite: the Ginners were

---

[58] *See* Δ Exh. 75 (emphasis in original).

given no indication that Earlam or Plexus Limited would solve Debtor's cash flow issues, hence the letter's demand that various other financial details be disclosed.  Regardless, Plaintiffs argued at trial that certain language in the letter should be interpreted as a reference to Earlam and the alleged "stand behind" statements.  Specifically, Plaintiffs direct the Court to the letter's inclusion of a reference to Plaintiffs' threat of "pursuing claims against [Debtor's] *directors*, officers, shareholders, and *controlling agents* and employees, as provided by law, in addition to [Debtor]."  Plaintiffs argued that the letter's reference to "directors, officers, shareholders, and controlling agents" of Debtor implies that Plaintiffs were relying on the "stand behind" statements as early as November 2008, considering Earlam's role as a director for Debtor and Plexus Limited's position as one of Debtor's controlling shareholders. The Court does not agree.  Although Plaintiffs assert that this language was a direct reference to Earlam and Plexus Limited, based on the evidence, a more plausible interpretation is that the language at issue constitutes boilerplate-like language used in a demand letter to a corporate entity to encourage a response, payment, and performance.  Considering the detail and tone of the November 4th letter, reliance on Earlam's alleged statements would logically be referenced and specifically cited.  Therefore, the greater weight of the evidence does not persuade the Court that Plaintiffs would make express reference to several certain conditions but omit *entirely* any specific reference to or description of the "stand behind" statements which are now the crux of their representation claims if they did in fact expect and believe Earlam's comments to be promises on which they should rely for performance.

Even if the Court were to accept Plaintiffs' argument that the boilerplate letter language constituted a reference to Earlam and/or Plexus Limited, the Court is not persuaded that the actions or inaction by Plaintiffs taking place during the same time period suggest reliance on the "stand behind" statements.  Specifically, the actions which Plaintiffs assert arise from their reliance on

44

the Earlam's alleged statements include moving the contracted cotton into storage while waiting on instruction from Debtor to begin (or, in the case of Plaintiff BCT as discussed further below, continue) delivery, deciding to forego taking legal action against Debtor immediately following the October 2008 meetings, and attempting to procure financing to pay the farmers who provided Plaintiffs the cotton for it to be ginned prior to its planned delivery to Debtor. Plaintiffs' representatives testified throughout the course of the trial that Earlam and/or Edward Clarke requested during the fall 2008 meetings that Plaintiffs wait to deliver the contracted cotton to Debtor. Plaintiffs' testimony on this subject consistently indicated that Earlam and/or Clarke informed Plaintiffs of Debtor's issues with receiving payment on old crop cotton from various third parties and that, as a result, Debtor needed more time before it could begin accepting the cotton contracted to be sold under the Ginner Contracts. Additionally, Adams, Clarke, and Earlam (all of whom participated in most, if not all, of the fall 2008 meetings with Plaintiffs) testified to the same effect.[59] Weighing the evidence, the Court finds that the primary topic of discussion at these fall 2008 meetings were Debtor's requests for Plaintiffs to delay delivery in order to provide Debtor with more time to get existing inventory out and paid for before January and allow for an extended timeframe for an offsetting purchase of the cotton from Debtor by a foreign buyer.[60]

---

[59] Specifically, Adams and Clarke were questioned at length about a document purporting to be an outline of the talking points for the various meetings at Plaintiffs' respective places of business. *See* Δ Exh. 152. This document, which contains Clarke's handwritten annotations, includes the presentation of three suggested courses of action that Debtor asked Plaintiffs to consider: (1) "walk away from your contract with [Debtor]"; (2) "hold tight and give us time to make these current crop shipments"; or (3) "file legal papers against [Debtor.]" Plaintiffs were told that "option number 2 is the least bad for you" and that Debtor would "continue to stay in touch with [Plaintiffs] as [it] progress[ed] with [its] shipments." While this document does contain reference to "PCL," which Clarke admitted to the Court likely stood for Plexus Cotton Limited, Plaintiffs failed to present any compelling evidence as to (1) whether "PCL" was noted on the document by Clarke after the various meetings' completion as well as (2) how the "PCL" annotation relates to any of Plaintiffs' supposed acts of reliance. Therefore, the Court finds Defendants' Exhibit 152's minor reference to Plexus Limited to be unconvincing with regard to the reliance elements of Plaintiffs' representation claims.

[60] Trial testimony of representatives of Plaintiffs indicated that neither Earlam, Adams, nor Clarke specifically identified this "foreign buyer" during the various fall 2008 meetings. Instead, Plaintiffs provided testimonial evidence that these agents of Debtor vaguely informed them that an unnamed foreign buyer which contracted to purchase the Ginners' cotton from Debtor after the Ginners' delivery had requested additional time to do so.

In reviewing Plaintiffs' representatives' statements, the evidence before the Court makes it more likely than not that any acts of reliance, include delayed delivery and the decision to forestall pursuit of legal action against Debtor, were based upon requests from Earlam and agents of Debtor (i.e., Clarke) that Plaintiffs give Debtor more time to receive payment on its old crop cotton, not the alleged "stand behind" statements.  For example, Linda Exum testified that BCT's election to withhold delivery beyond the rejection of the second shipment was out of reliance on Earlam and Clarke's statements that Debtor needed time to collect payments on its old crop cotton inventory before Debtor could accept delivery from BCT or the other Plaintiffs, *not* because BCT or its agents were under the impression that delayed delivery would somehow trigger a responsibility owed by Plexus Limited and/or Earlam to "stand behind" the contracts.[61] Additionally, Mike DeShazo on behalf of Alabama Plaintiff Henry County discussed its early October 2008 meeting with Earlam and two other of Debtor's board members in which DeShazo recalled being told that Debtor "needed us to just give them time . . . and if we did that they'd be fine."  Plaintiff Henry County and the others did just that: They did not attempt to deliver the contracted cotton in order to give Debtor the extra time its agents said was needed.[62]  The testimony of other Plaintiffs' representatives echoed that of Exum and DeShazo, painting a consistent picture of reliance on *Debtor's* promises of future performance through statements made by Clarke and/or

---

[61] Furthermore, as additional evidence of Plaintiff BCT's reliance on representations unrelated to the "stand behind" statements, the Court is persuaded by the absence of any reference to the statements, Earlam, or Plexus Limited in an October 29, 2008 letter sent by Van Murphy on behalf of BCT to Debtor.  *See* Δ Exh. 70.  The Court finds it reasonable to conclude that this letter, similar to that which was sent by Plaintiffs collectively in November and discussed further above, did not mention the "stand behind" statements because they were most likely not the representations on which Plaintiffs' relied at the times relevant to the representation claims as they are presently before the Court.

[62] DeShazo of Plaintiff Henry County also testified that he followed up with Edward Clarke after these meetings, *not* Earlam, which tips the scales in favor of Defendants' position that any alleged reliance on statements of any sort from the fall 2008 meetings was most likely a consequence of Clarke's statements rather than any made by Earlam, either individually or in his capacity as an agent of Plexus Limited.  DeShazo testified that he made numerous follow-up phone calls to Clarke after the fall 2008 meetings regarding assurances of performance of the Ginner Contracts. When questioned as to whether he made similar attempts to communicate with Earlam or any other party affiliated with Plexus Limited to inquire as to the "stand behind" statements, DeShazo testified that he did not.

Adams, not any pledge or promise that Earlam and/or Plexus Limited would step in and take over

the obligations recited in the Ginner Contracts if Debtor did not ultimately perform.  Notably,

when questioned on their point of contact for following up on the matters discussed at the fall 2008

meetings and Debtor's ultimate performance, representatives for Plaintiffs clearly and consistently

testified that Clarke, not Earlam or any agent of Plexus Limited, is whom they would reach out to

by telephone or email.  Plaintiffs' representatives testified repeatedly that they along with their

fellow directors at their respective gins believed in Debtor and its ability to survive the volatile

market.  This testimony supports the conclusion that if the circumstances of this case involve

reliance to any degree on what was said in the fall 2008 meetings, such reliance was in direct

relation to statements about Debtor's ability to perform and requests for delayed delivery, *not* the

alleged "stand behind" statements.

The Court in its Summary Judgment Order specifically separated out Plaintiffs' fraud,

negligent misrepresentation, and promissory estoppel claims into two groups: those relating to

Debtor's future performance and those tied to Earlam, individually and/or on behalf of Plexus

Limited, promising to "stand behind" the Ginner Contracts and guarantee their future performance.

The former were resolved in favor of Defendants in the Summary Judgment Order and the latter

are what remained at trial.  As discussed above, Plaintiffs failed to meet their burden by a

preponderance of the evidence or otherwise to show reliance on the "stand behind" statements.

### b.  Causation

Plaintiffs further failed to prove another common element of the representation claims:

causation.  As noted above, the parties have consistently agreed that Debtor breached the Ginner

Contracts in mid-January 2009.[63]  Defendants contend this breach was predicated entirely by

---

[63] The ACSA arbitration award, which was not appealed by the participating parties, found the date of Debtor's breach
of the Ginner Contracts to be January 12, 2009.  The evidence at trial supports this finding.

Debtor's lender, BB&T, eliminating Debtor's access to a much needed credit line in December

2008 for reasons unrelated to the Ginner Contracts.[64]  Although testimony was presented at trial

that Debtor may have had access to limited capital outside of this particular credit line, the

existence of such is not a relevant consideration to the issues of causation presented by the various

representation claims, because no evidence connects Earlam's "stand behind" statements or

Plaintiffs' alleged reliance thereupon to Debtor's ability to execute its obligations under the Ginner

Contracts.  The determinative question is whether Plaintiffs' reliance on the alleged "stand behind"

statements proximately caused them to suffer the contract damages claimed in the Amended

Complaint.  If Debtor's inability to perform the Ginner Contracts would have occurred regardless

of whether Earlam made the "stand behind" statements, it cannot be said that any reliance thereon

caused Plaintiffs' damages.

The evidence before the Court shows that it was more likely than not that Debtor would

not have accepted Plaintiffs' cotton if they had attempted to deliver it rather than forebear due to

its overall weakened financial condition and that such fact was reasonably known by Plaintiffs at

all relevant times.  In short, Plaintiffs' damages were not caused by their reliance, even if such

reliance did in fact exist, with respect to the "stand behind" statements.  Witnesses for Plaintiffs

and Defendants alike consistently agreed at trial that Earlam and other members of Debtor's board

of directors made clear in the October 2008 visits that Debtor was not in a position to accept

Plaintiffs' cotton in the fall of 2008.  Plaintiffs' concerns as to *these* statements, not the alleged

"stand behind" statements, is reflected in the various emails, letters, and testimony before the

---

[64] Specifically, on December 17, 2008, BB&T, Debtor's primary lender, asserting default, forced Debtor to begin
liquidating some of its assets and wind-down its business.  At trial, Edward Clarke, Dave McCarthy, and Earlam all
testified that this default came about as a result of Debtor's failure to abide by certain covenants in its credit agreement
with BB&T requiring Debtor to maintain a physical cotton inventory with no more than 10,000 unhedged bales.
Debtor's credit agreement with BB&T was introduced as evidence at trial and reflects terms consistent with this
testimony.

Court.  Even if Earlam did in fact state that he and/or Plexus Limited "stood behind" Debtor's performance of the Ginner Contracts, it is apparent that Plaintiffs' damages—which are directly connected to Debtor's ultimate breach—arose from Debtor's financial troubles and the absence of necessary credit to purchase the contracted cotton during the timeframe originally provided by the Ginner Contracts.  Even with Plaintiffs' temporary forbearance, Debtor's financial circumstances did not improve to the degree that it would be able to perform.  This would have occurred regardless of whether Earlam, individually and/or on behalf of Plexus Limited, ever spoke the words "stand behind" in the October 2008 meetings or elsewhere.  BB&T called Debtor in default on its credit line covenants for reasons unrelated to Debtor's contracts with Plaintiffs or Earlam's alleged representations to Plaintiffs or any other parties in relation to support that might be provided by him or Plexus Limited.  In the absence of a causal link between Plaintiffs' alleged reliance on Earlam's "stand behind" statements and Plaintiffs' damages, Plaintiffs remaining representation claims must fail as a matter of law.  Plaintiffs failed to meet their burden of proof.

## CONCLUSION

Based on the foregoing reasons, the Court finds judgment is appropriate in favor of Defendants Earlam and Plexus Limited on all remaining claims in this adversary proceeding.


**AND IT IS SO ORDERED.**